UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EDMUND J. SUSMAN JR. and all
similarly situated individuals,

              Plaintiff,

    v.

ANN MARIE T. SULLIVAN, M.D., in her
official capacity,

              Defendant.

_____

              24-CV-1281-LJV
              DECISION & ORDER

On December 31, 2024, the plaintiff, Edmund J. Susman Jr., commenced this action under 42 U.S.C. § 1983. Docket Item 1. Susman asserts claims against the defendant, Ann Marie T. Sullivan, M.D., in her official capacity as the Commissioner of the New York State Office of Mental Health ("OMH"). *Id.* at 1.[1] More specifically, Susman alleges that New York Mental Hygiene Law § 7.09(j) ("section 7.09(j)") and a related state regulation ("rule 543") violate his Second and Fourteenth Amendment rights. Docket Item 1 at ¶¶ 148-53; *see also* N.Y. Mental Hyg. Law § 7.09(j); 14 N.Y. Comp. Codes R. & Regs. §§ 543.1-543.6.

Two days after filing the complaint, Susman moved for a temporary restraining order ("TRO") and a preliminary injunction with respect to his Second Amendment claims; more specifically, he asked this Court to enjoin Sullivan from enforcing section

_____
[1] Page numbers in docket citations refer to ECF pagination.

7.09(j) and rule 543 against him.[2]  Docket Item 5.  Sullivan responded to the motion for a TRO and a preliminary injunction, Docket Item 16, and Susman replied, Docket Item 21.  On February 11, 2025, this Court heard oral argument.[3]  Docket Item 26.

For the reasons that follow, this Court denies Susman's motion for a TRO and a preliminary injunction.

## BACKGROUND[4]

Susman is a military veteran who "has been regularly armed with a firearm personally []or in his employment capacity for over 30 years, without incident."  Docket

---

[2] Susman's motion is based only on his Second Amendment, and not his Fourteenth Amendment, claims, and so this Court does not consider the latter here. *See* Docket Item 16 at 41-42; Docket Item 21 at 7 n.2.

[3] Susman also moved to expedite his motion.  Docket Item 6.  As the Court already has received briefing and heard argument on Susman's motion for a TRO and a preliminary injunction, his motion to expedite is denied as moot.

[4] The following facts are taken from the complaint, Docket Item 1; from Susman's medical records, Docket Item 23 at 46-231, which were submitted by Sullivan in support of her opposition and filed under seal, and from a signed declaration about OMH practices that also was submitted by Sullivan, Docket Item 16-1.  The parties generally agree about the underlying facts; when they do not, the Court notes the disagreement.

"A hearing is generally required on a properly supported motion for [a] preliminary injunction if material facts are in dispute."  *Mercado v. Dep't of Corr.*, 2017 WL 1095023, at *2 (D. Conn. Mar. 23, 2017) (citing *Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003)); *see Commodity Futures Trading Comm'n v. Incomco, Inc.*, 649 F.2d 128, 131 (2d Cir. 1981) ("The existence of factual disputes necessitates an evidentiary hearing followed by the making of findings of fact and conclusions of law as required by [Federal Rule of Civil Procedure] 52(a) before a motion for a preliminary injunction may be decided.").  "An evidentiary hearing is not required," however, "when the relevant facts either are not in dispute . . . or when the disputed facts are amenable to complete resolution on a paper record."  *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (citations omitted).  Further, "[a] party may, of course, waive its right to an evidentiary hearing."  *Id.*

Item 1 at ¶¶ 75-76.  He "is currently employed as a Special Agent with the [U.S. Department of State's] Bureau of Diplomatic Security" and "serves as a Liaison Agent to [the] Joint Terrorism Task Force" of the Federal Bureau of Investigation ("FBI") in Buffalo, New York.  *Id.* at ¶¶ 79-80.  He also "serves on protective details for senior U.S. and foreign diplomats in the U[nited States] and abroad, including [in] high threat environments, [and he] conducts advance security surveys and site assessments."  *Id.* at ¶ 81.

        In 2015—almost a decade ago—Susman was hospitalized at Erie County Medical Center ("ECMC")[5] for several days after experiencing a mental health episode. *Id.* at ¶¶ 103-08.  Susman says that he "was experiencing suicidal ideations" and "sought to discuss some personal issues with a counselor."  *Id.* at ¶¶ 103-04.  He therefore asked his wife to drive him to a hospital for an evaluation, and she did so.  *Id.* at ¶ 103.  Susman stresses that he "had not . . . taken any steps to harm himself," nor

---

        In response to this Court's questions at oral argument on February 11, 2025, Sullivan stated that in her view, no hearing was required for the Court to rule on the motion for a TRO and a preliminary injunction.  In a letter filed shortly after oral argument, Susman agreed, stating that he "joins [Sullivan's] position that no factual hearing is required to reach a determination on the merits of [the] motion for a preliminary injunction, and requests that a final determination be made to allow [Susman] to proceed to an appeal, if necessary."  Docket Item 25 at 1.  Susman also submitted a "citation to the federal NICS Indices."  *See id.*; Docket Item 25-1.  For the reasons stated in this decision and order, the Court agrees that a hearing is not required:  The parties do not dispute any material fact that would impact the Court's application of the law here.

        [5] Susman's complaint does not name the facility, instead referring to it simply as "the hospital[]."  *See* Docket Item 1 at ¶ 108.  But the medical records submitted under seal by Sullivan clearly identify the hospital as ECMC, *see* Docket Item 23, and Susman has not disputed the accuracy of those records.

did he have a plan to do so; in fact, he says, he has never taken any such steps. *Id.* at ¶¶ 104-05. Instead, he "simply sought to speak with someone." *Id.* at ¶ 107.

Sullivan disputes some of this account, suggesting that Susman was in considerably more distress than simply wanting to speak with someone. *See* Docket Item 16 at 10; *see also* Docket Item 23. Nonetheless, both parties agree that Susman was experiencing suicidal ideation and that he sought help from a hospital. And they largely agree about what happened in connection with that hospital visit.

Susman "was observed and evaluated" in the "Comprehensive Psychiatric Emergency Program" ("CPEP") at the ECMC emergency room. *Id.* at ¶ 108. He then was admitted under New York Mental Hygiene Law § 9.39;[6] in his telling, he "voluntarily admitted himself" to the CPEP. Docket Item 1 at ¶¶ 108-110. At no point was he ever "adjudicated by any court or other formal body as being a 'dangerous' individual or 'insane.'" *Id.* at ¶ 113. In fact, he was discharged from the hospital "[w]ithin days." *Id.* at ¶ 114.

