UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
EDMUND J. SUSMAN, JR., and all similarly
situated individuals,

                             Plaintiff,                 Case No. 1:24-cv-01281

         -against-                            (LJV) (LGF)

ANN MARIE T. SULLIVAN, M.D. in her official
capacity, ROSSANA ROSADO, in her official capacity,
PAM BONDI, in her official capacity, KASH PATEL,
in his official capacity,
                                 Defendants.
-----------------------------------------------------------------x

# MEMORANDUM OF LAW

# IN SUPPORT OF

# MOTION FOR A PRELIMINARY INJUNCTION

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiff*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**abell@bellantoni-law.com**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................... i

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 1

ARGUMENT ............................................................................................................ 6

I. PLAINTIFF HAS STANDING TO SEEK INJUNCTIVE RELIEF ...................... 7

    A. Plaintiff Is Suffering an Injury-in-Fact ...................................................... 7

    B. Plaintiff's Injury – Permanent Disarmament - is Traceable to Defendants ............... 8

        i. The Federal Defendants Enforce 18 U.S.C. § 922(g)(4) ................................. 8

        ii. The State Defendants Have a Duty to Remove Erroneous Information from NICS and CJIS ....................................................................................... 9

    C. Plaintiff's Harm is Redressable by a Favorable Judicial Decision ........................... 12

        i. The Federal Defendants ............................................................................. 12

        ii. The State Defendants ............................................................................... 13

II. IRREPARABLE HARM: THE "MOST IMPORTANT FACTOR" IN THIS CIRCUIT ....... 13

III. PLAINTIFF HAS A 'CLEAR AND SUBSTANTIAL' LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS SECOND AMENDMENT CLAIMS ..................................... 14

    A. Plaintiff's Conduct is Covered by the Second Amendment ..................................... 14

    B. Defendants Must Prove Their Conduct is Consistent With this Nation's Historical Traditions of Firearm Regulation ............................................................... 15

        i. MHL 9.39 is Not a Formal Finding T at the Individual Has a Mental Illness or is 'Dangerous' to Themselves of Others ..................................... 15

        ii. There is No Tradition of Permanent Disarmament Based on 'Suicidal Ideation' ................................................................................. 16

IV. AN INJUNCTION IS IN THE PUBLIC INTEREST ............................................................ 17

    A. The Public Interest Favors Enjoining Unconstitutional Laws .................................. 17

    B. Permanent Disarmament Creates a Barrier to Treatment......................................... 18

    C. Permanently Disarming Individuals Found *Not* 'Mentally Ill and Dangerous' is Contrary to the Public Interest ................................................................................. 18

V. THE BALANCE OF EQUITIES TIPS IN PLAINTIFF'S FAVOR ...................................... 19

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Able v. United States,*
    44 F.3d 128 (2d Cir. 1995) ................................................................. 7

*Arizona Dream Act Coalition,*
    757 F.3d 1053 (9th Cir. 2014) ........................................................ 17

*Bimber's Delwood, Inc. v. James,*
    496 F. Supp. 3d 760 (W.D.N.Y. 2020) ........................................... 6

*Breasted v Farmers' Loan & Trust Co.,*
    4 Hill 73 (Sup. Ct. 1843) ........................................................... 4, 16

*Care Comm. v. Arneson,*
    638 F.3d 621 (8th Cir. 2011) ......................................................... 13

*Consumer Data Indus. Ass'n v. King,*
    678 F.3d 898 (10th Cir. 2012) ...................................................... 13

*Davis v. Federal Election Comm'n,*
    554 U.S. 724 (2008) ....................................................................... 7

*District of Columbia v. Heller,*
    554 U.S.570 (2008) ...................................................................... 19

*Duncan v. Becerra,*
265 F. Supp. 3d 1106, 1136 (S.D. Cal. 2017) ................................. 19

*Escamilla v. United States,*
    62 F.4th 367 (7th Cir. 2023) ........................................................ 11

*Espinoza v. Montana Dept. of Revenue,*
    591 U.S. 464 (2020) ..................................................................... 15

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) .................................................... 13, 14

*Franklin v. Sessions,*
    291 F. Supp. 3d 705 (W.D. Pa. 2017) ............................................ 9

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) .................................................... 15

*Hines v. Doe*,
　2023 WL 2320234 (N.Y. Sup. Ct. Mar. 1, 2023) .................................................. 4, 16

*Hobby Lobby Stores, Inc. v. Sebelius*,
　723 F.3d 1114 (10th Cir. 2013) ............................................................................ 19

*J.S.R. by & through J.S.G. v. Sessions*,
　330 F. Supp. 3d 731 (D. Conn. 2018) ................................................................... 17

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992) ................................................................................................. 7

*McDonald v. City of Chicago*,
　561 U.S. 742 (2010) ............................................................................................... 19

*Ms. L. v. U.S. Immigr. & Customs*,
　415 F. Supp. 3d 980 (S.D. Cal. 2020) ................................................................... 17

*Ms. L. v. U.S Immigr. & Customs Enf't ("ICE*,
　310 F. Supp. 3d 1133 (S.D. Cal. 2018) ................................................................. 17

*Myers v Schneiderman*,
　30 N.Y.3d 1 (2017) ...................................................................................... 4, 16, 18

