UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EDMUND J. SUSMAN, JR., and all similarly
situated individuals,

Plaintiff,

vs.                                              Case No. 24-CV-1281

ANN MARIE T. SULLIVAN, M.D., in her
official capacity, ROSSANA ROSADO, in her
official capacity, PAM BONDI, in her official
capacity, KASH PATEL, in his official capacity,

Defendants.

_____

## UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff asks this Court for urgent injunctive relief, but this relief is not needed. First, Plaintiff is not facing irreparable harm and what harm he may face is self-created and avoidable. Plaintiff is a federal law enforcement officer who has come to the Court claiming that he "cannot legally carry weapons, which he is required to do for his job as a federal law enforcement officer . . . ." *Susman v. Sullivan*, No. 24-CV-1281-LJV, 2025 WL 575515, at *8 (W.D.N.Y. Feb. 21, 2025). But Plaintiff is legally entitled to carry a firearm in his role as a federal law enforcement officer *right now* because 18 U.S.C. § 925(a)(1) provides an exemption to the statutory prohibition found in 18 U.S.C. § 922(g)(4). Moreover, at the moment, Plaintiff is—by choice—on administrative leave and has no official job duties, let alone duties that would require him to carry a firearm. No Court intervention is needed to allow Plaintiff to do his job, and thus no urgent relief is needed.

Plaintiff is also a private citizen who required emergency in-patient mental health treatment at a medical facility in 2015, and, pursuant to 18 U.S.C. § 922(g)(4), is prohibited

from possessing a firearm unless and until he seeks relief through established administrative procedures. To avoid drawing Courts into lawsuits like this one, Congress established a process for Plaintiff to seek relief from § 922(g)(4) through administrative review at the state level. To date, Plaintiff has refused to follow the procedures that the State of New York has established to restore his ability to possess a firearm in his personal capacity—even as he asserts urgent constitutional harms. This failure to seek administrative relief is fatal to his motion for injunctive relief.

Plaintiff is also unlikely to succeed on the merits because he has failed to assert cognizable claims against the United States. Plaintiff's Amended Complaint purports to assert constitutional violations on his own behalf and on behalf of others who have undergone emergency in-patient mental health commitments. Plaintiff asserts these claims, however, under 42 U.S.C. § 1983, which provides a device for challenging the individual actions of state officials—not the official actions of federal agencies. Also, given that Plaintiff can, in fact, continue to carry a firearm in his job or has chosen not to, as well as his refusal to submit to the relief-from-disability program, Plaintiff likely lacks standing to assert his constitutional claims. Lastly, even if this Court were to consider the substance of Plaintiff's challenge, Supreme Court and Second Circuit precedents make clear that Plaintiff is unlikely to prevail on the merits. For these reasons, too, no urgent relief is needed.

## I.      Factual and Procedural Background.

Plaintiff Edmund J. Susman, Jr., is a resident of Grand Island, New York. ECF No. 56 (Stipulation of Facts ("Stip.")), at ¶ 1. Plaintiff is a Special Agent with the U.S. State Department, Diplomatic Security Service ("DSS"). Stip., at ¶ 49. DSS is the federal law enforcement and security arm of the State Department. *Id.* ¶ 48. DSS agents are federal law

enforcement officers. *Id*. Plaintiff is required to carry a firearm as part of his essential job duties. *Id*. ¶ 50. The State Department has established policies and procedures to govern the conduct of its employees, including DSS Special Agents. *Id*. ¶ 51. These procedures and policies are contained in the Foreign Affairs Manual ("FAM"), which is "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department." *Id*. 12 FAM 090 governs Use of Force Policies and Reporting for DSS agents such as Plaintiff. *Id*. ¶ 52.

In 2015, Plaintiff was hospitalized at Erie County Medical Center ("ECMC") for several days of treatment relating to a "mental health episode." *Susman*, 2025 WL 575515, at *2. Plaintiff was admitted by hospital staff pursuant to New York State Mental Hygiene Law ("MHL") § 9.39 (Emergency admissions for immediate observation, care, and treatment). Stip., at ¶70. Pursuant to MHL § 7.09(j), Plaintiff's multi-day commitment to the hospital for "suicidal ideations," 2025 WL 575515, at *2, was reported to the National Instant Criminal Background Check System ("NICS") Index. Stip., at ¶ 95.

On November 22, 2024, Plaintiff tried to make a purchase from a federal firearm licensee, where he underwent a NICS background check. *Id*. ¶ 104. His purchase was denied pursuant to 18 U.S.C. § 922(g)(4) based on his 2015 admission to ECMC under MHL § 9.39. *Id*. ¶¶ 98, 105. Plaintiff submitted an online appeal to the NYSP, which led to an appeal to the New York State Attorney General's Office through Background.Check@ag.ny.gov. *Id*. ¶ 109. Plaintiff was told that his transaction had been denied under 18 U.S.C. § 922(g)(4). *Id*. ¶ 109-110.