Susman says that he was never "provided with any notice that, by voluntarily admitting himself to [the] CPEP to speak with someone[,] he was forfeiting his Second Amendment rights." *Id.* at ¶ 116. And, he says, had he "known that New York would terminate his Second Amendment rights simply because he voluntarily went to [ECMC] to speak with someone, he never would have asked his wife to drive him there." *Id.* at

---

[6] In his complaint, Susman states that he was admitted under Mental Hygiene Law section "9.39/9.40," Docket Item 1 at ¶ 109, and notes that he refers to the two sections "interchangeably," *see id.* at ¶ 71 n.13. The medical records suggest that Susman was admitted only under section 9.39, *see* Docket Item 23, and Susman's reply in support of his motion for a TRO and a preliminary injunction refers only to that section, *see* Docket Item 21; *see also* Docket Item 16. So throughout this decision, this Court, much like the parties, discusses only section 9.39.

¶ 117.  But unbeknownst to Susman, ECMC reported his section 9.39 commitment to OMH, which in turn reported the information to the FBI's National Instant Criminal Background Check System ("NICS").  *Id.* at ¶ 118.  And according to Susman, "OMH continues to report [Susman] to NICS . . . and other law enforcement agencies as a 'prohibited person'" who cannot purchase a gun.  *Id.* at ¶ 135.

Sullivan, for her part, disputes Susman's contention that "OMH somehow 'continues' to transmit the information about his hospitalization."  Docket Item 16 at 22 n.2; Docket Item 16-1 at ¶ 34.  According to the declaration Sullivan submitted from Yacine Ounis, "an attorney in [OMH's] Counsel's Office," ECMC submitted a record of Susman's section 9.39 "commitment to the Person-based Electronic Response Data System, which resulted in an entry in [the] NICS [database]."  Docket Item 16-1 at ¶¶ 1, 34.  According to OMH, "[t]hat process is automatic and computerized; no OMH representative took any action regarding [Susman,] . . . [n]or has OMH taken any action since that time that had any bearing on [Susman's] inclusion in the NICS database."  *Id.* at ¶¶ 35-36.

But both sides agree about what happened next—the event that led to this lawsuit.  On November 22, 2024, almost a decade after his admission to ECMC, Susman attempted "to purchase a firearm" from a federal firearms licensee—referred to throughout this opinion as a firearms dealer—and so "underwent a NICS background check."  *Id.* at ¶ 97.  His purchase then "was denied by NICS."  *Id.* at ¶ 98.

Susman was entirely confused about why this transaction would be denied, and so he promptly contacted the New York State Attorney General's Office.  *Id.* at ¶ 99.  That office informed him that he had been denied under 18 U.S.C. § 922(g)(4), "which

prohibits a person who has been adjudicated as a mental defective or has been

committed to a mental institution at 16 years of age or older from possessing a firearm."

*Id.* at ¶ 100.

The Attorney General's office also told Susman that "from [his] email," it

"sound[ed] like" his admission had been "voluntary" and perhaps had been

"mischaracterized as involuntary."  Docket Item 5-3 at 2.  It informed Susman that if that

was the case, he could submit identifying documents to OMH, which would confirm the

error.  *Id.*  "Upon confirmation, the records that triggered the denial w[ould then] be

removed from the federal NICS database."  *Id.*

In other words, the Attorney General's office suggested that Susman try to fix the

problem administratively.  Instead, he filed this lawsuit.  *See* Docket Item 1.  He also

moved for a TRO and a preliminary injunction, Docket Item 5, and the parties briefed

that motion as described above.

Susman says that he currently cannot carry or possess a gun without exposing

himself to criminal prosecution and that his inability to exercise his Second Amendment

rights jeopardizes both his job and his safety.  Docket Item 1 at 26, ¶¶ 6-8.[7]  Indeed, in

his reply, Susman submitted an unsigned declaration stating that "because [he] cannot

perform [his] job duties unarmed, [he] ha[s] been forced to expend[] 160 hours of [his]

---

[7] Susman attached a signed declaration to his complaint in which he attested to
these facts.  Docket Item 1 at 25-27; *see L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d
419, 422 (2d Cir. 2011) ("A complaint is . . . deemed to include any written instrument
attached to it as an exhibit, materials incorporated in it by reference, and documents
that, although not incorporated by reference, are integral to the complaint." (internal
quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))).

Because the declaration has its own paragraph numbering, the Court cites the
relevant page and paragraph number when referring to it.

annual leave time to date, which will continue until the leave time is exhausted . . . in approximately 1-2 months' time."[8]  Docket Item 21-3 at ¶ 10.  He further stated that "[a]s part of [his] job duties, [he is] also required to qualify with [his] duty firearm on or before February 22, 2025," and that "[i]f [he] do[es] not qualify on or before that date, [he] will be deemed not fit[ ]for[ ]duty and either terminated or forced to retire."  *Id.* at ¶ 9.

## **LEGAL PRINCIPLES**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "When the government is a party to the suit, [the court's] inquiries into the public interest and the balance of the equities merge."  *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021).  "The standard for issuance of a temporary restraining order is identical to that for issuance of a preliminary injunction."  *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 771 (W.D.N.Y. 2020).

---

[8] There is some contradiction between the assertions in Susman's complaint and motion for a TRO and a preliminary injunction, on the one hand, and his later filings, on the other, about whether he continues to possess firearms.  For instance, in his complaint, he asserts that he "intend[s] to continue possessing [his] firearms," noting that "[c]arrying a firearm is an essential function of [his] employment."  Docket Item 1 at 26, ¶ 6; *see* Docket Item 5-4 at 14-15.  His reply in support of his motion, however, indicates that he has turned in his weapons due to his status as a prohibited person. *See* Docket Item 21 at 18; Docket Item 21-3 at ¶¶ 9-10.  Based on Susman's representations at oral argument and in his reply, it seems that he does not currently possess any firearms.

"A preliminary injunction is an extraordinary remedy never awarded as of right."
*Winter*, 555 U.S. at 24.  In fact, preliminary injunctions "should not be routinely granted."
*Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (quoting *Med. Soc. of State of N.Y. v. Toia*, 560 F.2d 535, 537 (2d Cir. 1977)).  And "[w]hen deciding whether to issue a preliminary injunction, courts 'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *We The Patriots USA, Inc.*, 17 F.4th at 279 (quoting *Winter*, 555 U.S. at 24).

## DISCUSSION

Assessing Susman's claims here requires an understanding of the statutory scheme at issue—a complex web of federal and state laws and regulations.  The Court therefore begins with a discussion of the background check system.