*NYSRPA v. Bruen*,
　597 U.S. 1 (2022) ........................................................................................ 14, 15, 19

*Phelps v. Bosco*,
　711 F. App'x 63 (2d Cir. 2018) ............................................................................. 10

*Rodriguez v. DeBuono*,
　175 F.3d 227 (2d Cir.1999) ................................................................................... 14

*Steffel v. Thompson*,
　415 U.S. 452 (1974) ................................................................................................. 7

*Susan B. Anthony List v. Driehaus*,
　573 U.S. 149 (2014) ................................................................................................. 7

*Susman v. Sullivan, M.D.*,
　2025 WL 575515 (W.D.N.Y. Feb. 21, 2025) ......................................................... 8

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
　837 F.3d 678 (6th Cir. 2016) ................................................................................. 10

ii

*U.S. S.E.C. v. Citigroup Global Mkts. Inc.*,
   673 F. 3d 158 (2d Cir. 2012) ........................................................ 17

*United States v. Giardina*,
   861 F.2d 1334 (5th Cir. 1988) ...................................................... 10

*United States v. Hansel*,
   474 F.2d 1120 (8th Cir. 1973) ...................................................... 10

*United States v. McIlwain*,
   772 F.3d 688 (11th Cir. 2014) ...................................................... 10

*United States v. Midgett*,
   198 F.3d 143 (4th Cir. 1999) ........................................................ 10

*United States v. Rahimi*,
   602 U.S. 680 (2024) .................................................................... 15

*United States v. Rehlander*,
   666 F.3d 45 (1st Cir. 2012) ............................................................ 9

*United States v. Tucker*,
   47 F.4th 258 (5th Cir. 2022) .......................................................... 9

*United States v. Veasley*,
   98 F.4th 906 (8th Cir. 2024) ........................................................ 10

*United States v. Waters*,
   23 F.3d 29 (2d Cir. 1994) ............................................................ 11

*Yang v. Kosinski*,
   960 F.3d 119 (2d Cir. 2020) ....................................................... 6, 7

**Statutes**

18 U.S.C. § 922(g) ............................................................................ 10
18 U.S.C. § 922(g)(4) ................................................................. Passim
New York State Mental Hygiene Law § 9.39 ................................... Passim

**Regulations**

27 C.F.R. § 478.11 ................................................................. 5, 9, 12
28 C.F.R. § 25.9 ................................................................. 6, 12, 13

## PRELIMINARY STATEMENT

Plaintiff seeks an order preliminarily enjoining federal defendants Pam Bondi and Kash Patel from enforcing 18 U.S.C. § 922(g)(4) against individuals reported to the New York State Office of Mental Health (OMH), New York State Division of Criminal Justice Services (DCJS), the Federal Bureau of Investigation's National Instant Criminal Background Check System (NICS) and Criminal Justice Information Services (CJIS) based solely on the individual's brief and temporary hospital admission under New York State Mental Hygiene Law (MHL) § 9.39, including Plaintiff.

Plaintiff further seeks an order directing the Commissioner of OMH (Sullivan) and the Commissioner of DCJS (Rosado) to take all action within their authority to cancel and remove the personal identifying information of individuals reported to OMH, DCJS, NICS, and CJIS based solely on a hospital admission pursuant to MHL § 9.39, including Plaintiff.

Plaintiff's conduct – possessing and acquiring firearms and ammunition – is protected by the plain text of the Second Amendment. Defendants' enforcement of the challenged state and federal regulations against MHL § 9.39 admissions violates the Second Amendment, as there is no historical analogue to support Defendants' conduct.

## STATEMENT OF FACTS

Plaintiff, age 50, is a resident of Erie County, New York; other than the events at issue herein, Plaintiff has been regularly armed with a firearm personally and/or in his employment capacity for over 30 years, without incident [see, Verified First Amended Complaint (FAC) attached to the Declaration of Amy L. Bellantoni ("Bellantoni") as Exhibit ("Ex.") 1 at ¶¶ 93-94]. Plaintiff received an Honorable Discharge from the Army after over 22 years of service; he has over 29 years of combined federal civilian and military service including active-duty experience

in Operation Iraqi Freedom, and he has served as an instructor of armor tactics, military skills, anti-terrorism/force protection procedures, CI, and multiple lethal and non-lethal weapons systems [Bellantoni Ex. 1 at ¶¶ 95-97].

Plaintiff is employed as a Special Agent with the Bureau of Diplomatic Security, under the U.S. Department of State; the duties of his position include serving as a Liaison Agent to FBI Joint Terrorism Task Force, Buffalo, NY, assignments on protective details for senior U.S. and foreign diplomats in the U.S. and abroad, including high threat environments, advanced security surveys and site assessments, including emergency procedures [Bellantoni Ex. 1 at ¶ 98]. The duties of that position include conducting complex and sensitive investigations involving terrorist activities, threats, and incidents directed against U.S. citizens, U.S. Government (USG) personnel and diplomatic facilities abroad, conducting Protective Intelligence Investigations (PII) into threat activity directed against the Secretary of State, other U.S. officials, international organizations, foreign officials, and diplomatic facilities in the U.S. and abroad, monitoring and interpreting sensitive intelligence to corroborate, develop, and expand information regarding threats against foreign diplomatic and consular personnel and facilities in the U.S. and abroad, and maintaining liaison with other USG agencies having statutory responsibilities in national security, intelligence, and criminal investigation matters [Bellantoni Ex. 1 at ¶ 99]. Plaintiff is required to carry a firearm as part of his essential job duties [Bellantoni Ex. 1 at ¶ 101].