Plaintiff filed his Original Complaint on December 31, 2024. Two days later, he moved for a temporary restraining order ("TRO") and a preliminary injunction with respect

to his Second Amendment claims. In his Original Complaint, Plaintiff asserted that "his inability to exercise his Second Amendment rights jeopardizes both his job and his safety." ECF No. 1, at 26, ¶¶ 6-8. He further asserted that he had been forced to expend annual leave—which was on the verge of being exhausted—because of his inability to exercise his Second Amendment rights. ECF No. 23-1, at ¶ 10. Plaintiff further provided that, if he was not able to "qualify with [his] duty firearm on or before February 22, 2025," then he would be terminated or forced to retire." *Id.*, at ¶ 9. This Court denied his motion for emergency relief on February 21, 2025. Plaintiff filed the Amended Complaint on March 3, 2025. Three days later, Plaintiff filed a motion for a TRO and preliminary injunction ("TRO Motion"), and to expedite a hearing on TRO Motion.

In his Amended Complaint, Plaintiff alleges that he "has been placed on administrative leave . . . ***because of*** Defendants' categorization of his § 9.39 hospital admission as a disqualifying event under 18 U.S.C. § 922(g)(4) and MHL 7.09(j)." ECF No. 36-4, at 14 (citing Susman PI Dec., at ¶ 8) (emphasis added). In fact, beginning in January 2025, Plaintiff voluntarily began taking leave for about 50% of his duty hours, Stip, at ¶ 53. On approximately February 2, 2025, Plaintiff voluntarily submitted his resignation pursuant to the "Fork in the Road" Program, also known as the Deferred Resignation Program. *Id.* ¶ 54. The Court held a status conference on March 14, 2025, and set a briefing schedule.

## II.     Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Requests for preliminary injunctions "should not be routinely granted." *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (internal citations omitted). It is the Plaintiff's burden to show that a

preliminary injunction is appropriate. *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 771 (W.D.N.Y. 2020). Where, as here, a party seeks to enjoin governmental action already taken pursuant to a statute, he must show: (1) a clear or substantial likelihood of success on the merits, (2) a "strong showing" of irreparable harm, (3) the balance of equities tips in his favor, and (4) the issuance of an injunction is in the public interest. *Bimber's Delwood, Inc.*, 496 F. Supp. 3d at 771. "When the government is a party to the suit, the court's inquiries into the public interest and the balance of the equities merge." *Susman*, 2025 WL 575515, at *12 (quoting *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021)).

**POINT I:**
**PLAINTIFF HAS NOT BEEN IRREPARABLY HARMED BECAUSE HE IS NOT IN FACT BARRED FROM CARRYING A FIREARM IN HIS CAPACITY AS A FEDERAL LAW ENFORCEMENT OFFICER**

As Plaintiff observes, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation omitted). To meet this requirement, plaintiffs "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

Plaintiff claims (incorrectly) that he has been "permanently disarmed," Am. Compl., at ¶¶ 6, 71, 127, 129, 136, 160; Pl.'s Mtn., at 4, subjected to "permanent disarmament," Pl.'s Mtn., at 5, and subjected to "an absolute barrier" to exercising his Second Amendment rights. Pl.'s Mtn., at 6. Plaintiff also asserts that this "disarmament" prevents him from doing his job "with the U.S. State Department as a Diplomatic Security Agent (federal law enforcement officer)." Susman PI Dec., at ¶ 8. "As a result of Defendants' enforcement of the challenged regulations, Plaintiff has been placed on administrative [leave] . . . because of

Defendants' categorization of his § 9.39 hospital admission as a disqualifying event under 18 U.S.C. § 922(g)(4) and MHL 7.09(j)." Pl.'s Mtn., at 14 (citing Susman PI Dec., at ¶ 8).

This contention—that 18 U.S.C. § 922(g)(4) prevented Plaintiff from doing his job as a federal law enforcement officer—was the foundation of his Original Complaint, too. *See* ECF No. 21, at 13 (ECF page 18 of 20) ("disarmament prevents [Plaintiff] from maintaining his firearms qualifications with the U.S. State Department, which is an essential function of his employment, and threatens his security clearance."). In an earlier filing, unsigned but dated February 4, 2025, Plaintiff further asserted that because of his inability to use a firearm at his job he had been forced to expend annual leave—which was on the verge of being exhausted. ECF No. 23-1, at ¶ 10. Plaintiff also asserted that it was "an essential function of my employment . . . that I carry a firearm," *id.*, and that if he was not able to "qualify with [his] duty firearm on or before February 22, 2025, then he would be terminated or forced to retire." *Id.*, at ¶ 9. At the time Plaintiff submitted this unsigned declaration, he had been ***voluntarily*** taking ***50%*** annual leave, which itself calls into question his inability to do his job—given that he could do the work some of the time, and also that he decided himself to take the leave, rather than being told he must. Finally, Plaintiff had submitted his resignation pursuant to the "Fork in the Road" Program by the time his Reply Brief asserted that his "disarmament prevents him from maintaining his firearms qualifications with the U.S. State Department, which is an essential function of his employment . . . ." ECF No. 21, at 13 (ECF page 18 of 20).

Plaintiff's TRO Motion completely glosses over these complicated facts, all of which undermine Plaintiff's claimed inability to work. Instead, Plaintiff simply notes that "[t]his Court already held that Plaintiff 'undoubtedly suffered an 'injury in fact." Pl.'s Mtn., at 14

(ECF 20 of 26) (citing *Susman*, 2025 WL 575515, at *8). But the full quote from this Court's decision—which Plaintiff omitted—stressed how the harm to Plaintiff was not general, but specifically flowed from Plaintiff's need to carry weapons "for his job as a federal law enforcement officer." *Susman*, 2025 WL 575515, at *8. This Court relied upon Plaintiff's representations in finding that he had suffered an "injury," observing that "as a result of that prohibition, Susman cannot legally carry weapons, which he is required to do for his job as a federal law enforcement officer; what is more, if he continued to carry weapons, he would be exposing himself to 'criminal penalties.'" *Susman*, 2025 WL 575515, at *8.