## I.    THE BACKGROUND CHECK SYSTEM

### A.    Federal Law and Regulations

For more than half a century, "[f]ederal law has . . . regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands."
*Abramski v. United States*, 573 U.S. 169, 172 (2014).  More specifically, under 18 U.S.C. § 922, individuals who fall into one of several enumerated categories are prohibited from "possess[ing]" or "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.'"  *Id.* § 922(g)(1)-(9).  And the same statute bars firearms dealers from selling or otherwise transferring guns to individuals who they "know[] or hav[e] reasonable cause to believe" fall into a prohibited category.  *Id.* § 922(d)(1)-(9).  Here, only one of the prohibited categories is relevant:

Section 922(g)(4) prohibits a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from purchasing or possessing a firearm, and section 922(d)(4) bars others from selling firearms to such an individual. *See id.* § 922(d)(4), (g)(4).

In 1993, to better enable enforcement of its gun control laws, Congress enacted the Brady Handgun Violence Prevention Act ("Brady Act"), which is codified at 18 U.S.C. § 922(t).  *See Robinson v. Sessions*, 721 F. App'x 20, 21-22 (2d Cir. 2018) (summary order).  The Brady Act "require[d] the Attorney General to establish a national instant background[ ]check system by November 30, 1998."  *Printz v. United States*, 521 U.S. 898, 902 (1997).  The result was NICS, which refers to the system managed by the FBI (or, more specifically, the FBI's NICS Operations Center) that provides information "on whether receipt of a firearm by a [particular person] . . . would violate [f]ederal or state law."  28 C.F.R. § 25.2; *see Robinson*, 721 F. App'x at 21-22.

Federal law and its related regulations spell out how NICS operates.  First, "before completing any sale, [a firearms] dealer must 'verif[y] the identity of the transferee by examining a valid identification document' bearing a photograph." *Abramski*, 573 U.S. at 172 (second alteration in original) (quoting 18 U.S.C. § 922(t)(1)(C)).  Each "prospective customer[ also] must complete . . . the [Bureau of Alcohol, Tobacco, Firearms, and Explosives] Form 4473, which elicits personal information and propounds questions to certify that the customer is qualified to possess a firearm under the enumerated Brady Act factors."  *Robinson*, 721 F. App'x at 22 (citing 27 C.F.R. § 478.124; 28 C.F.R. § 25.7(a); 18 U.S.C. § 922(g)(1)-(9), (n)).  The Brady

Act then requires[9] that "the dealer . . . submit that information" for a NICS background check "to determine whether the potential purchaser is for any reason disqualified from owning a firearm."[10]   *Id.* at 172-73 (quoting § 922(t)(1)(A)-(B)); *see Gazzola v. Hochul*, 88 F.4th 186, 200 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024).

---

[9] This requirement is subject to certain "limited exceptions."  *See Abramski*, 573 U.S. at 172 & n.1.  More specifically, a NICS background check is not required if the individual seeking to purchase a firearm "has presented . . . a permit" of a certain type; if "an authorized government official has verified that the information available to [the] official does not indicate that possession of a firearm" by the prospective buyer would be unlawful; or if the Attorney General has otherwise signed off on the transaction.  *See* 18 U.S.C. § 922(t)(3).  Susman has not argued that any of those exceptions apply to him, *see* Docket Items 1, 5-4, and 21; indeed, it is undisputed that Susman underwent a NICS background check when he sought to obtain a gun in November 2024, and he has not argued that was improper, Docket Item 1 at ¶¶ 97-102; *see also* Docket Items 5-4 and 21.  Instead, his quarrel is with whether the record obtained through that background check should have been in the NICS database.  *See, e.g.*, Docket Item 1 at ¶¶ 124-26; Docket Item 5-4 at 9.

[10] Whom the dealer must contact to conduct a NICS background check depends on the state where the transfer will be made.  As the Second Circuit recently explained, the default is that the FBI—and specifically the NICS Operations Center—performs the check.  28 C.F.R. § 25.2; *see Gazzola*, 88 F.4th at 200.  But federal regulations allow states to "alternatively designate a 'law enforcement agency' as a point of contact . . . to 'serv[e] as an intermediary between a[ firearms dealer] and the federal databases checked by . . . NICS.'"  *Gazzola*, 88 F.4th at 200 (quoting 28 C.F.R. § 25.2).  New York has designated the New York State Police as "a point of contact for NICS background checks," and state law "also directs the [New York] State Police to create a 'statewide firearms license and records database' containing records provided by various other state-level agencies, including" OMH.  *Id.* at 201 (quoting N.Y. Exec. L. § 228(3)).

Under federal regulations, when a state designates one of its law enforcement agencies as a "NICS point of contact," that agency—rather than the NICS Operations Center—"receive[s] NICS background check requests" from firearms dealers.  28 C.F.R. § 25.2; *see Gazzola*, 88 F.4th at 200-01.  The agency then reaches out to NICS for the system to search the federal databases.  28 C.F.R. § 25.6(d).  Such an agency also may "check state or local record systems" and then, based on the results of both inquiries, "determine whether matching records provide information demonstrating that an individual is disqualified from possessing a firearm under [f]ederal or state law, and respond to [firearms dealers] with the results of a NICS background check."  28 C.F.R. § 25.2; *see Gazzola*, 88 F.4th at 220.

In a NICS background check, the information from the customer is "compared against [several] databases," *Robinson*, 721 F. App'x at 22, including the NICS Index, an FBI-managed database containing records from both state and federal agencies; the National Crime Information Center database, a "nationwide computerized information system of criminal justice data established by the FBI as a service to local, state, and [f]ederal criminal justice agencies"; and the "Interstate Identification Index." 28 C.F.R. §§ 25.2 and 25.6; *see Sedita v. United States*, 2025 WL 387962, at *1 (D.D.C. Feb. 4, 2025) (stating that in a background check, "NICS searches relevant databases for any records suggesting that the customer may be prohibited from acquiring a firearm under federal or state law"). Based on the records that "match" the identifying information provided, a transaction is either approved, delayed, or denied. *See* 25 C.F.R. § 25.6(c)(iv), (g)(2); *see also Robinson*, 721 F. App'x at 22.

The FBI maintains a "NICS Audit Log of all incoming and outgoing transactions that pass through the system." 28 C.F.R. § 25.9(b); *see Sedita*, 2025 WL 387962, at *2. When a transaction is denied, the NICS Audit Log "retain[s]" all "records obtained or created in the course of" the background check for ten years, "after which time the[ records are] transferred to an appropriate FBI-maintained electronic database." 28 C.F.R. § 25.9(b)(1)(i); *see Sedita*, 2025 WL 387962, at *2.

---

It is not clear on the current record whether the New York State Police served as a point of contact in Susman's case. *See* Docket Item 1. Regardless, Susman does not say that OMH was involved in the NICS background check process other than by providing his 2015 hospitalization record to NICS. And for the reasons discussed below, *see infra* Section II.A.1, that is not enough to show that Susman has standing here.