Plaintiff has never been arrested, and owns multiple handguns, rifles, and shotguns, which were purchased from a federal firearm licensee (FFL) after undergoing and passing a federal background check through NICS [Bellantoni Ex. 1 at ¶ 104]. Plaintiff has lawfully owned firearms for decades, without incident, personally and professionally [Bellantoni Ex. 1 at ¶ 133]. As part of his employment with the federal government, Plaintiff has undergone and passed intensive

background checks to achieve high-level security clearance, including his Active Top Secret Clearance [Bellantoni Ex. 1 at ¶ 105].

On November 22, 2024, Plaintiff went to an FFL to purchase a firearm, where he underwent a NICS background check [Bellantoni Ex. 1 at ¶ 106]. Plaintiff's purchase was denied by the New York State Police background check system, as New York is a point-of-contact (POC) state for NICS [Bellantoni Ex. 1 at ¶ 107]. Plaintiff promptly appealed the denial to the NYS Attorney General's Office through Background.Check@ag.ny.gov and learned that his transaction "was denied under 18 United States Code s. 922(g)(4), which prohibits a person who has been adjudicated as a mental defective or has been committed to a mental institution at 16 years of age or older from possessing a firearm" [Bellantoni Ex. 1 at ¶¶ 109-110]. Stated differently, Plaintiff's purchase was denied because he is identified in Federal Bureau of Investigation's (FBI) National Instant Criminal Background Check System (NICS) and the Criminal Justice Information Services (CJIS) as a person prohibited from possessing firearms and ammunition under 18 U.S.C. § 922(g)(4) [Bellantoni Ex. 1 at ¶ 108].

The New York State Office of Mental Health and New York State Division of Criminal Justice Services (DCJS) reported Plaintiff to NICS and CJIS as a prohibited person [Bellantoni Ex. 1 at ¶¶ 39, 57-63]. OMH and DCJS reported Plaintiff because of a 2015 brief and temporary – *4 day* - admission to Erie County Medical Center (ECMC) under Mental Hygiene Law (MHL) § 9.39 [Bellantoni Ex. 1 at ¶¶ 39, 57-63].

Plaintiff voluntarily admitted himself to ECMC on a Thursday and was discharged on Monday; his legal status was never converted to a MHL § 9.27 or § 9.37 "Involuntary admission" to a mental health facility [Bellantoni Ex. 1 at ¶¶ 121-122]. At the time that Plaintiff was discharged, he was determined by a psychiatrist specifically ***not*** to be a danger to himself or others

[Bellantoni Ex. 1 at ¶ 123]. Plaintiff was discharged because he did not meet the criteria for involuntary commitment under MHL § 9.27 and/or § 9.37, New York State's "Involuntary Admission" statutes [Bellantoni Ex. 1 at ¶ 124]. Plaintiff was not provided with any notice that, by voluntarily admitting himself to ECMC was a forfeiture of his Second Amendment rights [Bellantoni Ex. 1 at ¶ 125-127].

Under the challenged regulations, Plaintiff has been permanently disarmed based solely on a 2015 emergency admission that lasted for 4 days [Bellantoni Ex. 1 at ¶136]. Yet, Plaintiff has undergone no event that warrants permanent disarmament, nor can the state or federal defendants justify his permanent disarmament based solely on his § 9.39 admission [Bellantoni Ex. 1 at ¶¶129, 146].

Additionally, § 9.39 neither contemplates nor addresses the issue of whether a person who threatens suicide is "mentally ill" [Bellantoni Ex. 1 at ¶ 137]. New York law has recognized a critical distinction between those who end their life in a rational state of mind and those who do so as a result of a mental illness – "[s]uicide involves the deliberate termination of one's existence, while in the possession and enjoyment of his mental faculties. Self-slaughter by an insane man or a lunatic is not an act of suicide within the meaning of the law." *Hines v. Doe*, No. 951-23, 2023 WL 2320234, at *3 (N.Y. Sup. Ct. Mar. 1, 2023) (concluding that "a suicidal ideation or attempt is not mental illness per se") quoting, *Breasted v Farmers' Loan & Trust Co.*, 4 Hill 73, 75 (Sup Ct 1843); and citing, *Myers v Schneiderman*, 30 NY3d 1, 12 (2017) (implying that suicide, by definition, must bear the indicia of rationality: suicide has long been understood as "the act or an instance of taking one's own life voluntarily and intentionally) (emphasis supplied); The Earliest Acts and Laws of the Colony of Rhode Island and Providence Plantations 1647-1719, p 19 (J Cushing ed 1977) (noting that as early as 1647 Rhode Island made a distinction between rational

suicide and suicide with mental illness: "[if a man] kills himself of a premeditated hatred against his own life: . . . his goods and chattels are the king's custom; but in case he be an infant, a lunatic, or mad, he forfeits nothing") [Bellantoni Ex. 1 at ¶138].