Plaintiff is legally and factually incorrect in a host of assertions he has made to the Court. As a federal law enforcement officer, Plaintiff can possess and use a firearm in his official capacity. While § 922(g)(4) makes it unlawful for any person "adjudicated as a mental defective or who has been committed to a mental institution" to possess or receive a firearm, § 925(a)(1) provides an exemption to allow for the possession of firearms for official government purposes by those who would be otherwise prohibited under § 922(g)(4).

Courts have repeatedly recognized that the prohibitions under § 922(g) are inapplicable to law enforcement officers acting in their official capacities.[1] *See, e.g., Gillespie v. City of Indianapolis*, 185 F.3d 693, 698 (7th Cir. 1999) ("the Gun Control Act exempts the state and federal members of the armed services and law enforcement agencies who might otherwise be prohibited from carrying firearms to do so in connection with their public responsibilities."); *see also United States v. Baker*, 438 F.3d 749, 758 (7th Cir. 2006) ("the statute's effect has been to allow members of the armed services and law enforcement

---

[1] By statute, this law enforcement exception does not apply to disabilities due to a misdemeanor conviction for domestic violence (18 U.S.C. §§ 922(d)(9) or (g)(9)).

agencies (i.e., *not* civilians) who might otherwise be prohibited from carrying firearms to do so in connection with their public responsibilities.") (internal citations omitted and cleaned up); *United States v. Gonzalez*, 528 F.3d 1207, 1214 (9th Cir. 2008) (Section 925(a)(1) provides armed forces members and law enforcement relief from the prohibitions of § 922 and allows them to carry firearms in connection with their public responsibilities); *Clifton v. United States DOJ*, 615 F. Supp. 3d 1185, 1191 (E.D. Cal. 2022) ("18 U.S.C. § 925(a) provides an exception to the firearms ban under 18 U.S.C. § 922(g)(4) for state or federal actors operating in their official capacity."); *Keyes v. Lynch*, 214 F. Supp. 3d 267, 270 (M.D. Pa. 2016) (individuals are "permitted to possess firearms in their official capacities as law enforcement officers by operation of 18 U.S.C. § 925(a)(1), which provides an exception to the firearms disability created by § 922(g)(4) for individuals benefitting in their official capacities the federal or state government"); *Franklin v. Sessions*, 291 F. Supp. 3d 705, 710 (W.D. Pa. 2017) (observing that a Kentucky state law enforcement officer was authorized to possess a handgun while in his official capacity pursuant to 18 U.S.C. § 925(a)(1)).

New York has an analogous exemption to state weapons possession laws. *See* NY Penal § 265.20(a)(1)(d) (exempting "[p]ersons in . . . service of the United States, in pursuit of official duty or when duly authorized by federal law, regulation or order to possess the same."); *see also People v. Vera*, 9 A.D.3d 413 (2d Dep't 2004) (describing Penal § 265.20 as "an absolute grant of immunity"). Moreover, the 922(a)(1) exemption is not limited to just traditional law enforcement, such as police, or the military. Instead, this exemption "applies to all employees of the United States . . . ." *Coy, Colby v. Dep't of the Army*, No. PH-0752-21-0328-I-1, 2021 WL 6199983 (MSPB Dec. 29, 2021). Furthermore, as part of his official

duties, Plaintiff is authorized by State Department regulations to "carry and use firearms in the performance of [his] duties," and "on and off duty":

> A DSS special agent stationed in the United States is authorized to carry approved firearms *on and off duty* in accordance with this policy and consistent with other applicable laws, regulations, and Department policies . . .

12 FAM 092.2-2 Authorization to Carry Firearms (emphasis added).

In short, Plaintiff is neither permanently disarmed nor unable to perform his job. To start with, he has no job duties at all, let alone duties that would require him to carry a firearm. But were he to resume his job as a DSS Special Agent, he could lawfully carry a firearm for his "official duties"—which include carrying firearms "on and off duty" under State Department regulations. True, Plaintiff could not use his firearm for any reason he wanted to—at this point. If, for example, Plaintiff wished to use his firearm for skeet shooting or fox hunting, such use would not be part of his "official duties" and would remain prohibited under § 922(g)(4). But this is a far cry from the scenario presented to the Court. And it is a limitation with a presumptively short duration should Plaintiff act to have the prohibition on his use of a firearm outside of his official duties lifted.

## POINT II:
## PLAINTIFF HAS NOT BEEN IRREPARABLY HARMED BECAUSE AN ADMINISTRATIVE REMEDY IS READILY AVAILABLE

Plaintiff has a readily available administrative path to lift his firearm prohibition: he can submit a relief-from-disability application pursuant to New York Mental Hygiene Law § 7.09(j)(2). Under § 709(j)(2), Plaintiff must simply show that his record and reputation are such that he will not be likely to act in a manner dangerous to public safety and that lifting the prohibition would not be contrary to public safety. *See Houston v. Nassau Cnty. Police Dep't*, No. 20-CV-5253-KAM-AKT, 2020 WL 7643132, at *3 (E.D.N.Y. Dec. 23, 2020)

(describing the administrative process). As this Court observed, "if relief is granted through this state process—which Susman thus far has declined to pursue—then federal law provides that section 922(g)(4) no longer applies." *Susman*, 2025 WL 575515, at *12.