B.    **New York's Role**

While NICS is a creation of the federal government, it operates with assistance from the states.  Indeed, as noted above, the NICS Index includes records from both federal and state agencies.  *See* 28 C.F.R. § 25.2.  That is by design:  In 2007, Congress passed the NICS Improvement Amendments Act, which aimed to make the federal background check system more comprehensive, including by providing grants to assist states in submitting all relevant records to NICS.[11]  *See* NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 122 Stat. 2559 (codified at 34 U.S.C. §§ 40901-40903, 40911-40917, 40931, 40941); *see also City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 428 (4th Cir. 2019); *Montgomery v. Cuomo*, 291 F. Supp. 3d 303, 315-16 (W.D.N.Y. 2018).  To be eligible for the grant money, states also must have an administrative process by which anyone barred under federal law from owning firearms based on a mental health event may obtain a certificate of relief from firearm disabilities.  *See* NICS Improvement Amendments Act of 2007, § 105 (codified at 34 U.S.C. § 40915).

In response to the NICS Improvement Amendments Act, "New York State law was amended to allow relevant mental health records to be made accessible to NICS."

---

[11] Congress passed the law in response to two mass shootings—including one at the Virginia Polytechnic Institute and State University ("Virginia Tech").  *See* NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 122 Stat. 2559.  In fact, the congressional findings explicitly refer to the Virginia Tech shooting, "the deadliest campus shooting in [U.S.] history."  *Id.*  That event underscored, in Congress's view, "the need to improve information-sharing that would enable [f]ederal and [s]tate law enforcement agencies to conduct complete background checks on potential firearms purchases" because "[i]n spite of a proven history of mental illness, the shooter was able to purchase the two firearms used in the shooting."  *Id.*

*Montgomery*, 291 F. Supp. 3d at 316.  Section 7.09(j) of New York's Mental Hygiene

Law—the statute that Susman challenges here—provides that

> [t]he commissioner [of OMH], in cooperation with other applicable state
> agencies, shall collect, retain or modify data or records, and shall transmit
> such data or records: (i) to the division of criminal justice services, or to the
> criminal justice information services division of the [FBI], for the purposes
> of responding to queries to [NICS] regarding attempts to purchase or
> otherwise take possession of firearms, as defined in 18 [U.S.C. §] 921(a)(3),
> in accordance with applicable federal laws or regulations. . . . Such records,
> which may not be used for any other purpose, shall include [the] names and
> other non-clinical identifying information of persons who have been
> involuntarily committed to a hospital pursuant to article nine of this chapter
> [among other statutes].

N.Y. Mental Hyg. Law § 7.09(j)(1); *see also Montgomery*, 291 F.Supp.3d at 316

(explaining that section 7.09(j)(1) "gives OMH authorization to collect data, including the

'names and other non-clinical identifying information of persons who [were] involuntarily

committed to a hospital,' and to make such information available to queries from NICS"

(quoting N.Y. Mental Hyg. Law § 7.09(j)(1))).

    In accordance with congressional requirements, section 7.09(j)(2) provides for a

relief from disabilities program.  *Houston v. Nassau Cnty. Police Dep't*, 2020 WL

7643132, at *3 (E.D.N.Y. Dec. 23, 2020) ("New York Mental Hygiene Law § 7.09 sets

forth a process for removing a name from the NICS list by seeking a certificate of relief

from disabilities, which is based on a determination as to whether the 'person's record

and reputation are such that such person will not be likely to act in a manner dangerous

to public safety and where the granting of the relief would not be contrary to public

safety.'" (quoting N.Y. Mental Hyg. Law § 7.09)).

    The last parts of the relevant legal scheme are the New York regulatory code

sections that implement section 7.09(j).  As relevant to this lawsuit, rule 543 essentially

reiterates section 7.09(j)'s directive about mental health records, explaining that section

13

7.09(j) "authorizes [OMH] to collect, retain, modify[,] or transmit data or records for inclusion in . . . NICS . . . for the purpose of responding to NICS queries regarding attempts to purchase or otherwise take possession of firearms."  14 N.Y. Comp. Codes R. & Regs. § 543.1(c).  The rule further notes that "[t]he records which [OMH] is authorized by law to collect, retain, modify, or transmit are expressly limited to persons who have been involuntarily committed pursuant to article 9 or 10 of the Mental Hygiene Law" or under several other statutes not relevant here.  *Id.*  Other regulations "establish the required administrative 'certificate of relief from disabilities' process."  *See id.* § 543.1(d); *id.* §§ 543.2-543.6.

## II.    MOTION FOR A TRO AND PRELIMINARY INJUNCTION

Having surveyed the legal context of this dispute, the Court now addresses the *Winter* factors.  *Winter*, 555 U.S. at 20.

### A.    Likelihood of Success on the Merits

Sullivan says that Susman cannot show a likelihood of success on his Second Amendment claims because this Court lacks jurisdiction over those claims.  *See* Docket Item 16 at 19-27.  More specifically, she argues that Susman lacks standing and that the Eleventh Amendment bars his claims.[12]  *Id.* at 19-23.  Susman contests those arguments*, see* Docket Item 21 at 14-15, and the Court therefore reviews each in turn.

_____

[12] Sullivan also argues that this Court cannot exercise jurisdiction over Susman's claims based on his failure to use the relief from disabilities process.  *See* Docket Item 16 at 23-27.  Because Congress intended that relief to be "exclusive," she says, Susman cannot bring a section 1983 suit, and, even if he could, his failure to seek administrative relief would render his lawsuit unripe.  *See id.*  She further argues that even if this Court could exercise jurisdiction, Susman "cannot demonstrate a clear likelihood of success on [the merits of] his Second Amendment claim[s]."  *See id.* at 27-41 (bold omitted).  Because this Court lacks jurisdiction over Susman's claims on

1.     **Standing**

Article III of the United States Constitution limits the jurisdiction of federal courts

to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  "For there to be a case or

controversy under Article III, the plaintiff must have a 'personal stake' in the case—in

other words, standing."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting

*Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  As the Second Circuit recently has

explained, "[t]he doctrine of standing gives meaning to the[] constitutional limits, by

requiring a plaintiff to allege such a personal stake in the outcome of the controversy as

to warrant his invocation of federal[ ]court jurisdiction and to justify exercise of the

court's remedial powers on his behalf."  *Antonyuk v. James*, 120 F.4th 941, 976 (2d Cir.

2024) (some internal quotation marks omitted) (quoting *Knife Rights, Inc. v. Vance*, 802

F.3d 377, 383 (2d Cir. 2015));  *see also TransUnion*, 594 U.S. at 430-31 (stating that

the plaintiff—"[a]s the party invoking federal jurisdiction"—"bear[s] the burden of

demonstrating . . . standing").