To find that an emergency evaluation and observation under § 9.39 is the equivalent of a "commitment" warranting permanent disarmament means that there is no non-actionable period of evaluation in New York State [Bellantoni Ex. 1 at ¶ 139]. Under the challenged regulations, every time a person is admitted to a hospital for a period of evaluation and observation under § 9.39, they succumb to permanent disarmament [Bellantoni Ex. 1 at ¶ 140].

The unconstitutional overbreadth of MHL § 7.09(j) required Plaintiff to be reported to OMH, DCJS, NICS and CJIS for the purpose of – and having the effect of – permanently disarming him [Bellantoni Ex. 1 at ¶ 142]. The continued retention of Plaintiff's identifying information in the OMH, DCJS, CJIS databases and the NICS Indices as a "prohibited person" permanently forecloses Plaintiff's ability to lawfully possess and purchase firearms and ammunition in violation of the Second Amendment [Bellantoni Ex. 1 at ¶143].

OMH and DCJS wrongfully and erroneously reported to NICS and CJIS that Plaintiff is a 'prohibited person' under 18 U.S.C. § 922(g)(4) because brief and temporary admissions, like those under § 9.39, do not fall within the scope of § 922(g)(4) [Bellantoni Ex. 1 at ¶¶ 145-149].

Under 27 C.F.R. § 478.11, the term "committed to a mental institution" "**does not include** a person in a mental institution **for observation or a voluntary admission** to a mental institution" (emphasis added) [Bellantoni Ex. 1 at ¶ 78].

And if § 9.39 is found to fall within the scope of § 922(g)(4), then § 922(g)(4) as applied to § 9.39 admissions – and as applied to Plaintiff - violates the Second Amendment.

Under either scenario, the state and federal Defendants are obligated to take all action in their authority to purge all information concerning individuals reported to OMH, DCJS, NICS and CJIS based solely on an admission under § 9.39, including Plaintiff's 2015 admission to ECMC [Bellantoni Ex. 1 at ¶¶ 144-151] because their regulations are inconsistent with this country's historical traditions of firearm regulation.

Under 28 C.F.R. § 25.9, "Retention and destruction of records in the system", "NICS will retain NICS Index records that indicate that receipt of a firearm by the individuals to whom the records pertain would violate Federal or state law. The NICS will retain such records indefinitely, ***unless they are canceled by the originating agency***" (emphasis added) [Bellantoni Ex. 1 at ¶ 44].

Defendants will continue to enforce the challenged regulations, which present an absolute barrier to Plaintiff's exercise of conduct presumptively protected by the Second Amendment [Bellantoni Ex. 1 at ¶ 159]. Plaintiff's permanent disarmament will continue without the relief sought herein [Bellantoni Ex. 1 at ¶ 160].

## ARGUMENT

A party seeking to enjoin governmental action taken pursuant to a statute must demonstrate that (1) he is likely to succeed on the merits, (2) he will suffer irreparable harm absent injunctive relief, (3) the balance of equities tips in his favor, and (4) the issuance of an injunction is in the public interest. *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 771 (W.D.N.Y. 2020) citing *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).

Where a party seeks a "mandatory preliminary injunction"—one that seeks to modify the status quo—and where issuance of the requested injunction will provide the party substantially all the relief it seeks, a heightened standard applies. In such a case, the party must demonstrate a "clear or substantial" likelihood of success on the merits and make a "strong showing" of irreparable

harm. *Id.* citing, *Yang*, 960 F.3d at 127-28. Requiring such a heightened showing is consistent with the principle that "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam).

## I. PLAINTIFF HAS STANDING TO SEEK INJUNCTIVE RELIEF

To have standing under Article III, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008).

To establish injury in fact, a plaintiff must show that he suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). An allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "substantial risk" that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). This injury must be fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision. *Lujan,* 504 U.S. at 560–61.[1]

### A. Plaintiff Is Suffering an Injury-in-Fact

This Court has already found, "Susman undoubtedly has suffered an "injury in fact" here: His attempt to purchase a gun was denied after a NICS background check found that he was

---

[1] For pre-enforcement challenges, "[a] party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008). An actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging a law. *Id.* citing, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

prohibited from doing so under section 922(g)(4) based on his 2015 hospitalization." *Susman v. Sullivan, M.D.,* No. 24-CV-1281-LJV, 2025 WL 575515, at *8 (W.D.N.Y. Feb. 21, 2025).[2]

Since that decision, Plaintiff has incurred additional harm. When attempting to return from Canada yesterday, Plaintiff and his family were stopped at the border and pulled for secondary inspection [Susman Dec.[3] at ¶ 4]. The Customs and Border Patrol (CBP) agent stated, "I got a guy who's a NICS hit, what do you want me to do?" Plaintiff and his family were detained as Plaintiff was subjected to interrogation by CBP based on his § 922(g)(4) status as reported by the state defendants. Notably, it was only after Plaintiff's November 2024 denial of a firearm purchase that (i) his Global Entry credentials were revoked, and (ii) he was pulled for secondary inspection every time he traveled out of the country [Susman Dec. at ¶¶ 4-6]. Between 2015 and November 2024, Plaintiff traveled freely across the border, to other countries, and back into the United States – without incident [*Id.* at ¶ 7]. Yet, every time Plaintiff has traveled out of the country since the NICS denial in November 2024, he has been subject to secondary inspection and interrogated [*Id.*].