Plaintiff has this option *right now*. At least facially, Plaintiff appears readily capable of lifting the firearm prohibition that applies to his private use of firearms. Indeed, his filings to date—and representations by the State Defendants—suggest that New York State would likely conclude that Plaintiff should not be disqualified from possessing a firearm. *See* ECF No. 16 (NYAG observed that "if Plaintiff's allegations about his mental health recovery and job responsibilities over the past ten years are accurate, he would appear to be a strong candidate for a certificate of relief."). But Plaintiff has declined to pursue that administrative process. Instead, Plaintiff has chosen to pursue the far more prolonged, tangled, and difficult path of asserting constitutional challenges against both the United States and New York. In addition to the legal reasons below, Plaintiff's ***chosen path*** is also highly impractical. The United States has extremely limited knowledge as to what treatment Plaintiff did or did not receive during his admission to the Erie County Medical Center. Should this case proceed, the United States would need full discovery, including depositions, such that any resolution via lawsuit would take far longer than the administrative process readily available to Plaintiff.

Plaintiff's arguments should be rejected because (i) he has failed to exhaust his administrative remedies; (ii) his request entangles the Court unnecessarily in a constitutional issue in violation of the judicial avoidance doctrine; and (iii) the availability of an administrative "off-ramp" for Plaintiff defeats (as a definitional matter) Plaintiff's claim of

irreparable harm. Accordingly, this Court should deny Plaintiff's motion for a TRO and stay this litigation for the brief period needed for Plaintiff to complete the administrative process.

I.     **New York's Relief-From-Disability Process Exists Within a Larger Federal Statutory Scheme.**

New York's administrative process is an essential component of the federal statutory scheme designed by Congress to balance Second Amendment rights and public safety. Congress established NICS in 1993. *See* Pub. L. 103-159 § 103 (1993). NICS is a database of records obtained from federal agencies and authorized state and local agencies. 28 C.F.R. §§ 25.3, 25.4. With the NICS Improvement Amendments Act of 2007, P.L. 110-180, Congress required states, as a condition for federal grant eligibility, to establish procedures for persons to seek relief from Section 922(g)(4) disabilities. *See* 34 U.S.C. § 40915.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is responsible for reviewing the eligibility of a state's disability relief program. To qualify, a state must complete and submit ATF Form 3210.12 (Certification of Qualifying State Relief from Disabilities Program) to certify that it has established a qualifying mental health relief from firearms disabilities program that satisfies certain minimum criteria. New York's program was certified by the ATF in 2009. *See* nics_act_list.7-7-21_0.pdf.[2] New York (like over 30 other states) has accepted the Congressional invitation to establish a procedure to lift the disqualification that Section 922(g)(4) imposes. *See* 34 U.S.C. § 40915(a)(2). In such a scheme, a state agency or state court must consider whether a person is no longer "likely to act in a manner dangerous to public safety." *Id.* If a state grants an "application for relief,"

---

[2]     Available at: https://www.atf.gov/firearms/docs/guide/nicsactlist7-7-210pdf (last accessed April 9, 2025)

then "the adjudication or commitment . . . is deemed not to have occurred for purposes of subsection[ ] (g)(4)." 34 U.S.C. § 40915(b). The state court or agency must adjudicate any application for relief "in accordance with the principles of due process," and the applicant must have a right to "*de novo* judicial review." 34 U.S.C. § 40915(a)(2)-(3).

Here, New York has enacted a qualified scheme compliant with 34 U.S.C. § 40915. *See* N.Y. Consolidated Laws § 13.09(g). Thus, in New York, Section 922(g)(4) applies only to individuals who have been unable to establish that they no longer present a danger to the public or to themselves. Because Plaintiff resides here, that should be the end of the matter because that qualified administrative process—Section 709(j)(2)—provides Plaintiff an adequate opportunity to show he is no longer likely to act dangerously.

## II.     Plaintiff Has Failed to Exhaust His Administrative Remedies.

First, plaintiffs are generally expected to exhaust administrative remedies. Indeed, the Second Circuit has confirmed that this is the normal rule. *St. Regis Mohawk Tribe v. President R.C. St. Regis Mgmt. Co.*, 451 F.3d 44, 50 (2d Cir. 2006) ("As a rule, plaintiffs must exhaust administrative remedies before seeking redress in federal court."). In that case, plaintiff (a Native American Tribe) asked the court to void a contract to build a casino for lack of approval allegedly required by a federal statute (the Indian Gaming Regulatory Act, or "IGRA"). The IGRA, however, specified steps to challenge contract decisions before bringing the claims in federal court. The Second Circuit found that the statutory scheme was plain. Thus, it rejected the plaintiff's claim based upon "the long-settled rule of judicial administration . . . that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Id.* (cleaned up).