"[T]o establish standing, a plaintiff must show" three things: "(i) that he suffered

an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury

was likely caused by the defendant; and (iii) that the injury would likely be redressed by

judicial relief."  *TransUnion*, 594 U.S. at 423 (citing *Lujan v. Defs. of Wildlife*, 504 U.S.

555, 560-561 (1992)).  Only the second and third elements are at issue here.

To show the second element, sometimes called "traceability," "the plaintiff must

'demonstrate a causal nexus between the defendant's conduct and the injury.'"

---

standing and sovereign immunity grounds, at least as to his motion for a TRO and a
preliminary injunction, *see infra*, it need not and does not reach any of those arguments.

*Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir.1992)); *see also Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (holding that for plaintiff's injury to "be 'fairly traceable to the challenged action of the defendant,' . . . 'there must be a causal connection between the injury and the conduct complained of'" (quoting *Lujan*, 504 U.S. at 561)).  The required nexus is something "lower than that of proximate cause."  *Rothstein*, 708 F.3d at 91.  Indeed, an "indirect[]" relationship between the injury and the challenged conduct does not necessarily mean that the plaintiff lacks standing, although it may make the showing required "substantially more difficult."  *Id.* (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 44-45 (1976)).

At the same time, there is a floor:  An injury is not "fairly traceable" if it is "the result of the independent action of some third party not before the court."  *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  As the Supreme Court has held, in cases challenging a statute's constitutionality, the plaintiff must "assert an injury that is the result of a statute's actual or threatened *enforcement*, whether today or in the future."  *See California v. Texas*, 593 U.S. 659, 670-71 (2021) (collecting cases).  And courts have frequently found that an injury was not "fairly traceable" to the conduct of a defendant who did not enforce the statute causing the alleged injury.  *See Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 526 (2d Cir. 2024) (plaintiffs lacked standing when there was no risk that the defendant, New York City, would enforce the challenged statute against them); *Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*, 2021 WL 4198332, at *12 (S.D.N.Y. Sept. 14, 2021) (holding that plaintiffs failed to show that injuries caused by allegedly unconstitutional statute were

16

"fairly traceable" to New York City because the City did "not enforce" the law—a state statute—"and thus could not possibly cause any [of plaintiffs' alleged] injuries"), *aff'd*, 2024 WL 1061142 (2d Cir. Mar. 12, 2024) (summary order).

The third element, called "redressability," refers to "a non-speculative likelihood that the injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008). "There is no redressability where such depends on an independent actor who retains 'broad and legitimate discretion [that] the courts cannot presume either to control or to predict.'" *Neary v. Weichert*, 489 F. Supp. 3d 55, 67 (E.D.N.Y. 2020) (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)); *see also California*, 593 U.S. at 673 (plaintiffs had no standing to assert claims against Secretary of Health and Human Services "because he ha[d] no power to enforce [challenged law] against them" and thus could not be enjoined from doing so).

### a.    Required showing

The plaintiff's burden to establish standing changes depending on the stage of the litigation. *See Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025) ("As with any other matter on which the plaintiff bears the burden of proof, each element of standing must be supported 'with the manner and degree of evidence required at the successive stages of the litigation.'" (quoting *Lujan*, 504 U.S. at 561)); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Elias Bochner*, 118 F.4th at 518-19 (quoting *Lujan*, 504 U.S. at 561). In contrast, "[t]he evidentiary burden for establishing Article III

standing for the purposes of a motion for a preliminary injunction is at least as onerous as the burden for establishing standing to secure a summary judgment." *Do No Harm*, 126 F.4th at 113-14. Thus, "to establish standing for a preliminary injunction, 'a plaintiff cannot rest on such mere allegations as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.'" *Id.* at 119 (quoting *Cacchillo*, 638 F.3d at 404).

                    *b.    Susman's showing*

Susman undoubtedly has suffered an "injury in fact" here: His attempt to purchase a gun was denied after a NICS background check found that he was prohibited from doing so under section 922(g)(4) based on his 2015 hospitalization. *See* Docket Item 1 at ¶¶ 97-98, 100. As a result of that prohibition, Susman cannot legally carry weapons, which he is required to do for his job as a federal law enforcement officer; what is more, if he continued to carry weapons, he would be exposing himself to "criminal penalties." *Id.* at 26-27, ¶¶ 8-9.

Thus, Susman's inability to purchase or carry weapons is certainly an injury, one that he says impairs his ability both to work at his current job and to protect himself. *See id.* at 26, ¶¶ 6-8. In addition, the unsigned declaration he attached to his reply says that "[i]f [he] do[es] not qualify" with his duty firearm "on or before" February 22, 2025, he "will be deemed not fit[ ]for[ ]duty and either terminated or forced to retire." Docket Item 21-3 at ¶ 9.

Sullivan does not contest that Susman has suffered an injury in fact.[13]   Instead, she says that Susman has failed to establish the second and third standing elements—namely, traceability and redressability.  Docket Item 16 at 21-22.  That is, she says that Susman has not shown that "any of his alleged Second Amendment injuries are traceable to OMH," or that those injuries would be redressed "if [this Court] grant[ed]" his requested relief.  *See id.*

Susman counters that his injuries are directly traceable to OMH and would be redressed if this Court enjoined Sullivan—the commissioner of the agency—from enforcing section 7.09(j) and rule 543 against him.  *See* Docket Item 21 at 14-15.  Indeed, Susman's complaint asserts that the sole cause of his disarmament is OMH's report to NICS about his 2015 hospitalization.  *See, e.g.*, Docket Item 1 at ¶¶ 143-44; *id.* at 26 ¶ 8 (Susman's statement that "[d]efendant's enforcement of the challenged regulations exposes [him] to federal and state criminal penalties, prevents [him] from acquiring new firearms, and prevents [him] from possessing and carrying firearms for self-defense").  But such assertions—even if expressed in the guise of factual allegations—are nothing more than legal conclusions, which this Court has no obligation to accept.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court

---

[13] Sullivan argues that "until [Susman] makes an application [for a certificate of relief] and has it denied, he lacks standing to sue," because otherwise, he has not "'submit[ted] to the challenged policy.'"  *See* Docket Item 16 at 20-21 (quoting *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012)).  Such arguments are relevant to the first standing requirement: whether a plaintiff has proven that the alleged injury is sufficiently concrete and actual.  *See id.*  But Sullivan does not contest the fact that Susman cannot legally carry a weapon and that his inability to do so currently impacts his ability to perform his job.  *See generally id.*  In any event, because this Court finds that Susman has not met the second and third prongs of the standing requirements, the Court need not and does not address Sullivan's alternative argument that Susman was required first to pursue a certificate of relief to establish standing.

must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[Courts] are not bound to accept as true a legal conclusion couched as a factual allegation."). And, in fact, this Court cannot accept those legal conclusions here because they are simply incorrect.