As a result of Defendants' enforcement of the challenged regulations, Plaintiff has been placed on administrative with the U.S. State Department as a Diplomatic Security Agent (federal law enforcement officer) because of Defendants' categorization of his § 9.39 hospital admission as a disqualifying event under 18 U.S.C. § 922(g)(4) and MHL 7.09(j) [*Id.* at 8].

**B. Plaintiff's Injury – Permanent Disarmament - is Traceable to Defendants**

*i. The Federal Defendants Enforce 18 U.S.C. § 922(g)(4)*

Plaintiff's injury is directly traceable to federal defendants Bondi and Patel. *Susman*, at * 10 (finding that Susman's injury is caused by the federal government). Plaintiff was reported by the state defendants to NICS and CJIS as having been "committed to a mental institution" within

---

[2] "Sullivan does not contest that Susman has suffered an injury in fact." *Susman*, at *8.
[3] Declaration of Edmund K. Susman, Jr. dated March 6, 2025.

the meaning of 18 U.S.C. § 922(g)(4). As such, Plaintiff is permanently barred from purchasing (NICS) and possessing (CJIS) firearms and ammunition based on the federal defendants' enforcement of criminal and administrative penalties under federal law.

Enjoining Bondi and Patel from enforcing § 922(g)(4) against individuals who were subject to a brief and temporary hospital admission under § 9.39, like Plaintiff, would provide Plaintiff with the relief he seeks. Likewise, directing Bondi and Patel to remove Plaintiff's disqualifying information from the NICS Indices and CJIS under § 925A would remove the criminal and administrative barriers to Plaintiff's possession and purchase of firearms and ammunition.

> *ii. The State Defendants Have a Duty to Remove Erroneous Information from NICS and CJIS*

Like several Circuit Courts of Appeal, the federal defendants may take the position that New York's reporting of § 9.39 admissions to NICS and CJIS is erroneous because brief and temporary emergency admissions, like those under § 9.39, do not fall within the scope of § 922(g)(4) – and, therefore are not disqualifiers under § 922(g)(4) and should not be reported.

Under 27 C.F.R. § 478.11, the term "committed to a mental institution" "**does not include** a person in a mental institution **for observation or a voluntary admission** to a mental institution" (emphasis added). Several other Circuit Courts of Appeal agree. *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012) ("This would be a different case if section 922 addressed *ex parte* hospitalizations and provided for a temporary suspension of the right to bear arms pending further proceedings."); *United States v. Tucker*, 47 F.4th 258, 261 (5th Cir. 2022) ("Thankfully, the plain text of the statute relieves us of the need to precariously balance the Second Amendment on *ex parte*, often-unreviewable opinions of medical professionals…Courts interpreting the ATF's regulatory definition have concluded similarly") citing, *Franklin v. Sessions*, 291 F. Supp. 3d 705, 716 (W.D. Pa. 2017) (applying the principle of noscitur a sociis, concluding "other lawful

authority" must resemble the specific, introductory categories of a "court, board, [or] commission"); *United States v. Hansel*, 474 F.2d 1120, 1124-1125 (8th Cir. 1973)[4] (§ 922(g)(4) does not prohibit persons who have any history of mental illness from possessing guns) (accumulating various sources that pre-date the passage of the Gun Control Act in 1968); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 687 ("[W]e note that § 922(g)(4) does not use the phrase 'mentally ill,' nor does it attempt to prohibit all currently mentally ill persons from firearm possession…[it] uses prior judicial adjudications…as proxies for mental illness."); *United States v. Giardina*, 861 F.2d 1334, 1337 (5th Cir. 1988) the court held that nothing in 18 U.S.C. § 922(g) indicates an intent to prohibit firearm possession by persons who had been hospitalized for observation and examination where they were found not to be mentally ill and were not committed; see also, *United States v. Hansel*, 474 F.2d 1120, 1122–23 (8th Cir. 1973) (same); *United States v. McIlwain*, 772 F.3d 688, 698 (11th Cir. 2014) (criminal defendant was "committed" within § 922(g)(4), and not just subject to "emergency hospitalization," where he *received* a full judicial hearing, was represented by counsel, found to be "mentally ill and…a real and present threat of substantial harm to himself and others," and ordered confined); *United States v. Midgett*, 198 F.3d 143, 146 (4th Cir. 1999) (same); but see, *Susman,* at * 12 ("even if this Court could reverse time and prevent [Plaintiff's personal identifying information] from having ever been transmitted to NICS—that would not change the fact that Susman's section 9.39 commitment renders him ineligible to purchase a gun under *federal* law.") citing, *Phelps v. Bosco*, 711 F. App'x 63, 64 (2d

---

[4] *United States v. Veasley*, 98 F.4th 906, 908 (8th Cir. 2024), cert. denied, No. 24-5089, 2024 WL 4427336 (U.S. Oct. 7, 2024), cited by the State, recognized that not all mentally ill people were disarmed, only those who were both "mentally ill and dangerous." *Id.* at 913. And a discussion of "mental illness" [see, *Id.* at 913 describing "notable deficits in the speed of processing, working memory, attention/vigilance, verbal learning, visual learning, reasoning and problem-solving, and social cognition" as manifestations of mental illness"] has nothing to do with Plaintiff who was discharged because a *psychiatrist* – not a 'justice of the peace'- evaluated him and found he was *not* a danger to himself or others. Still, the 8th Circuit reaffirmed that "disarming the mentally ill today" requires a judicial finding. *Veasley*, 98 F.4th at 916.