Here, Plaintiff appears to believe that he can avoid the general administrative exhaustion requirement by asserting a constitutional challenge. But Plaintiff gets things backward. "Requiring exhaustion is ***particularly appropriate*** when the administrative remedy may eliminate the necessity of deciding constitutional questions." *Cooper v. Lee*, 86 F. Supp. 3d 480, 487 (E.D. Va. 2015) (emphasis added), *aff'd* Jan. 14, 2016; *Collazo v. Santiago*, 698 F. Supp. 30, 34 (D.P.R. 1988). In *Cooper*, plaintiff was an inventor who challenged the constitutionality of administrative review proceedings conducted by the U.S. Patent and Trademark Office. The court rejected the argument that constitutional claims are exempt from administrative requirements and held that "exhaustion is required when an administrative litigant challenges the constitutionality of a statute that an agency is charged with implementing." *Cooper,* 86 F. Supp. 3d at 486. While Plaintiff here is not "an administrative litigant," he acknowledges that his correspondence with the NYAG was an "appeal" (Stip., at ¶ 109); furthermore, under 34 U.S.C. § 40915(a)(2)-(3), New York must process applications for relief "in accordance with the principles of due process," and the applicant must have a right to "*de novo* judicial review."

In fact, it is not unusual for the Supreme Court and lower courts to require administrative exhaustion when a Plaintiff asserts constitutional challenges:

> the very fact that constitutional issues are put forward constitutes a strong reason for not allowing this suit either to anticipate or to take the place of the [administrative process]. When that has been done, it is possible that nothing will be left of appellant's claim, asserted both in that proceeding and in this case, concerning which it will have a basis for complaint.

*Aircraft & Diesel Equip. Corp. v. Hirsch*, 331 U.S. 752, 772 (1947); *see also Thetford Props. IV Ltd. P'ship v. U.S. Dep't of Housing & Urban Dev.*, 907 F.2d 445, 448 (4th Cir. 1990) ("The exhaustion requirement serves many purposes not the least of which are to allow an agency

the opportunity to use its discretion and expertise to resolve a dispute without premature judicial intervention . . . ."); *Chicago Auto. Trade Ass'n v. Madden*, 328 F.2d 766, 769 (7th Cir. 1964) ("an allegation of unconstitutional harm is insufficient to warrant equitable intervention where pursuit of administrative remedies might ultimately render judicial disposition of such issues unnecessary."). Plaintiff's failure to exhaust his administrative remedies thus greatly undermines his claims to irreparable harm and likelihood of success.

III.     **The Constitutional Avoidance Doctrine Counsels Dismissal.**

Plaintiff's chosen path seeks to unnecessarily entangle this Court in a constitutional issue in violation of the judicial avoidance doctrine, which guides federal courts to avoid unnecessarily deciding challenges on constitutional grounds. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (regarding its application in choosing one statutory interpretation over another, the Supreme Court observed that "one of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions"). For many of the same reasons that this Court should require Plaintiff to exhaust his administrative remedy, it should avoid unnecessarily deciding a constitutional issue. As one federal court observed:

> Much like the doctrine of constitutional avoidance, the doctrine of exhaustion is grounded in important prudential considerations, such as providing an agency with the opportunity to correct its mistakes before it is haled into court and ensuring that parties do not employ judicial review to weaken an agency's administrative processes.

*Seraji v. Gowadia*, No. 8:16-CV-01637-JLS-JCG, 2017 WL 2628545, at *3 (C.D. Cal. Apr. 28, 2017) (dismissing Fifth Amendment claim because Plaintiff failed to exhaust his administrative remedies). Should this Court deny the injunctive relief and stay this proceeding while Plaintiff pursues his administrative remedies, it would ensure that it is only called to decide the constitutional claim if truly necessary. "[T]he crucible of

administrative review ensures that the petitioner's case presents a true constitutional dispute before the Judiciary steps in to decide those weighty issues." *Berry v. Saul*, No. 1:18-CV-00046, 2019 WL 4923979, at *13 (M.D. Tenn. Aug. 20, 2019), *report and recommendation adopted*, No. 1:18-CV-00046, 2019 WL 4916566 (M.D. Tenn. Oct. 4, 2019).

## IV. Plaintiff's Option to Choose an Administrative Remedy Undermines His Claim of Irreparable Harm.

As this Court has already recognized, the availability of an administrative offramp that may (and presumably should) eliminate the firearm prohibition defeats Plaintiff's claim of irreparable harm. *See Susman v. Sullivan*, No. 24-CV-1281-LJV, 2025 WL 575515, at *14 (W.D.N.Y. Feb. 21, 2025) ("The Court notes, however, that even if Susman had standing here, this Court would have reservations about whether he had shown 'irreparable harm' in light of his failure to seek relief through the administrative avenues available to him, even in tandem with this lawsuit."). Nor may Plaintiff claim that having to submit to the administrative process itself constitutes irreparable harm. To the contrary, "[i]rreparable harm cannot be established by a mere reliance on the burden of submitting to agency [proceedings. Instead, the] absence of irreparable harm renders inexcusable plaintiff's failure to exhaust [his] administrative remedies, as well as the district court's interference with the administrative process." *Small v. Kiley*, 567 F.2d 163, 165 (2d Cir. 1977).