Susman's theory seems to be that if OMH ceased to "enforce" section 7.09(j) against him, any bar to his ability to possess firearms would be removed. But that is not accurate for several reasons.

For one thing, this Court has no reason to believe that any action that OMH takes now with respect to Susman's hospitalization record will impact the FBI's knowledge of that record. As Sullivan points out, OMH already submitted the record to NICS some nine and a half years ago. So it is not clear that Sullivan is doing anything to enforce the statute against Susman at this time.

True, Susman asserts something somewhat different: that OMH "only recently beg[a]n to report" him and that it "continues" to do so. Docket Item 1 at ¶¶ 123, 135. But the basis for those assertions is suspect at best. Susman seems to suggest that this report must be recent because he has "successfully undergone federal high-level security clearance background checks, without incident" in the past, *see id.* at ¶ 122, although it is not apparent to this Court why such checks would necessarily involve the same criteria or databases as the NICS background check. And Susman provides no factual basis for his bald assertion that "OMH continues to report [him] to NICS," *id.* at ¶ 135, an assertion that Sullivan contests, *see* Docket Item 16-1 at ¶ 36.

Even if this Court were to accept Susman's assertion that OMH continues to transmit the record of his hospitalization and thus that its "enforcement" of the statute is

ongoing, it is undisputed that Susman's attempt to purchase a weapon was denied in November 2024 following a NICS background check. *Id.* at ¶ 97. Thus, under federal regulations, NICS has a record of that denied transaction and all related records in the NICS Audit Log, which is separate from the NICS database to which states contribute. 28 C.F.R. § 25.9(a), (b)(1)(i); *Sedita*, 2025 WL 387962, at *2. So even if OMH's transmission of the record to NICS is continuous—and even if this Court ordered it to stop—there is no basis for this Court to conclude that would prevent the FBI from accessing those records of denied transactions in the NICS Audit Log. *See* 28 C.F.R. § 25.9(a), (b)(1)(i).

In addition, and aside from any of the specifics about how NICS operates, section 7.09(j) is a *reporting* statute; by its own terms, it imposes no criminal penalties and no proscriptions. *See* N.Y. Mental Hyg. Law § 7.09(j)(1). On the contrary, it simply authorizes the transfer of records to NICS. *Id.* And rule 543 merely reiterates that directive. *See* 14 N.Y. Comp. Codes R. & Regs. § 543.1(c).

In other words, neither section 7.09(j) nor rule 543 bars anyone from purchasing or possessing a weapon. To argue otherwise is to confuse the whistleblower with the prosecutor, the person who calls in a tip with the arresting officer. Indeed, Susman implicitly admits that a federal law—section 922(g)(4)—rather than section 7.09(j) is to blame for his predicament.[14] *See, e.g.*, Docket Item 1 at ¶ 100 (stating that Susman

---

[14] Following oral argument, Susman submitted a letter in further support of his argument that this Court could order Sullivan to "change . . . or cancel" information in the NICS database and included a "citation to the federal NICS Indices." Docket Item 25 at 1; *see also* Docket Item 25-1. But the letter itself, quoting the indices, described NICS as "contain[ing] information on people who are prohibited from receiving firearms by federal or state law" and further stated that the "information helps *the FBI* make sure firearms are not sold or transferred to people who are prohibited from receiving them."

was informed that his transaction was denied under section 922(g)(4)); Docket Item 5-4 at 15 (stating that Susman is subject to prosecution under section 922(g)(4) based on OMH's reporting).

It is true, of course, that had OMH never transferred the record of Susman's commitment, NICS might never have flagged Susman, and no one may ever have identified his 2015 hospitalization as disqualifying. Seen in that light, OMH's transmission of the record would be a but-for cause of Susman's injury. But the Second Circuit has stated that for purposes of standing, showing that an injury is fairly traceable "requires more than mere 'but[-]for' causation." *Pettus v. Morgenthau*, 554 F.3d 293, 299 n.1 (2d Cir. 2009). So the fact that Susman might not have been flagged would not—without more—be enough here.

Further, and even more important, OMH's report is not even a but-for cause of Susman's possession of firearms being illegal. Instead, Susman's injury is the result of "the independent action of [a] third party not before the court"—namely, the federal government—and therefore not traceable to Sullivan. *See Bennett*, 520 U.S. at 167. That is, because section 7.09(j) is only a reporting statute that authorizes the transfer of records to NICS, it has no effect on what is actually illegal—as opposed to what is flagged as being illegal. Put still another way, NICS is a tool designed to flag unlawful transactions and thus to "prevent guns from falling into the wrong hands." *See Abramski*, 573 U.S. at 172-73. But the mere fact that someone has passed a NICS

---

Docket Item 25 at 1 (emphasis added) (citation omitted). So even based on Susman's own submission, there is no reason for this Court to believe that altering or cancelling the record here will change the fact that the federal government—and not OMH— enforces section 922(g).

background check does not mean that the person's possession of a weapon is, in fact, legal. Indeed, individuals barred under federal law from accessing weapons have nonetheless been cleared to purchase weapons through NICS, sometimes with devastating consequences. *See, e.g.*, *supra* note 11.

In other words, section 922(g), a federal statute, is the cause of Susman's injury and would continue to apply regardless of this Court's disposition of the motion here. It is undisputed that Susman was admitted to the hospital in 2015 under section 9.39, *see supra* note 6; and whether or not that admission precludes his possessing a weapon under federal law may be a question worth litigating. But the answer to that question is irrelevant to Susman's claim here.

The crux of Susman's argument is that OMH is "falsely reporting him to . . . NICS . . . as a prohibited person" based on his 2015 commitment under section 9.39. *See, e.g.*, Docket Item 5-4 at 15. But by "falsely reporting," Susman does not mean that OMH is erroneously reporting that he was committed under section 9.39 when in fact he was not. If that were his claim, he might indeed be entitled to relief: As Sullivan points out, if an agency provides an incorrect record to NICS and then "refuses to correct the information, the individual may sue for an order directing correction of the erroneous information" under 18 U.S.C. § 925A.[15] Docket Item 16 at 15. But Susman did not bring this case under section 925A, *see* Docket Item 1, and he does not claim that he was not committed under section 9.39, *see id.* at ¶ 109.

_____

[15] This Court expresses no opinion on whether such a challenge would be ripe on the record here.

23

Instead, Susman's real argument is with the interpretation of section 922(g)(4) under federal law as it intersects with section 9.39. The former makes it unlawful for anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess or purchase a firearm. 18 U.S.C. § 922(g)(4). And the statute's implementing regulations define being "[c]ommitted to a mental institution" as involving:

> [a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

27 C.F.R. § 478.11.

New York Mental Hygiene Law section 9.39, in turn, provides:

> The director of any hospital maintaining adequate staff and facilities for the observation, examination, care, and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients pursuant to this section may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.