Cir. 2018); *Escamilla v. United States*, 62 F.4th 367, 374-375 (7th Cir. 2023); cf. *United States v. Waters*, 23 F.3d 29, 34-36 (2d Cir. 1994).

The plain text of § 9.39 reveals that the statute allows confinement to ascertain *whether or not* the individual (i) has mental illness that (ii) renders them a danger to themselves or others. Under § 9.39, hospitals "*may* receive and retain therein as a patient for a period of fifteen days any person *alleged to have a mental illness* for which immediate observation, care, and treatment in a hospital is appropriate *and* which is likely to result in serious harm to himself or others" (emphasis added).

A § 9.39 emergency admission does not constitute a 'determination' of 'finding' that the individual actually (i) suffers from a mental illness (ii) that likely to result in serious harm to himself or others. Indeed, even if the individual requests a court hearing to be released from the hospital and the court determines "that there is such reasonable cause [to retain the individual],…Any such order entered by the court *shall not be deemed to be an adjudication that the patient is mentally ill*, but only a determination that there is reasonable cause to retain the patient for the purposes of this section." See, § 9.39(a) (emphasis added).

And if, at any time during the 15 days allotted for evaluation "a determination is made that the person is not in need of involuntary care and treatment, he *shall be discharged*." § 9.39(b) (emphasis added). Plaintiff admitted himself on a Thursday and was discharged on a Monday [Bellantoni Ex. 1 at ¶121].

A hospital may only continue to retain an individual past the statutory timeframe if the person is converted to an involuntary commitment under the MHL § 9.27 or § 9.37 – New York State's "Involuntary Admission" statutes. As such, an individual who is discharged within the

evaluation period under § 9.39 has, *de facto*, been determined **not** to pose a danger to themselves or others.

And because § 922(g)(4) does not encompass brief and temporary emergency admissions [see, 27 C.F.R. §478.11], like § 9.39, OMH and DCJS wrongfully reported Plaintiff's § 9.39 admission to NICS and CJIS as a violation of § 922(g)(4). As such, Sullivan and Rosado are required to cancel, correct, and otherwise remove such information from the OMH and DCJS databases, as well as the NICS Indices and CJIS.

*Second,* under 28 C.F.R. § 25.9, "Retention and destruction of records in the system", "NICS will retain NICS Index records that indicate that receipt of a firearm by the individuals to whom the records pertain would violate Federal or state law. The NICS will retain such records indefinitely, **unless they are canceled by the originating agency**" (emphasis added).

*Third,* causing the permanent disarmament of an individual based solely on a § 9.39 admission violates the Second Amendment. There is no historical tradition justifying MHL 9.07(j)'s reporting requirement for § 9.39 admissions. Therefore, it is incumbent upon OMH and DCJS to (i) cease reporting § 9.39 admissions to NICS and CJIS; and (ii) take all action necessary to remove from the NICS Indices and CJIS the personal identifying information of individuals who were reported by OMH and DCJS based solely on a § 9.39 admission, including Plaintiff.

### C. Plaintiff's Harm is Redressable by a Favorable Judicial Decision

#### i. The Federal Defendants

Enjoining Bondi and Patel from enforcing 18 U.S.C. § 922(g)(4) against individuals who were reported to NICS and CJIS based solely on an admission under § 9.39, like Plaintiff, will provide Plaintiff with the relief he seeks. Such an injunction will prevent NICS from denying Plaintiff's firearm and ammunition transactions and will enjoin federal law enforcement from

enforcing the criminal penalties against individuals based solely on a § 9.39 admission, including Plaintiff.

### ii. The State Defendants

If, consistent with the majority of the Circuit Courts, the federal government takes the position that § 9.39 admissions do not fall within the scope of § 922(g)(4), then New York's reporting of § 9.39 admissions to NICS and CJIS is erroneous and must be corrected.

As such, Sullivan and Rosado have a duty to take all action necessary to cancel and otherwise remove such information. Such an order will provide Plaintiff with the relief that he seeks, as his personal identifying information will no longer exist in the OMH, DCJS, NICS Indices and CJIS.

If Sullivan and Rosado are required to take such action, DCJS, NICS and CJIS will no longer have any disqualifying information about Plaintiff. Under 28 C.F.R. § 25.9 entitled, "Retention and destruction of records in the system", NICS will only retain NICS Index records that indicate that receipt of a firearm by the individuals to whom the records pertain would violate Federal or state law indefinitely "***unless they are canceled by the originating agency***" (emphasis added). Ordering Sullivan and Rosado – the "originating agencies" - to cancel the NICS Index records related to Plaintiff's § 9.39 admission will provide Plaintiff with the relief he seeks.[5]

## II. IRREPARABLE HARM: THE "MOST IMPORTANT FACTOR" IN THIS CIRCUIT

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d

---

[5] Even partial relief satisfies Plaintiff's burden. See, *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012) ("[A] favorable decision would relieve [the plaintiffs'] problem 'to some extent,' which is all the law requires."); *Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) (fact that anyone could institute complaint did not undercut redressability as to county attorneys and attorney general, since granting injunctive relief "would redress a discrete injury to plaintiffs").