## POINT III: PLAINTIFF CANNOT SHOW CLEAR LIKELIHOOD OF SUCCESS BECAUSE HIS CLAIMS ARE INVALID AND/OR PREMATURE

Plaintiff purports to sue the named federal officials under 42 U.S.C. § 1983. Am. Compl., at ¶¶ 161 - 164. The Amended Complaint expressly states that each cause of action is based on Section 1983. *Id.* But that statute is plainly inapplicable to the federal actors he sues here because Section 1983 applies only to state actors. *See Dotson v. Griesa*, 398 F.3d 156,

163 (2d Cir. 2005) (Section 1983 applies only to state actors); *Lopez v. Dir., IRS*, No. 16-CV-600-VAB, 2017 WL 337978, at *5 (D. Conn. Jan. 23, 2017) ("Section 1983 provides a remedy only for state actors' deprivations of federal law or constitutional rights, and it does not apply to the actions of the federal government or its agents."). The United States "has not waived its sovereign immunity for claims under Sections 1981 to 1986 of Title 42." *Lopez,* 2017 WL 337978, at *6. For this reason, alone, Plaintiff's claims should be dismissed.

In addition, Plaintiff likely lacks standing to assert this constitutional challenge, as the State argued in its memorandum of law in opposition to Plaintiff's Original Complaint. *See* ECF No. 16, at 20-21. In *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012), for example, the Second Circuit held that a plaintiff did not have standing to raise a constitutional challenge to New York's firearm licensing scheme because he failed to apply for a gun license in New York. Plaintiff's failure to use available administrative remedies severely undercuts his standing under well-established Second Circuit precedent. *See Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997) (prisoner had no standing to sue over refusal to allow him to wear religious garb associated with a particular religious group because he had not registered with the prison as a member of that group).

### POINT IV: PLAINTIFF CANNOT SHOW CLEAR LIKELIHOOD OF SUCCESS UNDER SUPREME COURT AND SECOND CIRCUIT PRECEDENT

Plaintiff has not shown a clear likelihood of success on the merits, as is necessary to obtain a preliminary injunction. The Supreme Court has repeatedly emphasized that laws disarming the mentally ill are "presumptively lawful," and American law and history demonstrate that laws preventing persons who have experienced mental illness from obtaining firearms are fully consistent with the Nation's tradition of firearm regulation, as are individualized assessments of dangerousness prior to granting or restoring a person's

ability to carry deadly weapons. New York's administrative process to seek a certificate for relief from disabilities reinforces the constitutionality of the applicable framework.

I.      **Framework for Analyzing Second Amendment Challenges**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Amendment guarantees an individual right to possess and carry firearms for self-defense, but that right "is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022); *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024).

Under *Bruen* and *Rahimi*, courts reviewing a claim that a law violates the Second Amendment ask two questions. First: Does the Second Amendment's plain text cover the conduct at issue? *Bruen*, 597 U.S. at 24. If so, then second: Does the challenged law square with the nation's tradition of gun regulation? *Id.* At the second stage of analysis, the government bears the burden of offering historical evidence to support the challenged law. *Id.* at 24-25; *see also Antonyuk v. James*, 120 F.4th 941, 968 (2d Cir. 2024), *cert. denied*, No. 24-795, 2025 WL 1020368 (U.S. Apr. 7, 2025) (*Bruen* requires courts to engage in two analytical steps when assessing Second Amendment challenges).

When comparing modern and historical gun laws, courts often must "reason[ ] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 597 U.S. at 28-29 (quotation marks omitted). *Rahimi* further clarified that Second Amendment law is not "trapped in amber" or otherwise limited to "regulations identical to ones that could be found in 1791." *Id.* at 1897-1898. There is no requirement that a law be a "'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30).

II.    **Because the Mentally Ill Are Not "Law-Abiding, Responsible Citizens," the Second Amendment Does Not Protect Their Right to Bear Arms.**

a.    **The Second Amendment Permits Categorical Group Bans on Firearm Possession.**

In determining the scope of the "right to keep and bear arms," the Supreme Court has recognized that Congress may ban certain categories of "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. Nor does the Second Amendment guarantee an unlimited right to carry protected weapons in all locations. *Antonyuk*, 120 F.4th at 971 (Congress may ban weapons in "sensitive places") (*quoting Bruen*, 597 U.S. at 30).

Categorical bans on the possession of firearms by specific groups are similarly compatible with the Second Amendment. In *Rahimi*, for example, the Supreme Court reiterated that nothing in its opinion was meant to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 144 S. Ct. at 1901. For example, some early legislatures banned firearm possession by specified groups of individuals, such as "drunken New Year's Eve revelers." *Rahimi*, 144 S. Ct. at 1897. Other laws targeted "individuals who physically threatened others." *Id.* at 1899. Similarly, the Court has emphasized that the government may require gun owners to pass background checks—which typically include a mental health check—because such checks ensure that those who carry guns "are, in fact 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (citation omitted).

The Court's conclusion that only law-abiding, responsible citizens may possess firearms stems from the "Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The United States has a longstanding tradition, dating to colonial times and

continuing to the present, of disarming those who lack the capacity to be responsible or who pose a danger to themselves or others. In exercising this authority, legislatures have frequently made categorical judgments about responsibility, rather than proceed through individualized case-by-case analysis.