N.Y. Mental Hyg. Law § 9.39(a). The law defines a "[l]ikelihood to result in serious harm" as meaning either:

> 1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
>
> 2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

*Id.* And courts have repeatedly held that commitments under section 9.39 are involuntary as a matter of law. *See, e.g.*, *Montgomery*, 291 F. Supp. 3d at 311-12

24

(stating that section 9.39 provides for "involuntary admission," in contrast to other sections of the Mental Hygiene Law that provide for voluntary admission); *R.M. v. C.M.*, 226 A.D.3d 153, 160, 207 N.Y.S.3d 634, 640 (2d Dep't 2024) (stating that section 9.39 "permits the emergency involuntary commitment" of certain individuals); *Colihan v. State*, 211 A.D.3d 1432, 1436, 181 N.Y.S.3d 359, 363 (3d Dep't 2022) (rejecting "any claim that petitioner's . . . admission [under section 9.39] was not an involuntary commitment within the meaning of federal law" and noting that "[c]ourts have consistently understood Mental Hygiene Law [section] 9.39 to be one of the several sections of that law that authorize involuntary civil commitment" (collecting cases)).

Susman protests that he "voluntarily" consented to a section 9.39 commitment, but that is of no moment: As one court has explained, the fact that a particular individual "may have been cooperative with the admission process . . . does not render a[ section 9.39] admission 'voluntary'" under section 922(g). *See Colihan*, 211 A.D.3d at 1437; *see also Escamilla v. United States*, 62 F.4th 367, 373 (7th Cir. 2023) (rejecting plaintiff's argument that "his admission [under section 9.39] was voluntary because he wanted to be there and never tried to leave" and stating that "whatever [plaintiff's] subjective intentions were at the time, his admission was still involuntary under New York law"). So under the plain language of section 922(g)(4) and its implementing regulations, a section 9.39 admission is disqualifying under federal law. And there is nothing that this Court can do to change that.

In fact, the Second Circuit already has found that a commitment under section 9.39 is an involuntary commitment under section 922(g)(4) and that such a commitment disqualifies an individual from purchasing a gun under federal law. *See Phelps v.*

25

*Bosco*, 711 F. App'x 63, 64 (2d Cir. 2018) (summary order).[16]  And the Seventh Circuit

reached the same conclusion in *Escamilla*, rejecting the plaintiff's argument that his

commitment in a New York hospital under section 9.39 was not a commitment under

section 922(g)(4).  *See* 62 F.4th  at 374-75.

Susman tries to distinguish *Phelps* by noting that the case "involved no

constitutional challenge."  Docket Item 21 at 13.  And he says that consistent with the

Second Amendment, section 922(g) "cannot be read to encompass" commitments

under section 9.39, which do not involve "an adjudication that an individual has a mental

illness or is a violent person."  *Id.* at 9, 11-13 (emphases omitted).  It is true that the

plaintiff in *Phelps* "did not raise a constitutional challenge to [New York officials']

conduct on appeal."  *Phelps*, 711 F. App'x at 65.  Moreover—as Susman also notes,

Docket Item 21 at 13—the Second Circuit observed that "[s]uch a [constitutional]

challenge would present complex issues, whether under the Second Amendment or the

Due Process Clause."  *Phelps*, 711 F. App'x at 65.  Indeed, the court explicitly noted

that it "d[id] not consider whether . . . concern for these constitutional rights might

change [its] interpretation of the word 'commitment' under New York's scheme."[17]  *Id.*

The problem for Susman is that none of this makes his injury any more

"traceable" to Sullivan or OMH.  For one thing, *Phelps* involved a challenge to both state

and federal defendants:  The plaintiff in that case sued, among others, the U.S. attorney

---

[16] Although *Phelps* is a non-precedential summary order, the parties do not cite—
nor has this Court found—any other Second Circuit decisions directly on point.

[17] Elsewhere, however, the Second Circuit has "held that section 9.39 facially
satisfies Fourteenth Amendment due process requirements."  *Olivier v. Robert L.
Yeager Mental Health Ctr.*, 398 F.3d 183, 188 (2d Cir. 2005).

general and the FBI director.  *See Phelps*, 711 F. App'x at 63.  In other words, the

plaintiff in *Phelps* challenged the way that both section 922(g)(4) and section 9.39—a

federal statute and a state one—were being applied to him*, see id.*, while Susman

challenges only OMH's transferring a record of his section 9.39 commitment.  And even

if this Court barred the agency from transmitting that record—indeed, even if this Court

could reverse time and prevent that record from having ever been transmitted to

NICS—that would not change the fact that Susman's section 9.39 commitment renders

him ineligible to purchase a gun under *federal* law.  *See id.* at 64; *Escamilla*, 62 F.4th at

374-75; *cf. United States v. Waters*, 23 F.3d 29, 34-36 (2d Cir. 1994).[18]  Absent a

constitutional challenge to the application of section 922(g)(4)—which Susman does not

make,[19] *see* Docket Items 5-4 and 21—this Court is unable to give him the relief that he

seeks.

The fact that Susman could seek a certificate of relief from disability through a

state process does not change this analysis.  Federal law provides that if a state grants

---

[18] In *Waters*, the Second Circuit held that an "involuntary admission" under section 9.27 of the New York Mental Hygiene Law "constitute[d] a 'commitment' within the meaning of 18 U.S.C. § 922(g)(4)."  23 F.3d at 36.  The court rejected the defendant's argument that because he was hospitalized under section 9.27 without "any formal judicial 'commitment' or adjudication of mental illness," he could not be convicted of violating section 922(g)(4).  *See id.* at 34.  While Susman's case involves a hospitalization under a different section of the Mental Hygiene Law—section 9.39, rather than 9.27—he makes a very similar argument.  Docket Item 21 at 9, 11.  The court's decision in *Phelps* relied heavily on *Waters*.  *See Phelps*, 711 F. App'x at 64-65 ("Although that decision dealt with involuntary hospitalization under [s]ection 9.27 and we deal with [s]ection 9.39 here, *Waters* provides all the guidance we need.").  And this Court sees no reason not to find it equally persuasive here.

[19] As Sullivan points out, if Susman had raised such a constitutional challenge to section 922(g), "he would have been required to provide notice to the United States Attorney General and an opportunity for the United States to intervene."  Docket Item 16 at 27 n.5 (citing Fed. R. Civ. P. 5.1(a)).  He did not do so.

"an application for relief" under a certificate of relief from disability program "with respect to an adjudication or a commitment to a mental institution . . . the adjudication or commitment, as the case may be, is deemed not to have occurred for purposes of subsections (d)(4) and (g)(4) of section 922 of Title 18."  34 U.S.C. § 40915.  In other words, if relief is granted through this state process—which Susman thus far has declined to pursue—then federal law provides that section 922(g)(4) no longer applies.  But the state has no free-floating power to otherwise determine the correct interpretation of section 922(g)(4), much less how it will be enforced.