Cir. 2009) quoting, *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir.1999). To satisfy the irreparable harm requirement, a plaintiff must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. *Id.*

This Court already held that Plaintiff "undoubtedly has suffered an "injury in fact" - a fact undisputed by the state defendants [Point I(A) *supra*]. "[Plaintiff] cannot legally carry weapons…what is more, if he continued to carry weapons, he would be exposing himself to "criminal penalties."…Thus, Susman's inability to purchase or carry weapons is certainly an injury, one that he says impairs his ability both to work at his current job and to protect himself." *Susman,* at *8 (internal citations omitted).

Plaintiff has satisfied the "most important factor," which tips the balance substantially in his favor.

## III. PLAINTIFF HAS A 'CLEAR AND SUBSTANTIAL' LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS SECOND AMENDMENT CLAIMS

The test announced by the Supreme Court for determining Second Amendment challenges is as follows:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, 597 U.S. at 17 (citation omitted).

### A. Plaintiff's Conduct is Protected by the Second Amendment

The Second Amendment presumptively protects Plaintiffs' conduct – the possession of firearms.

**B. Defendants Must Prove Their Conduct is Consistent with this Nation's Historical Traditions of Firearm Regulation**

To prevail, the government must establish that their conduct is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. "Only then may this Court conclude that Plaintiffs' conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. Defendants cannot meet this burden.

Because "not all history is created equal," *Bruen* held that, when deciding whether the government's regulation is consistent with this Nation's historical tradition,

> "the only appropriate inquiry is what the public understanding of the right to keep and bear arms was during the ratification of the Second Amendment in 1791, and perhaps during ratification of the Fourteenth Amendment in 1868."

*Bruen*, 597 U.S. at 37.

"Post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, at 2137 (emphasis supplied) citing, *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n. 6 (2011) (Kavanaugh, J., dissenting); *Espinoza v. Montana Dept. of Revenue*, 591 U.S. 464, 480-483 (2020).

While under our Nation's historical traditions an individual who "poses a clear threat of physical violence to another…may be disarmed,"[6] permanently disarming people based on a brief and temporary hospital admission and/or an *ex parte* non-judicial assessment – like § 9.39 – is inconsistent with the Second Amendment.

> *i. MHL 9.39 is Not a Formal Finding That the Individual Has a Mental Illness or is 'Dangerous' to Themselves of Others*

By its plain language, an admission under § 9.39 is no more than an *allegation* that the individual has (i) a mental illness and (ii) is a danger to themselves or others.

---

[6] *Rahimi*, 602 U.S. at 698.

It cannot be overlooked that the text of § 9.39 declares that, even where an individual requests a court hearing seeking release from the hospital and the court determines "that there is such reasonable cause [to retain the individual],…Any such order entered by the court *shall not be deemed to be an adjudication that the patient is mentally ill*, but only a determination that there is reasonable cause to retain the patient for the purposes of this section." § 9.39(a) (emphasis added).

Under § 9.39(b), if, at any time during the 15 days allotted for evaluation under § 9.39, "a determination is made that the person is not in need of involuntary care and treatment, he *shall be discharged*" (emphasis added). Individuals discharged under § 9.39[7] – and not converted to an "Involuntary Admission" under MHL §§ 9.27[8] or 9.37[9] - are, as a matter of law, ***not*** a danger to themselves or others.

<em>ii. There is No Tradition of Permanent Disarmament Based on 'Suicidal Ideation'</em>

There is no historical analogue for permanently disarming people based on a 'suicidal ideation.' And § 9.39 neither contemplates nor addresses the issue of whether a person who threatens suicide is "mentally ill."

In fact, New York law has recognized a critical distinction between those who end their life in a rational state of mind and those who do so as a result of a mental illness – "[s]uicide involves the deliberate termination of one's existence, while in the possession and enjoyment of his mental faculties. Self-slaughter by an insane man or a lunatic is not an act of suicide within the meaning of the law." *Hines v. Doe*, No. 951-23, 2023 WL 2320234, at *3 (N.Y. Sup. Ct. Mar. 1, 2023) (concluding that "a suicidal ideation or attempt is not mental illness per se") quoting, *Breasted v Farmers' Loan & Trust Co.*, 4 Hill 73, 75 (Sup Ct 1843); and citing, *Myers v*

---

[7] "Emergency admissions for immediate observation, care, and treatment."
[8] Entitled, "Involuntary admission on medical certification."
[9] Entitled, "Involuntary admission on certificate of a director of community services or his designee."

*Schneiderman*, 30 NY3d 1, 12 (2017) (implying that suicide, by definition, must bear the indicia of rationality: suicide has long been understood as "the act or an instance of taking one's own life voluntarily and intentionally) (emphasis supplied); The Earliest Acts and Laws of the Colony of Rhode Island and Providence Plantations 1647-1719, p 19 (J Cushing ed 1977) (noting that as early as 1647 Rhode Island made a distinction between rational suicide and suicide with mental illness: "[if a man] kills himself of a premeditated hatred against his own life: . . . his goods and chattels are the king's custom; but in case he be an infant, a lunatic, or mad, he forfeits nothing") (emphasis supplied).

Plaintiff has a clear and substantial likelihood of success on the merits of his claims.

## IV. AN INJUNCTION IS IN THE PUBLIC INTEREST

### A. The Public Interest Favors Enjoining Unconstitutional Laws

A preliminary injunction is "in the public interest" if the preliminary injunction would not "cause harm to the public interest." *U.S. S.E.C. v. Citigroup Global Mkts. Inc.*, 673 F. 3d 158, 163 n.1 (2d Cir. 2012). "As with irreparable injury, when a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 743 (D. Conn. 2018) citing, *Ms. L. v. U.S Immigr. & Customs Enf't ("ICE")*, 310 F. Supp. 3d 1133, 1146 (S.D. Cal. 2018), modified, 330 F.R.D. 284 (S.D. Cal. 2019), and enforcement granted in part, denied in part sub nom. *Ms. L. v. U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020) quoting, *Arizona Dream Act Coalition*, 757 F.3d 1053, 1069 (9th Cir. 2014) (balance of equities favors preventing the violation of a party's constitutional rights).

**B. Permanent Disarmament Creates a Barrier to Treatment**

Permanently disarming individuals based on brief and temporary hospital admissions, like § 9.39, creates a substantial barrier to treatment and wellness.

A 2025 study published by The Benjamin Center, SUNY New Paltz reveals that the "pervasive and chronic stress of first responders' work can impact their mental health and well-being and place them at risk for mental health challenges, including anxiety, depression, PTSD, burnout, and substance abuse. Some research has found higher rates of depression, PTSD, anxiety, and suicidal ideation among first responders compared to the general population.[10] There is also a "deep concern about suicidality within the first responder community." *Id.* at 20.

When asked to "reflect on the barriers to seeking mental health care," 80% of participants identified the "stigma associated with seeking mental health care" and 68% cited "concerns about losing [their] pistol license." These punitive barriers discourage  and/or prevent individuals from coming forward, which *increases* the chances of harm to self or others – circumstances that are decidedly not in the public interest.

**C.  Permanently Disarming Individuals Found *Not* 'Mentally Ill and Dangerous' is Contrary to the Public Interest**

Permanently disarming individuals who were accused of being 'mentally ill and dangerous' but then discharged shortly thereafter because a psychiatrist determined they were, in fact, not 'mentally ill and dangerous' is contrary to the public interest and undermines the protections afforded to the People under the Second Amendment. [11]

---

[10] https://www.newpaltz.edu/media/the-benjamin-center/First%20Responder.2025.pdf (last visited March 6, 2025) (cleaned up).

[11] MHL § 9.39 is a period of evaluation is a temporary disarmament based on reasonable cause, like the constitutionally allowable temporary confinement under the Fourteenth Amendment to evaluate an individual for mental illness and dangerousness. If an individual does not meet the standard for a commitment under MHL § 9.37 (and are thus discharged) they do not meet the standard for permanent disarmament.

The challenged regulations are "not a constitutionally-permissible policy choice." See *e.g.*, *Heller*, 554 U.S. at 636 ("…the enshrinement of constitutional rights necessarily takes certain policy choices off the table."). There is strong public interest in encouraging people to seek help and assistance when needed. Permanently disarming those who are determined to be medically sane and non-dangerous undermines the public trust.

"The public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens. And it is always in the public interest to prevent the violation of a person's constitutional rights. *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1136 (S.D. Cal. 2017), aff'd, 742 F. App'x 218 (9th Cir. 2018) (granting preliminary injunction of California's magazine ban statute) citing, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom., *Burwell v. Hobby Lobby Stores, Inc.*, ⸺ U.S. ⸺, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014).

"As Members of the Supreme Court have already explained, [t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *Bruen*, 597 U.S. at 17, n. 3 quoting, *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010) (plurality opinion).

## V. THE BALANCE OF EQUITIES TIPS IN PLAINTIFF'S FAVOR

*Bruen, Heller* and *McDonald*, flatly rejected 'balancing' the government's interests against the individual rights guaranteed by the Second Amendment. The right to be armed for self-defense is the "very product of an interest balancing by the people" and "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense." *Heller*, 554 U.S. at 635.

That said, the equities decidedly tip in Plaintiff's favor. Plaintiff is absolutely foreclosed from exercising his rights under the Second Amendment. Any inconvenience to the government

is vastly outweighed by the irreparable harm suffered by Plaintiff in the absence of an injunction and the restoration of constitutionality to the People of New York.

## CONCLUSION

Plaintiff's motion for a preliminary injunction should be granted.

Dated: March 6, 2025
      Scarsdale, New York

                    THE BELLANTONI LAW FIRM, PLLC
                    *Attorneys for Plaintiff*

By:    *Amy L. Bellantoni*
                    Amy L. Bellantoni
                    2 Overhill Road, Suite 400
                    Scarsdale, New York 10583
                    abell@bellantoni-law.com