For example, when the Revolutionary War began, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic. See, e.g., 4 *Journals of the Continental Congress 1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776). Continuing into the 19th century, legislatures disarmed a range of individuals whom they deemed unfit to carry firearms. Some states began to restrict the sale of firearms to, or the possession of firearms by, individuals below specified ages. *See, e.g.*, 1856 Ala. Acts 17; Act of Feb. 17, 1876, No. 128, § 1. Others disarmed "tramps" and vagrants. *See*, *e.g.,* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394. Still more forbade intoxicated persons from buying or carrying arms. *See, e.g.,* Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290. These disqualifications, like those in the Republic's earliest days, reflect the enduring principle that the Second Amendment allows Congress and other legislative bodies to disarm individuals who are not law-abiding, responsible citizens.

### b. The Second Amendment Permits Bans on Firearm Possession by the Mentally Ill.

One category of individuals who lack the right to bear arms are the mentally ill. *See United States v. Gonzalez*, No. 23-CR-6210CJS, 2024 WL 5336649, at *3 (W.D.N.Y. Nov. 13, 2024), *report and recommendation adopted*, No. 23-CR-6210-CJS-MWP, 2025 WL 219112 (W.D.N.Y. Jan. 16, 2025) ("As this Court observed, the Court in *Rahimi* reiterated its previous statements that many prohibitions on firearms possession, 'like those on the

possession of firearms by felons and the mentally ill, are presumptively lawful.'"). Indeed, the Supreme Court has made this observation repeatedly. *See, e.g., Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786.

"[H]istorical evidence supports the view that society did not trust the mentally ill with the responsibility of bearing arms." *Mai v. United States*, 952 F.3d 1106, 1114 (9th Cir. 2020). In pre-Founding and Founding-era America, for example, those who had become affected with mental illnesses "were generally treated as if they had been . . . [s]tripped of all . . . their rights and privileges." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949). "It should come as no surprise that confinement did not include access to guns." *United States v. Veasley*, 98 F.4th 906, 913 (8th Cir. 2024). Around the time of the Second Amendment's ratification, several states had enacted laws that permitted the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind." See, *e.g.*, 1769 Va. Act 13; 2 William Littell, *The Statute Law of Kentucky* 578 (1810) (referencing statute of 1787). Governing officials under these and other provisions had "a lot of discretion when deciding whether to confine the mentally ill." *Veasley*, 98 F.4th at 914.

In the twentieth century, more regulations restricting the delivery or sale of firearms were extended to the mentally ill. *See, e.g.*, 1927 N.J. Laws 745; 1931. Given this entire body of American law, "longstanding prohibitions on the possession of firearms" by the mentally ill have a well-established "historical tradition." *Heller*, 554 U.S. at 626-627; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).

### c. Congress Could Categorically Bar the Individuals Described in 18 U.S.C. § 922(g)(4) from Possessing Firearms.

Since both categorical prohibitions and prohibitions on firearm possession by the mentally ill are consistent with the Second Amendment, it logically follows that 18 U.S.C. § 922(g)(4) is facially constitutional. Congress could reasonably conclude that persons who have been involuntarily committed to mental institutions are not "responsible" citizens and thus (as a category) are more likely than ordinary citizens to pose a risk of misusing firearms. The principal purpose of the Gun Control Act, which enacted Section 922(g)(4), was to "c[ur]b crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 90-1501, at 22, *available at* 1968 U.S.C.A.N.N. 4410). More recently, in passing amendments to this scheme, Congress has reiterated findings that shootings, including mass shootings, have been committed by persons with a history of mental illness. NICS Improvement Amendment Act of 2007, Pub. L. No. 110-180, § 2(8)-(9), 121 Stat. 2559-2560.

Congress broke no new ground in legislating in this field. States almost uniformly impose some sort of restriction on gun possession by persons who have suffered from mental illness. *See* https://www.ncsl.org/civil-and-criminal-justice/possession-of-firearms-by-people-with-mental-illness (last visited Apr. 10, 2025). Connecticut, for example, criminalizes possession by, among others, anyone who "[h]as been confined . . . in a hospital for persons with psychiatric disabilities." New York, similarly, bars licensure to, among others, anyone who has "been involuntarily committed to a facility under the jurisdiction of an office of the department of mental hygiene." N.Y. Penal Law §§ 400.00.

Section 922(g)(4) is consistent with these principles. It applies only to persons whose hospitalization in a mental institution was both (1) involuntary and (2) formally executed by a court, board, commission, or other lawful authority. *Escamilla*, 62 F.4th at 373 (construing "committed to a mental institution"). Data suggest only a small subset of people with serious mental illness are involuntarily committed each year. Alexandra T. Cline, *Who Has the Right?: Analysis of Second Amendment Challenges to 18 U.S.C. § 922(g)(4),* 96 Notre Dame L. Rev. 1623, 1626-1627 (2021). Moreover, the Constitution prohibits involuntary commitment of any "nondangerous individual who is capable of surviving safely in freedom" with or without the assistance of family and friends. *O'Connor v. Donaldson*, 422 U.S. 563, 575-576 (1975). Congress could reasonably find that persons who at one time presented a danger sufficient to warrant involuntary commitment under current due process standards should have restricted access to machinery that can be used to perpetrate dangerous violent acts.

Admittedly, Section 922(g)(4) applies to individuals (like Plaintiff) even if they have been released from involuntary commitments that occurred years in the past. Still, that does not render the statute unconstitutional. *Heller* indicated that the Second Amendment permits categorical bans on firearms possession by the "mentally ill." *Heller*, 554 U.S. at 626. The fact of a person's prior commitment, which must be grounded in a finding of dangerousness, presumptively establishes a sufficient risk of future danger and firearms irresponsibility to support disarmament. *See Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 116 (1983) (observing that Congress in Section 922(g)(4) "made no exception for subsequent curative events" and that "Congress obviously felt that" a person who "may be deemed cured and released" was nevertheless "too much of a risk to be allowed firearms privileges"). Nor is there evidence that mentally ill persons released today would have been

released in early America. *Cf. United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir.) (*cert. filed*) (ban on possession by those on federal pretrial release permissible as they likely would not have been released to bail in the founding era). *Veasley*, 98 F.4th at 915 (noting "heavy-handed" treatment of the mentally ill, who had limited "chance to regain their rights").

III.   **Under Second Circuit Precedent, Section 922(g)(4) is Constitutional as Applied to Plaintiff.**

As discussed above, Congress was entitled to conclude that persons previously involuntarily committed to mental-health institutions or otherwise subject to the bar in Section 922(g)(4) posed an unacceptable risk of danger. As relevant to this case, the Second Circuit, the Seventh Circuit, and New York courts have uniformly characterized admissions under Section 9.39 (as Plaintiff's was) as ***involuntary***. *See Phelps v. Bosco*, 711 F. App'x 63, 65 (2d Cir. 2018) (collecting cases); *Escamilla v. United States*, 62 F.4th 367, 374 (7th Cir. 2023); *Matter of Colihan v. State of New York*, 211 A.D.3d 1432, 1436 (N.Y. App. Div. 2022) (collecting cases). In *Phelps*, for example, the Second Circuit rejected plaintiff's argument (which Plaintiff in this case echoes) that his emergency hospital admission was "for observation and evaluation only and did not constitute a commitment within the meaning of Section 922(g)(4)." Plaintiff-Appellant Phelps' Brief on Appeal, No. 17-627 (C.A.2), 2017 WL 3334763. Thus, under Second Circuit precedent, Plaintiff's emergency hospital admission under § 9.39—despite his claims that it was voluntary and only for observation— was properly considered an involuntary commitment and he was properly disabled (in his personal capacity) from possessing firearms under Section 922(g)(4).

As *Rahimi*, *Gazzola*, and *Antonyuk* made clear, the categorization of individuals as mentally ill (and thus ineligible pursuant to Section 922(g)(4)) was *presumptively* lawful. Under Second Circuit precedent, this "presumption of legality" "can be overcome" only if a

regulation "has the effect of eliminating the ability of law abiding, responsible citizens to acquire firearms." *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023); *accord Antonyuk*, 120 F.4th at 965. While Second Circuit precedent firmly places Plaintiff in this category, Plaintiff's ability to acquire firearms for his personal use was clearly not ***eliminated*** because a Congressionally encouraged, state-designed relief-from-disability program existed. Contrary to Plaintiff's incorrect claims that he has been "permanently disarmed," *see, e.g.,* Am. Compl., at ¶¶ 6, 71, 127, 129, 136, 160, he (and others like him) have a readily available administrative option: submit a relief-from-disability application. New York will then be required to process that application "in accordance with the principles of due process," and Plaintiff must have a right to "*de novo* judicial review."

Plaintiff—for unknown reasons—refuses to take advantage of New York's relief-from-disability program. One might suppose that Plaintiff believes this administrative process is unconstitutionally burdensome as applied to him; in fact, that is not his argument, and this only underscores the impermanent nature of Plaintiff's prohibition. *See Rahimi*, 602 U.S. at 699 (finding that the burden of Section 922(g)(8) "fits within our regulatory tradition," in part, because "like surety bonds of limited duration" its restriction "was temporary."). Rather, Plaintiff objects to his categorization as "mentally ill" under Section 922(g)(4), a step which he himself may contest without tilting at the Second Amendment structure built by *Bruen* and *Rahimi*. To find that Congress's presumptively lawful categorical firearm prohibition is unconstitutional without requiring Plaintiff to first submit to the requisite administrative process that Congress established would turn the *Bruen* and *Rahimi* framework on its head.

This is especially true given that, as the Supreme Court has recognized, the Constitution itself provides no remedy when an adequate state remedy exists. *See generally Parratt v. Taylor*, 451 U.S. 527, 535-543 (1981) (holding that a state actor's negligent deprivation of property does not violate the Due Process Clause if the state provides an adequate alternative remedy); *compare O'Sullivan v. Boerckel*, 526 U.S. 838, 842-849 (1999) (state prisoner may not seek federal habeas relief without first presenting matter to state court and exhausting all levels of review).

In sum, Plaintiff's substantive claim that Section 922(g)(4) was unconstitutional as applied to him (and others like him) should fail. The Second Amendment permits Congress to bar firearm possession by one who has been previously found dangerously mentally ill and has not secured available state relief from that finding. Because Plaintiff falls within that category of persons under well-established Second Circuit precedent, the government did not violate the Second Amendment by restricting Plaintiff's personal access to firearms.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction.

Respectfully,

MICHAEL DiGIACOMO
*United States Attorney for the Western District of New York*

By: /s James Bobseine
JAMES E.B. BOBSEINE
Assistant United States Attorney
138 Delaware Avenue
Buffalo, NY 14202
(716) 843-5824
james.bobseine@usdoj.gov
*Attorneys for Federal Defendants*

25