So Susman's injury is not traceable to OMH and Sullivan:  As a matter of law, the statute that is inflicting Susman's injury is section 922(g)(4).  And for similar reasons, his injury is not redressable by this Court.  Regardless of what the Court orders OMH to do, Susman will not be able to purchase and possess a firearm legally absent some action by the federal government or a change to the interpretation of federal law in this circuit.

Courts have reached the same conclusion in similar cases.  For instance, in *Mahoney v. United States Department of the Interior*, 682 F. Supp. 3d 265 (E.D.N.Y. 2023), the plaintiffs sued several agencies to "halt construction" on a project near their homes, claiming that "onshore trenching" for the project would "worsen . . . contamination in their groundwater."  *Id.* at 266-67.  The plaintiffs argued that their injuries were sufficiently traceable to the federal defendants—despite the fact that the project was being carried out by a separate entity—because the "trenching . . . would not occur without [the federal d]efendants' approval of the" project.  *Id.* at 269-71.  Because none of the federal agencies had jurisdiction over the place and manner of the trenching, however, the court found that their actions in approving certain permits

related to the project was "too attenuated from the location and manner of onshore trenching to be fairly traceable to [the p]laintiffs' alleged injuries," and it therefore dismissed the claims against those defendants for lack of standing. *See id.* at 271; *see also Elias Bochner*, 118 F.4th at 526.

Similarly, Susman has failed to establish standing here, at least with respect to his request for a preliminary injunction. Indeed, he certainly has failed to meet the demanding standard applicable on motions for a preliminary injunction, and even his complaint's factual allegations—accepted as true—appear not to establish standing. The Court therefore denies Susman's motion for a TRO and preliminary injunction because he lacks standing on his Second Amendment claims.

### 2.    Eleventh Amendment

Sullivan argues that Susman's Second Amendment claims must be dismissed because she is entitled to state sovereign immunity. Docket Item 16 at 22-23. And for some of the same reasons discussed in this Court's analysis of standing, the Court agrees. Thus, the Eleventh Amendment provides an alternative basis for denying Susman's motion.

"The Eleventh Amendment shields states and their agencies, departments, and officials in their official capacities from suit in federal court." *Gianni v. Kopp*, 2011 WL 5080195, at *2 (N.D.N.Y. Oct. 26, 2011) (citing *Papasan*, 478 U.S. at 276). In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a narrow exception to state sovereign immunity in cases in which "a state official is sued in her official capacity for prospective injunctive relief." *Gianni*, 2011 WL 5080195, at *2. But the requested injunction must remedy that plaintiff's injury. And because there appears to be no

prospective relief that this Court can provide to remedy Susman's injury here, his claims against Sullivan likely are barred by sovereign immunity.

A case from the Tenth Circuit is illustrative. In *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013), the plaintiff sued state officials based on the denial of his application for a concealed handgun license in Colorado. *Id.* at 1201. Colorado law generally permitted only state residents to obtain such licenses but included an exception for residents of any state that had a reciprocity agreement with Colorado. *Id.* at 1202. The plaintiff sued, in addition to a sheriff, the executive director of Colorado's Department of Public Safety, arguing that the executive director "maintain[ed] a database of states with which Colorado maintains reciprocity." *Id.* at 1206. But the Tenth Circuit dismissed that claim because under the statutory scheme, only Colorado sheriffs had the ability to enforce the provisions of the license law. *Id.* In doing so, the court noted that while the executive director's "maintenance of a database may provide a convenient source for sheriffs seeking information relevant to . . . reciprocity, . . . *Ex parte Young* require[d] a nexus between the defendant and enforcement of the challenged statute." *Id.* (emphasis and internal quotation marks omitted). The court therefore dismissed the claims against the executive director on sovereign immunity grounds. *Id.* at 1206-07; *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 35-45 (2021) (state court judge and state court clerk were entitled to sovereign immunity in case challenging constitutionality of Texas statute that allowed private citizens to bring civil suits against those who provided abortions because neither of those defendants enforced the challenged statute against plaintiffs).

The same logic would appear to apply here.  Indeed, Susman seems to have failed to establish—even on the allegations of his complaint—that either Sullivan or OMH enforce the law that bars him from accessing firearms.  But Sullivan has not moved for dismissal, instead raising the argument as part of her opposition to Susman's motions for a TRO and a preliminary injunction.  So while this Court might be inclined to grant such a motion, it declines to decide issues other than those raised by the motions before it.

### B.    Other Factors

Because this Court finds that Susman lacks standing, it denies his motion for a TRO and a preliminary injunction, and it need not address the remaining *Winter* factors. *See Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015) (holding that because plaintiff "lacked standing," court "need not address the [remaining] factors to be considered in deciding whether to award a preliminary injunction").

The Court notes, however, that even if Susman had standing here, this Court would have reservations about whether he had shown "irreparable harm" in light of his failure to seek relief through the administrative avenues available to him, even in tandem with this lawsuit.  At oral argument, Susman cited red tape as his reason for not taking that route, noting the delays inherent in the administrative process and stating that it would likely take at least four months for him to obtain relief through that avenue. But it now has been nearly three months since Susman's attempt to purchase a firearm was denied, *see* Docket Item 1 at ¶ 97, and Susman "does not explain why he could not have used those same three months to exhaust" or at least make use of "the administrative procedures" available to him.  *See Rosenberg v. Pliler*, 2021 WL

6014938, at *3-4 (S.D.N.Y. Dec. 20, 2021) (addressing whether habeas petitioner had shown that possibility of "irreparable harm" excused his failure to exhaust his administrative remedies).  And so while Susman's failure to use those procedures does not necessarily divest this Court of jurisdiction over his claims—a question this Court does not reach—his failure to pursue the avenues of recourse available to him does at least undercut his argument of irreparable harm.

## CONCLUSION

In light of Susman's employment history, he has a strong argument that he ought to be able to possess a weapon.  And he certainly may make that argument in another case challenging the statute that causes his injury, namely, section 922(g)(4).  Perhaps he even can amend his complaint to establish standing on this Second Amendment claim here, although this Court is hard-pressed to see how that is possible.

But regardless of all that, it is clear to this Court that Susman has not established standing sufficient to be entitled to a TRO or preliminary injunction.  Susman's motion for a TRO and a preliminary injunction, Docket Item 5, is DENIED.  His motion to expedite, Docket Item 6, is DENIED as moot.  By separate order, the Court will refer the case to a magistrate judge to proceed to discovery.

SO ORDERED.

Dated:   February 21, 2025
         Buffalo, New York


   */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE