UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

EDMUND J. SUSMAN, JR., and all similarly
situated individuals,

                            Plaintiffs,

     vs.

ANN MARIE T. SULLIVAN, M.D., in her official
capacity, ROSSANA ROSADO, in her official
capacity, PAM BONDI, in her official capacity,
and KASH PATEL, in his official capacity,

                            Defendants.

Case No. 24-cv-1281 (LJV)

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General
State of New York
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
Attorney for the State Defendants

Daniel Maguire
James M. Thompson
Assistant Attorneys General
Of Counsel

## TABLE OF CONTENTS

PRELIMINARY STATEMENT....................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

   A.   Statutory and Regulatory Background ......................................................... 2

   B.   Factual Background ...................................................................................... 3

STANDARD OF REVIEW ........................................................................................... 4

ARGUMENT ............................................................................................................... 4

   POINT I: PLAINTIFF'S PRELIMINARY INJUNCTION MOTION IS
         FORECLOSED UNDER THE LAW OF THE CASE DOCTRINE ............................. 4

   POINT II: PLAINTIFF CANNOT DEMONSTRATE A CLEAR LIKELIHOOD OF
         SUCCESS ON THE MERITS ...................................................................... 6

       A.   Subject-matter jurisdiction is lacking over Plaintiff's Second Amendment
           claim against the State Defendants. ............................................................. 6

         1.   Plaintiff lacks standing to bring his Second Amendment claims because
             he has not applied for a certificate of relief....................................... 6

         2.   Plaintiff lacks standing because any Second Amendment injuries are not
             traceable to the State Defendants' conduct. ...................................... 7

         3.   The Eleventh Amendment bars Plaintiff's suit because there is no
             ongoing violation and because the State Defendants do not enforce the
             challenged statutes. ........................................................................ 8

       B.   Plaintiff's rush to federal court without utilizing the available federal-state
           administrative process is improper. ................................................... 10

         1.   The federal-state relief from disabilities system is an exclusive remedy ........10

         2.   Plaintiff's failure to utilize the relief from disabilities system renders
             his claim unripe............................................................................. 12

       C.   The Plaintiff has failed to show a likelihood of success on the merits of his
           Second Amendment claim ................................................................ 13

         1.   A Mental Hygiene Law § 9.39 admission is involuntary as a matter of law...14

         2.   The Second Amendment permits disarmament of persons who have been
             involuntarily committed. ................................................................. 15

i. Mental health restrictions do not implicate the Second Amendment's text. .......................................................................................... 15

ii. The temporary disarmament of institutionalized persons is fully consistent with American history and tradition. ....................................... 17

iii. The administrative process for seeking a certificate of relief from disabilities does not violate the Second Amendment ............................... 21

POINT III: PLAINTIFF FAILS TO DEMONSTRATE IRREPARABLE HARM .................... 24

POINT IV: THE EQUITIES AND THE PUBLIC INTEREST SUPPORT INDIVIDUALIZED ADJUDICATION OF PERSONS WHO HAVE BEEN INVOLUNTARILY COMMITTED .......................................................................... 25

CONCLUSION ........................................................................................................ 26

## TABLE OF AUTHORITIES

<u>**Cases**</u>

<u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001) .................................................................. 10

<u>Alharbi v. Miller</u>, 368 F. Supp. 3d 527 (E.D.N.Y. 2019) ................................................. 5

<u>Antonyuk v. James</u>, 120 F.4th 941 (2d Cir. 2024) ................................................... passim

<u>Bimber's Delwood, Inc. v. James</u>, 496 F. Supp. 3d 760 (W.D.N.Y. 2020) ...................... 4

<u>City of New York v. Gordon</u>, 155 F. Supp. 3d 411 (S.D.N.Y. 2015) ................................. 5

<u>City of Rancho Palos Verdes v. Abrams</u>, 544 U.S. 113 (2005) ....................................... 11

<u>Colihan v. State</u>, 211 A.D. 3d 1432 (3d Dep't 2022) ...................................................... 14

<u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) ................................................ passim

<u>EC Term of Years Trust v. United States</u>, 550 U.S. 429 (2007) ...................................... 11

<u>Escamilla v. United States</u>, 62 F.4th 367 (7th Cir. 2023) ......................................... 14, 15

<u>Gardner v. Bassett Med. Ctr.</u>, 148 A.D.3d 1331 (3d Dep't 2017) .................................. 15

<u>Gazzola v. Hochul</u>, 645 F. Supp. 3d 37 (N.D.N.Y. 2022) .............................................. 15

<u>Gazzola v. Hochul</u>, 88 F.4th 186 (2d Cir. 2023) ............................................................ 16

<u>Hinck v. United States</u>, 550 U.S. 501 (2007) ................................................................. 11

<u>Houston v. Nassau Cty. Police Dep't</u>, No. 20 Civ. 5253, 2020 WL 7643132
    (E.D.N.Y. Dec. 23, 2020) .......................................................................................... 11

<u>Jackson-Bey v. Hanslmaier</u>, 115 F.3d 1091 (2d Cir. 1997) ............................................. 6

<u>Joglo Realties, Inc. v. Seggos</u>, No. 16-cv-1666, 2016 WL 4491409 (E.D.N.Y. Aug. 24, 2016) ..... 24

<u>Johnson v. Holder</u>, 564 F.3d 95 (2d Cir. 2009) ............................................................... 5

<u>Karahalios v. Federal Employees</u>, 489 U.S. 527 (1989) ................................................ 10

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992) ....................................................... 8

<u>Mai v. United States</u>, 952 F.3d 1106 (9th Cir. 2020) ..................................................... 13

<u>Make the Road N.Y. v. Cuccinelli</u>, 419 F. Supp. 3d 647 (S.D.N.Y. 2019) ...................... 25

Matal v. Tam, 582 U.S. 218 (2017) ........................................................................ 12

Md. Shall Issue, Inc. v. Moore, 116 F.4th 211 (4th Cir. 2024)............................... 22

Mills v. New York City, No. 23 Civ. 7460, 2024 WL 4979387 (S.D.N.Y. Dec. 4, 2024)......... 15, 21

Monserrate v. New York State Senate, 599 F.3d 148 (2d Cir. 2010) ...................... 4

Murphy Med. Assocs., LLC v. Yale Univ., 120 F.4th 1107 (2d Cir. 2024)................ 10

Musacchio v. United States, 577 U.S. 237 (2016) ................................................. 5

N.Y. State Firearms Ass'n v. James, No. 23 Civ 6524, 2024 WL 1932050
    (W.D.N.Y. May 2, 2024) ............................................................................. 18, 21, 22

N.Y. State Firearms Ass'n v. Nigrelli, No. 23 Civ. 6524, 2023 WL 8495198
    (W.D.N.Y. Sept. 21, 2023).................................................................................. 21

N.Y. State Vegetable Growers Ass'n v. James, No. 23 Civ. 1044, 2024 WL 1161115
    (W.D.N.Y. Feb. 21, 2024)..................................................................................... 12

NYSRPA v. Bruen, 597 U.S. 1 (2022) ........................................................... passim

NYSRPA v. Cuomo, 804 F.3d 242 (2d Cir. 2015) ................................................. 25

People v. Thomas, 22 N.Y.3d 629 (2014) ............................................................. 15

Pepper v. United States, 562 U.S. 476 (2011) ....................................................... 5

Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013) ......................................... 10

Phelps v. Bosco, 711 F. App'x 63 (2d Cir. 2018)................................................. 15

R.M. v. C.M., 226 A.D.3d 153 (2d Dep't 2024)..................................................... 14

Rosenberg v. Pliler, No. 21-cv-5321, 2021 WL 6014938 (S.D.N.Y. Dec. 20, 2021) ..................... 25

Sabin v. Nelson, No. 12 Civ. 1373, 2014 WL 2945770 (N.D.N.Y. June 30, 2014)........................... 9

Sandoz v. Amgen Inc., 582 U.S. 1 (2017) ............................................................. 10

Smith v. Hollingsworth, No. 14-CV-1778, 2016 WL 4357489 (D.N.J. Aug. 15, 2016)................. 25

Smith v. Robinson, 468 U.S. 992 (1984) ............................................................... 11

Stegemann v. United States, 132 F.4th 206 (2d Cir. 2025) .................................... 14

Susman v. Sullivan, No. 24-cv-1281, 2025 WL 575515 (W.D.N.Y. Feb. 21, 2025)
    ("Susman I").................................................................................................. passim

_T.W. v. N.Y. State Bd. of Law Examiners_, 110 F.4th 71 (2d Cir. 2024) ............................... 9

_Time Warner Cable v. Bloomberg L.P._, 118 F.3d 917 (2d Cir. 1997) ................................ 24

_United States ex rel. Five Star Elec. Corp. v. Liberty Mut. Ins. Co._, No. 15-CV-4961,
  2020 WL 2530180 (S.D.N.Y. May 19, 2020)................................................................... 5

_United States v. Decastro_, 682 F.3d 160 (2d Cir. 2012) ............................................... 6, 7

_United States v. Franzky_, No. 23 Cr. 40022, 2024 WL 4494988 (D.S.D. Oct. 15, 2024).................. 17

_United States v. Gonzalez_, No. 23 Cr. 6210, 2024 WL 5336649 (W.D.N.Y. Nov. 13, 2024) ........... 16

_United States v. Gonzalez_, No. 23 Cr. 6210, 2025 WL 219112 (W.D.N.Y. Jan. 16, 2025)............... 16

_United States v. Gould_, 672 F. Supp. 3d 167 (D.S.D. 2023) ............................................ 17

_United States v. Laykovich_, No. 24 Cr. 35, 2024 WL 4376265 (E.D. Ky. Oct. 2, 2024) ................. 16

_United States v. Libertad_, 681 F. Supp. 3d 102 (S.D.N.Y. 2023)...................................... 22

_United States v. Miller_, 307 U.S. 174 (1939)......................................................... 17

_United States v. Mingues_, No. 23 Cr. 81, 2023 WL 9604697 (N.D.N.Y. Dec. 23, 2023) ................ 21

_United States v. Price_, 111 F.4th 392 (4th Cir. 2024)................................................ 15

_United States v. Quinones_, 313 F.3d 49 (2d Cir. 2002)............................................... 12

_United States v. Quintieri_, 306 F.3d 1217 (2d Cir. 2002).............................................. 5

_United States v. Rahimi_, 602 U.S. 680 (2024)................................................... passim

_United States v. Veasley_, 98 F.4th 906 (8th Cir. 2024) ....................................... 19, 20, 21

_United States v. Walker_, No. 24 Cr. 22, 2024 WL 4024204 (D. Minn. Sept. 3, 2024) ..................... 17

_United States v. Weathers_, No. 23 Cr. 31, 2024 WL 2871356 (N.D. Ga. Mar. 11, 2024) ........... 16, 17

_Winter v. Nat. Res. Def. Council, Inc._, 555 U.S. 7 (2008) ............................................. 4

## **Statutes**

18 U.S.C. § 922 ................................................................................ passim

34 U.S.C. § 40915 .............................................................................. passim

N.Y. Mental Hygiene Law § 7.09 ......................................................................................... 3, 8

N.Y. Mental Hygiene Law § 9.27 ........................................................................................... 3

N.Y. Mental Hygiene Law § 9.31 ........................................................................................... 3

N.Y. Mental Hygiene Law § 9.37 ........................................................................................... 3

N.Y. Mental Hygiene Law § 9.39 ........................................................................................... 3

Pub. L. 275, 72 Stat. 650 (1932) .......................................................................................... 20

**Regulations**

27 C.F.R. § 478.11 ................................................................................................................. 15

**Other Authorities**

William Blackstone, Commentaries on the Laws of England (Clarendon Press 1770) ................. 18, 19

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon The Legislative
Power of the States of the American Union (2d Ed. 1871) ............................................. 17

Defendants Ann Marie T. Sullivan, M.D., sued in her official capacity as Commissioner for the New York State Office of Mental Health ("Commissioner Sullivan"), and Rossana Rosado, sued in her official capacity as Commissioner of the New York State Division of Criminal Justice Services ("Commissioner Rosado," and collectively with Commissioner Sullivan, the "State Defendants"), by their attorney Letitia James, Attorney General of the State of New York, respectfully submit this memorandum of law in opposition to the second motion for a preliminary injunction filed by Plaintiff Edmund J. Susman, Jr. (the "Plaintiff"), ECF No. 36.

## PRELIMINARY STATEMENT

There is nothing in Plaintiff's new pleading or his new moving papers to undermine the Court's holding that two key elements of standing are lacking, and that his claims as against New York are separately barred by the Eleventh Amendment. Susman v. Sullivan, No. 24-cv-1281, 2025 WL 575515, at *4-6 (W.D.N.Y. Feb. 21, 2025) ("Susman I"). Nor has anything changed to undermine the Court's statement at oral argument that the challenged federal and state laws are constitutionally sound. Transcript of February 11, 2025 Preliminary Injunction Hearing, Thompson Declaration ("TD") Exhibit 1 (the "PI Tr.") 7:16-19 ("I mean, declaring the statute unconstitutional is -- is swatting a fly with a sledgehammer. The statute is not unconstitutional. The statute is clearly, I think, constitutional."). As a matter of both procedure and substance, this second preliminary injunction motion should be denied.

A host of threshold barriers prevent Plaintiff from showing the required likelihood of success on the merits. First, his refusal to apply for a certificate of relief undermines his standing against any defendant, as he has failed to "prove up [his] premise either by applying for a license or by making a substantial showing of futility." Antonyuk v. James, 120 F.4th 941, 979 (2d Cir. 2024). Traceability and redressability are absent as against the State Defendants for the reasons the Court cited in Susman I, and the Court also correctly found that the Eleventh Amendment

separately bars suit. The <u>Susman I</u> ruling is also the law of the case, and Plaintiffs have not made any of the significant showings necessary to undermine that doctrine. And the fact that Congress has provided a specific remedy for involuntarily committed persons to lift disqualifications renders this Section 1983 suit improper.

Even if the Court reaches the merits, the federal laws at issue – which do not create the "permanent disarmament" Plaintiff claims, but rather a temporary disarmament after institutionalization pending a swift and effective administrative process – are fully "consistent with the principles that underpin our regulatory tradition." <u>United States v. Rahimi</u>, 602 U.S. 680, 692 (2024). The Supreme Court has repeatedly emphasized that "longstanding prohibitions on the possession of firearms by . . . the mentally ill" are "presumptively constitutional," <u>District of Columbia v. Heller</u>, 554 U.S. 570, 626-27 & n.26 (2008), and the laws at issue here stand at the nexus of two of the longest and deepest strands of American legal tradition: laws restricting firearms access by the mentally infirm, and laws requiring an individualized administrative review for dangerousness before a potentially threatening person can access a firearm.

Finally, Plaintiff cannot demonstrate irreparable harm or that the equities and public interest weigh in his favor. The Court rightly "ha[d] reservations about whether he had shown irreparable harm in light of his failure to seek relief through the administrative avenues available to him." <u>Susman I</u>, 2025 WL 575515 at *14. He still has not done so. And both the equities and the public interest stand strongly against the order Plaintiff is applying for, which would allow institutionalized persons to go straight from the psychiatric facility to the gun shop.

## STATEMENT OF FACTS

### A.    STATUTORY AND REGULATORY BACKGROUND

The Court is familiar with the laws prohibiting weapons possession by persons who have been involuntarily committed to a mental institution, and with the federal-state relief of disabilities

system, having extensively analyzed the relevant law in its opinion denying Plaintiff's first preliminary injunction motion. See Susman I, 2025 WL 575515 at *4-6.

To implement federal-law requirements related to NICS, state law directs OMH to report to NICS mental-health data relating to several groups of people, "including persons who have been involuntarily committed to a hospital." N.Y. Mental Hygiene Law ("MHL") § 7.09(j)(1). A treating Article 28 hospital, like ECMC, will enter information about qualifying involuntary admissions to the Person-based Electronic Response Data System (PERDS) in DOH's secure Health Commerce System portal. That information is then immediately transmitted electronically to OMH who then bundle the information into an automatic batch process which forwards the information to the NICS Index through a process facilitated by the New York State Office of Information Technology Services. See Joint Stipulation of Facts, ECF No. 56 ("JSOF") ¶ 23. Involuntary psychiatric admissions subject to this reporting requirement include hospitalizations under New York's procedures for emergency commitment, MHL §§ 9.37 and 9.39, as well as involuntary hospitalizations under New York's procedures for commitment outside the emergency context, MHL §§ 9.27, 9.31. (Supplemental Declaration of Yacine Ounis, dated May 1, 2025, ("Supp. Ounis Decl."), ¶ 11). This process is automatic and does not require a determination or any action by OMH, DCJS, or any other agency. JSOF ¶ 23.

B.    **FACTUAL BACKGROUND**

There are no material facts alleged in the First Amended Complaint that extend significantly beyond the ones discussed in the original complaint and summarized by the Court in Susman I. See 2025 WL 575515, at *2-3. Nor does Plaintiff's moving brief allege any such material new facts regarding the State Defendants. See ECF No. 36-4 at 1-6. As to the newly-named Commissioner Rosado and DCJS, the only significant factual assertion in the moving brief is that DCJS reported Plaintiff's hospitalization to the federal NICS database back in 2015. See

id. at 3. Although the new First Amended Complaint states that it is filed on behalf of the Plaintiff and "all similarly situated individuals," First Amended Verified Complaint, ECF No. 30 (the "FAC") at 1, no class has been certified, Plaintiff has not moved for class certification, and neither the First Amended Complaint nor the moving brief contain specific allegations regarding anyone other than the Plaintiff.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Monserrate v. New York State Senate, 599 F.3d 148, 154 (2d Cir. 2010). In cases such as this, where the moving party seeks to enjoin the operation of state laws and regulations, "the party must demonstrate a clear or substantial likelihood of success on the merits and make a strong showing of irreparable harm." Bimber's Delwood, Inc. v. James, 496 F. Supp. 3d 760, 771 (W.D.N.Y. 2020) (cleaned up). The moving party must also demonstrate that the injunction serves the public interest, and courts must "pay particular regard for the public consequences of employing the extraordinary remedy of injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

## ARGUMENT

## POINT I

## PLAINTIFF'S PRELIMINARY INJUNCTION MOTION IS FORECLOSED UNDER THE LAW OF THE CASE DOCTRINE

Plaintiff's second preliminary injunction motion as against the State Defendants is foreclosed under the law of the case doctrine. This doctrine posits that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Musacchio v. United States, 577 U.S. 237, 245 (2016) (quoting Pepper v. United States, 562 U.S. 476, 506 (2011)). A court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the

need to correct a clear error or prevent manifest injustice.'"[1] <u>Johnson v. Holder</u>, 564 F.3d 95, 99–100 (2d Cir. 2009) (quoting <u>United States v. Quintieri</u>, 306 F.3d 1217, 1230 (2d Cir. 2002)); <u>see, e.g., United States ex rel. Five Star Elec. Corp. v. Liberty Mut. Ins. Co.</u>, No. 15-CV-4961 (LTS) (JLC), 2020 WL 2530180, at *8 (S.D.N.Y. May 19, 2020) (noting that a "subsequent attempt to replead the same legal claim under the same or similar facts would be precluded by the law of the case doctrine").

Here, the Court already held that Plaintiff lacked standing with respect to Commissioner Sullivan because Plaintiff could not demonstrate that she caused his Second Amendment injury or that his Second Amendment injury could be redressed by judicial relief against her. <u>See Susman I</u>, 2025 WL 575515 at *13. The Court also held that "the Eleventh Amendment provides an alternative basis for denying Susman's motion." <u>Id.</u> Plaintiff has provided no new legal arguments or factual evidence to support deviating from these previous holdings. Moreover, the Court's reasoning in its previous Decision and Order applies with equal force to Commissioner Rosado. As detailed above (and as discussed in the briefing on the previous preliminary injunction motion, <u>see</u> ECF No 16 at 13, ECF No. 16-1 ¶ 10), DCJS does not enforce, interpret, or implement 18 U.S.C. § 922(g), which as this Court previously explained is "the statute that is inflicting Susman's injury." <u>Susman I</u>, 2025 WL 575515 at *13. Because this Court has already decided that Plaintiff's Second Amendment injury is caused by 18 U.S.C. § 922(g), the law of the case doctrine forecloses Plaintiff's request for preliminary injunctive relief.

---

[1] Although decisions in a preliminary injunction posture generally do not constitute law of the case for a subsequent merits determination such as a summary judgment motion, <u>see</u> <u>Alharbi v. Miller</u>, 368 F. Supp. 3d 527, 556 (E.D.N.Y. 2019), there is no reason why the law of the case doctrine would not apply where, as here, a party is seeking the same preliminary relief for a second time, and the Court's original decision was made on legal grounds. <u>See</u> <u>City of New York v. Gordon</u>, 155 F. Supp. 3d 411, 419 (S.D.N.Y. 2015) ("While preliminary factual determinations must be revisited against a more complete record, good sense dictates that a court interpret the same statute in the same way throughout a litigation, unless there is an intervening change in the law, or unless an earlier interpretation was clearly an error." (citations omitted)).

## POINT II

**PLAINTIFF CANNOT DEMONSTRATE A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS**

A.    **Subject-matter jurisdiction is lacking over Plaintiff's Second Amendment claim against the State Defendants.**

      1.    **Plaintiff lacks standing to bring his Second Amendment claims because he has not applied for a certificate of relief.**

"As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." United States v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012). The Second Circuit has repeatedly applied this principle to conclude that a plaintiff who fails to submit to the procedural requirements of a law or policy that offers an exemption or other relief from its mandate does not have standing to challenge the restrictions imposed by the law or policy. See Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997); Decastro, 682 F.3d at 164.[2] Here, nearly six months after his initial NICS denial, and despite several offers to expedite his application made both informally and in open court, see, e.g., PI Tr. 5:18-24, Plaintiff has chosen not to apply to lift his firearms prohibition. Cf. Susman I, 2025 WL 575515 at *14 ("Susman does not explain why he could not have used those same three months to exhaust or at least make use of the administrative procedures available to him." (quotation omitted)). "Since the plaintiff's injury in such a case stems from his personal ineligibility for a [weapon], the plaintiff must prove up that premise either by applying for a license or by making a substantial showing of futility." Antonyuk, 120 F.4th at 978.

---

[2] The Second Circuit further clarified this aspect of standing doctrine last year in Antonyuk, explaining that the application requirement in Decastro and Jackson-Bey governs in cases "challenging a rule that limits eligibility" for firearms possession, rather than a challenge to "a component of the application process itself." 120 F.4th at 978. This case is not a challenge to an aspect of the relief from disabilities process–for instance, the requirement that an applicant submit certain information, or the standard of review applied by the panel–but rather a challenge to the existence of laws that bar Plaintiff from carrying a weapon without going through the process itself. Cf. FAC ¶¶ 3-6.

Plaintiff has not applied for a certificate of relief from disabilities, nor has he made any attempt to show that doing so would be futile. "In this context[], 'futility' refers to the *outcome* of the contemplated application, *i.e.*, whether the result is preordained." Id. (citing Decastro, 682 F.3d at 164) (emphasis in the original). There is no basis to believe an application would be futile. Indeed, OMH has granted approximately 57% of applications it received between 2019 and 2023. JSOF ¶ 39; Cf. Decastro, 682 F.3d at 164 (not futile for plaintiff to apply for firearms license where record showed that "roughly 2/3 to 3/4 of handgun license applications during the period in question were granted."). And if Plaintiff's allegations about his health and job responsibilities over the years are accurate, he would appear to be a strong candidate for a certificate of relief.

The Court did not reach the issue of Plaintiff's failure to apply in its Susman I opinion "because this court f[ound] that Susman has not met the second and third prongs of the standing requirements." 2025 WL 575515, at *8 n.13. But the facts of Plaintiff's failure to apply have not changed and it remains a viable "alternative argument" warranting dismissal as against all defendants. Id. Unless and until Plaintiff makes an application and has it denied, he lacks standing to sue.

### 2.    Plaintiff lacks standing because any Second Amendment injuries are not traceable to the State Defendants' conduct.

Plaintiff also lacks standing to sue the State Defendants because he cannot establish any alleged injury are traceable to OMH or DCJS. To show a "causal connection between the injury and the conduct complained of," a plaintiff must demonstrate that their injury is fairly traceable to the defendant's actions, "not the result [of] the independent action of some third party not before the court." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). This issue was fatal in Susman I, as the Court found Plaintiff's injury traceable only to a third party "namely, the federal government—and therefore not traceable to Sullivan." 2025 WL 272215 at *10.

As the Court noted, "it is undisputed that Susman's attempt to purchase a weapon was denied in 2024 following a NICS background check." <u>Susman I</u>, 2025 WL 575515 at *9. Although the fact of Plaintiff's hospitalization was transmitted to that NICS database in 2015, that report "is not even a but-for cause of Susman's possession of firearms being illegal." <u>Id.</u> at 10. The Court pointed out that reporting a hospitalization under MHL § 7.09(j) "has no effect on what is actually illegal," since "section 922(g), a federal statute, is the cause of Susman's injury and would continue to apply regardless of this Court's disposition of the motion" against OMH. <u>Id.</u> The same conclusion follows as to DCJS.

Redressability is also lacking: because of the State Defendants' limited involvement, the Court cannot repair Plaintiff's alleged Second Amendment injury even if it grants the relief sought by Plaintiff against them. "Regardless of what the Court orders OMH [or DCJS] to do, Susman will not be able to purchase and possess a firearm legally absent some action by the federal government or a change to the interpretation of federal law in this circuit." <u>Susman I</u>, 2025 WL 575515 at *13. That is because even if the Court issues such an injunction, Plaintiff would still be prohibited by 18 U.S.C. § 922(g) from possessing or purchasing a firearm, and could be prosecuted federally if he did so.

### 3.    The Eleventh Amendment bars Plaintiff's suit because there is no ongoing violation and because the State Defendants do not enforce the challenged statutes.

The Court found in <u>Susman I</u> that "the Eleventh Amendment provides an alternative basis for denying Susman's motion," 2025 WL 575515 at *13, and nothing has happened to alter that conclusion. Plaintiffs cannot squeeze this case into the narrow <u>Ex parte Young</u> exception for two reasons.

First, to be actionable a violation must be ongoing: even where the requested "*relief* is prospective," the Eleventh Amendment bars suit when a lawsuit "is aimed exclusively at a *past violation*." T.W. v. N.Y. State Bd. of Law Examiners, 110 F.4th 71, 95 (2d Cir. 2024) (emphasis in the original). Here, there simply is no evidence of any ongoing violation (or ongoing action at all) by the State Defendants against the Plaintiff: to the extent that the agencies have taken any action regarding him, they did so on or around September 28, 2015, when the report of his commitment was transmitted to the NICS Index. See Declaration of Yacine Ounis, dated January 28, 2025, ECF No. 16-1 ("Ounis Decl."), ¶¶ 34-36; but see Susman I, 2025 WL at *10 (noting that the 2015 report "is not even a but-for cause of Susman's possession of firearms being illegal"). The State Defendants have done nothing in the nine-and-a-half years since that time that had any bearing on Plaintiff's inclusion in the NICS database.[3] (Id. ¶ 36). Accordingly, the preliminary injunctive relief sought is unavailable under the doctrine of Ex parte Young as "it does not seek to remedy an alleged ongoing violation of federal law." T.W., 110 F.4th at 95.

Second, in order to challenge a law by suing a state officer in her official capacity, a plaintiff must show that "that official by virtue of h[er] office has some connection with the enforcement of the act." Sabin v. Nelson, No. 12 Civ. 1373, 2014 WL 2945770, at *2-3 (N.D.N.Y. June 30, 2014). The Court correctly found in Susman I that Plaintiff's claims failed on this ground, since "Susman seems to have failed to establish . . . that either Sullivan or OMH enforce the law that bars him from accessing firearms." 2025 WL 575515 at *14. Plaintiff has not done so in his second go-around either, arguing only that OMH (and the newly-added DCJS) "are the 'data sources' for events that are reported to NICS." First Amended Verified Complaint (the "FAC") ¶

---

[3] Although Plaintiff had asserted in his original pleading that "OMH has only recently begun to report Plaintiff to NICS, NYSP and other federal law enforcement agencies," Compl. ¶ 123, and that "OMH continues to report Plaintiff to NICS," Compl. ¶ 135, the new First Amended Complaint does not contain those allegations.

39; see also id. at 9 (heading), ¶¶ 52-54. As the Court correctly noted, "maintenance of a database" is not sufficient to provide a "nexus between the defendant and enforcement of the challenged statute," as required for the Young exception to apply. Susman I, 2025 WL 575515 at *13 (quoting Peterson v. Martinez, 707 F.3d 1197, 1206 (10th Cir. 2013)).

**B.      Plaintiff's rush to federal court without utilizing the available federal-state administrative process is improper.**

**1.      The federal-state relief from disabilities system is an exclusive remedy.**

Plaintiff's lawsuit under Section 1983 is also improper because Congress has created a remedy for his alleged injury, and he has not utilized it. "Generally, 'the express provision of one method of enforcing a substantive rule,' such as through an agency proceeding, 'suggests that Congress intended to preclude others,'" such as direct Section 1983 suits by involuntarily committed persons. Murphy Med. Assocs., LLC v. Yale Univ., 120 F.4th 1107, 1112 (2d Cir. 2024) (quoting Alexander v. Sandoval, 532 U.S. 275, 290 (2001)). "Where, as here, 'a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.'" Sandoz v. Amgen Inc., 582 U.S. 1, 16 (2017) (quoting Karahalios v. Federal Employees, 489 U.S. 527, 533 (1989)). Although the Court did not need to reach this argument in Susman I, see 2025 WL 575515 at *6 n.12, it remains fatal to Plaintiff's claim that Congress laid out a specific path for him to obtain relief and he has repeatedly chosen not to follow it.

Congress, which created the disqualification of involuntarily committed persons in 18 U.S.C. § 922(g)(4), has also created the remedy for such persons: application to a "State court, board, commission, or other lawful authority" under a relief from disabilities program. See 34 U.S.C. § 40915 (a)(2). And Congress has also designated the avenue for judicial review from such determinations: "a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial." Id § 40915(a)(3); cf. Houston v. Nassau Cty. Police Dep't, No. 20 Civ.

5253, 2020 WL 7643132, at *3 (E.D.N.Y. Dec. 23, 2020) ("if plaintiff did seek a certificate and was denied, he must seek further relief in state court.").

Because Congress has provided for a specific avenue to resolve mental health-based disqualifications, the more general remedy of a Section 1983 suit is improper. Cf. Hinck v. United States, 550 U.S. 501, 506 (2007) ("Our analysis is governed by the well-established principle that, in most contexts, 'a precisely drawn, detailed statute pre-empts more general remedies.'" (quoting EC Term of Years Trust v. United States, 550 U.S. 429, 434 (2007)). To be sure, Plaintiff's lawsuit concerns allegations of a constitutional harm, and "[t]he constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." NYSRPA v. Bruen, 597 U.S. 1, 70 (2022). But there is nothing novel about Congress creating a narrower avenue for vindicating certain rights, including constitutional rights, than the generalized Section 1983 remedy, see Smith v. Robinson, 468 U.S. 992, 1012-13 (1984), and "evidence of such congressional intent may be . . . inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 120 (2005). That is the case here, where the availability of direct lawsuits under Section 1983 would render the relief from disabilities system futile: few if any formerly committed persons would ever utilize the system Congress and New York created when they could jump directly into federal court— and even, in cases like this one, seek emergency relief on a limited record. Cf. id. at 121 ("The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983.").

11

2.    **Plaintiff's failure to utilize the relief from disabilities system renders his claim unripe**

Plaintiff's decision to simply ignore the relief from disabilities process renders his case unripe for adjudication. The Second Circuit considered such a scenario last year, writing in dicta that "it is doubtful that a plaintiff who brings a federal suit challenging an initial denial [of a firearms license] before seeking administrative review would present a ripe case or controversy." Antonyuk, 120 F.4th at 986 n.34.

"Prudential ripeness is 'a [] flexible doctrine of judicial prudence' that reflects a court's conclusion that a case 'will be better decided later and that the parties will not have constitutional rights undermined by the delay.'" N.Y State Vegetable Growers Ass'n v. James, No. 23 Civ. 1044, 2024 WL 1161115, at *3 n.2 (W.D.N.Y. Feb. 21, 2024). "[I]n addressing any and all ripeness challenges, courts are required to make a fact-specific determination as to whether a particular challenge is ripe by deciding whether (1) the issues are fit for judicial consideration, and (2) withholding of consideration will cause substantial hardship to the parties." United States v. Quinones, 313 F.3d 49, 58 (2d Cir. 2002). Here, the case as it stands presents a poor vehicle for judicial consideration: the factual record is sparse, no discovery has been conducted, and the relief from disabilities process would provide a reviewing court with a full administrative record and written determination for consideration. Meanwhile, there is no hardship (let alone a substantial one) involved in going through the state-federal relief from disabilities process – which might already have concluded had Plaintiff applied promptly after discovering the disqualification back in November 2024 – and a successful outcome would eliminate any potential constitutional issue without need for adjudication. Cf. Matal v. Tam, 582 U.S. 218, 230-31 (2017) ("We have often stressed that it is important to avoid the premature adjudication of constitutional questions, and that [federal courts] ought not to pass on questions of constitutionality unless such adjudication is

unavoidable."). This is particularly so where the Supreme Court has recognized the constitutionality of laws "designed to ensure only that those carrying weapons in the jurisdiction are, in fact, law abiding, responsible citizens," so long as there are not "lengthy wait times in processing license applications" so great as to "deny ordinary citizens their right to public carry." Bruen, 597 U.S. at 38 n.9.

**C.    Plaintiff has failed to show a likelihood of success on the merits of his Second Amendment claim**

Although Plaintiff's new papers repeatedly assert that he "has been completely and permanently disarmed," FAC ¶ 136; see also id. ¶¶ 71, 85, 127, 129, that framing of the issue is fundamentally mistaken. There is no "permanent disarmament" under 18 U.S.C. § 922(g)(4) and the state-federal relief from disabilities system;[4] instead, upon being admitted to a psychiatric institution on an involuntary basis, a patient is temporarily disarmed until he or she completes a swift administrative process to protect public safety; in New York, that process generally takes three to six months, though OMH will generally expedite review for law enforcement officers such as the plaintiff. See Ounis Dec. ¶ 38. If a certificate of relief is granted, the psychiatric admission "is deemed not to have occurred." 34 U.S.C. § 40915(b).

Nothing about this process violates the Second Amendment. The temporary disarmament of involuntary psychiatric patients stands at the nexus of two of the most well-established categories of constitutional firearm regulation: "longstanding prohibitions on the possession of firearms by . . . the mentally ill," which are "presumptively constitutional," Heller, 554 U.S. at 626-27 & n.26, and administrative processes "designed to ensure only that those bearing arms in

---

[4] The analysis might be different in one of the 17 states that do not operate a relief from disabilities process pursuant to 34 U.S.C. § 40915. See Mai v. United States, 952 F.3d 1106, 1112 (9th Cir. 2020) (recognizing that without a state relief program, there is "no avenue for relief from § 922(g)(4)'s prohibition"). But there is no dispute that New York operates a relief program that satisfies the federal law. JSOF ¶¶ 32-33; cf. Susman I, 2025 WL 575515 at *12.

the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" which are constitutional unless "lengthy wait times" or "exorbitant fees deny ordinary citizens their right to public carry." Bruen, 597 U.S. at 38 n.9.

### 1.    A Mental Hygiene Law § 9.39 admission is involuntary as a matter of law

As a threshold matter, although Plaintiff continues to make the argument, see FAC ¶¶ 69, 75, 122; ECF No. 36-4 at 3-4, 11-12, there can be no serious dispute that his admission to a psychiatric institution under Mental Hygiene Law § 9.39 was "involuntary" as a matter of state and federal law. The Court already held as much in Susman I, collecting cases and finding that "courts have repeatedly held that commitments under section 9.39 are involuntary as a matter of law." 2025 WL 575515 at *11. The Court also found that the Plaintiff's agreement to the MHL § 9.39 commitment is "of no moment" because "the fact that a particular individual may have been cooperative with the admission process does not render a section 9.39 admission 'voluntary' under section 922(g)." Id. (citing Colihan v. State, 211 A.D. 3d 1432, 1437 (3d Dep't 2022), and Escamilla v. United States, 62 F.4th 367, 373 (7th Cir. 2023)).

The Court's legal holding in Susman I is the law of the case, and binding unless Plaintiff can show "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," none of which he has done. Stegemann v. United States, 132 F.4th 206, 211 (2d Cir. 2025). And even if the Court were to review the matter de novo, there would be no reason to depart from the long line of decisions that "have consistently understood Mental Hygiene Law § 9.39 to be one of the several sections . . . that authorize involuntary civil commitment." Colihan, 211 A.D.3d at 1436; see, e.g., R.M. v. C.M., 226 A.D.3d 153, 160 (2d Dep't 2024); Gardner v. Bassett Med. Ctr., 148 A.D.3d 1331, 1332 (3d Dep't 2017); People v. Thomas, 22 N.Y.3d 629, 637-38 (2014); Phelps v. Bosco, 711 F. App'x 63, 65 (2d Cir.

2018) (summary order); <u>Escamilla</u>, 62 F.4th 367 at 374. The same conclusion follows from the specific facts of Plaintiff's case, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████ There is no basis in law or fact to view the admission here as anything but involuntary under the meaning of 18 U.S.C. § 922(g)(4) and 27 C.F.R. § 478.11.

   2.    **The Second Amendment permits disarmament of persons who have been involuntarily committed.**

         i.    Mental health restrictions do not implicate the Second Amendment's text.

"<u>Bruen</u> requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" <u>Antonyuk</u>, 120 F.4th at 968 (quoting <u>Bruen</u>, 597 U.S. at 19). In the first stage, a plaintiff bears the burden of demonstrating that his conduct is covered by the Second Amendment's text. <u>See</u> <u>Gazzola v. Hochul</u>, 645 F. Supp. 3d 37, 64 (N.D.N.Y. 2022) (denying preliminary injunction where "Plaintiffs fail to demonstrate that the Second Amendment's plain text covers the conduct regulated by the statutory provisions at issue."), <u>aff'd</u>, 88 F.4th 186 (2d Cir. 2023). If the text is not implicated, "that ends the inquiry: the Second Amendment does not apply." <u>Mills v. New York City</u>, No. 23 Civ. 7460, 2024 WL 4979387 at *7 (S.D.N.Y. Dec. 4, 2024) (quoting <u>United States v. Price</u>, 111 F.4th 392, 398 (4th Cir. 2024) (<em>en banc</em>)).

The Supreme Court has "made clear that nothing in its <u>Heller</u> decision should 'cast doubt

on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' According to the Court, such non-exhaustive 'regulatory measures' are 'presumptively lawful.'" United States v. Gonzalez, No. 23 Cr. 6210, 2024 WL 5336649, at *1 (W.D.N.Y. Nov. 13, 2024) (quoting Heller, 554 U.S. at 626-27 & n.26), R&R adopted, 2025 WL 219112 (W.D.N.Y. Jan. 16, 2025). The Supreme Court has repeatedly re-emphasized the validity of such laws, including less than a year ago in Rahimi. See 602 U.S. at 699.

The Second Circuit has made clear that this language creates a legal presumption like any other: a "presumption of legality" that "can be overcome," but only if a regulation has "the effect of eliminating the ability of law abiding, responsible citizens to acquire firearms." Gazzola v. Hochul, 88 F.4th 186, 196 (2d Cir. 2023); see also id. (law cannot be "so restrictive that it threatens a citizen's right to acquire firearms"). Accordingly, although there have been few post-Bruen challenges to 18 U.S.C. § 922(g)(4), several courts have affirmed its constitutionality at the textual step based on the Supreme Court's repeated instruction that such measures do not implicate the Constitution. See, e.g., United States v. Laykovich, No. 24 Cr. 35, 2024 WL 4376265, at *4 (E.D. Ky. Oct. 2, 2024) ("The Court has no reason to depart from the Supreme Court's guidance that prohibitions on the possession of firearms by the mentally ill are presumptively lawful, dicta or not."); United States v. Weathers, No. 23 Cr. 31, 2024 WL 2871356, at *16-17 (N.D. Ga. Mar. 11, 2024) ("the rights of those who have been committed to a mental institution are not addressed by Bruen, and regulations restricting those peoples' ability to possess firearms are presumably lawful"). The Court can and should do the same in this instance.

ii.    The temporary disarmament of institutionalized persons is fully consistent with American history and tradition.

An analysis of America's historical tradition of gun regulation would lead to the same result. Indeed, federal courts across the country have been unanimous in upholding 18 U.S.C. § 922(g)(4), the statute that disarms the plaintiff, as justified by our nation's history of firearms regulation. See, e.g., United States v. Gould, 672 F. Supp. 3d 167, 184 (D.S.D. 2023); Weathers, 2024 WL 2871356 at *19; United States v. Walker, No. 24 Cr. 22, 2024 WL 4024204, at *5 (D. Minn. Sept. 3, 2024); United States v. Franzky, No. 23 Cr. 40022, 2024 WL 4494988, at *4 (D.S.D. Oct. 15, 2024). The same result is warranted here.

We begin with the Second Amendment's text, as the framers were concerned with the maintenance of a "well-regulated militia." See Heller, 554 U.S. at 599 (noting that "the Second Amendment's prefatory clause announces the purpose for which the right was codified"). But although the scope of the militia was broad, extending to "all males physically capable of acting in concert for the common defense," id. at 595 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)), Americans at the time of the founding specifically excluded the mentally ill from "the people" eligible to serve in the militia (though using language that, to a modern ear, may justly sound barbaric). See, e.g., Mass. Gen. Laws ch. 240 § 1 (1837), TD Ex. 2 ("Every able-bodied white male citizen resident within this Commonwealth . . . excepting idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia."); 1837 Me. Pub. Laws 424 § 5, TD Ex. 3 (similar); 1843 R.I. Pub. Laws 1 § 1, TD Ex. 4 (similar); 1842 Vt. Acts & Resolves 37, TD Ex. 5 (similar); cf. Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon The Legislative Power of the States of the American Union 28 (2d Ed. 1871) ("[c]ertain classes have been almost universally excluded" from

the term "the people," including "the idiot [and] the lunatic").[5] The Second Circuit in <u>Antonyuk</u> found that these laws demonstrated "that individuals with behavioral or substance dependence disorders have historically been viewed as a vulnerable population justifying firearm regulation." 120 F.4th at 1012.

"[F]or an originalist, the history that matters most is the history surrounding the ratification of the text." <u>Rahimi</u>, 602 U.S. at 737 (Barrett, J., concurring). And the history of mental health law during the Founding Era included invasions of rights far more grievous than a mere temporary bar from firearms possession. The leading piece of legislation in colonial times was the Vagrancy Act of 1744, which allowed any two justices of the peace to cause anyone suffering "lunacy" to "be apprehended, and be kept safely locked up in some secure place," and "to be there chained," with his or her property seized to pay for expenses. <u>See</u> 17 George II c. 5, TD. Ex. 6 at 519-20. Blackstone's <u>Commentaries</u> recognized this as an expression of Britain's common-law tradition, writing that "[i]t was the doctrine of our antient law, that persons deprived of their reason might be confined till they recovered their senses, without waiting for the forms of commission or other special authority from the crown: and now, by the vagrant acts, a method is chalked out for imprisoning, chaining, and sending them to their proper homes."   4 William Blackstone, <u>Commentaries on the Laws of England</u> 25 (Clarendon Press 1770), TD Ex. 7. In keeping with the era's limited understanding of mental illness, the term "lunatic" swept much more broadly than our modern understanding of persons suffering from mental illness (let alone the very limited

---

[5] The State Defendants obviously do not endorse the language or perspective used in these laws, nor does anyone think these terms describe the Plaintiff. The nature of the <u>Bruen</u> historical test, which prioritizes historical analogy over modern policy considerations, necessarily requires the consideration of sources that do not share our modern values. <u>See, e.g.</u>, <u>N.Y. State Firearms Ass'n v. James</u>, No. 23 Civ. 6524, 2024 WL 1932050, at *6 (W.D.N.Y. May 2, 2024) (considering "problematic" 18th century laws in upholding background check provisions because the backwardness of the laws "does not undermine the basic principle animating the law which is the determination of dangerousness"). Notably, Justice Scalia in <u>Heller</u> cited and quoted Thomas Cooley's <u>Treatise</u> extensively. <u>See</u> 554 U.S. at 616-17 (discussing Cooley as "[t]he most famous" of the 19th century legal scholars, block-quoting his work, and asserting that "[a]ll other post-Civil War 19th-century sources we have found concurred with Cooley.").

subset of persons subject to involuntary civil commitment under MHL § 9.39), including persons with only intermittent symptoms. Blackstone noted that the term "properly" included "one that hath lucid intervals; sometimes enjoying his senses, and sometimes not" and also could include "persons under frenzies." 1 William Blackstone, Commentaries on the Laws of England 304 (Clarendon Press 1770), TD Ex. 8.

History from the Founding Era shows that an involuntary emergency admission (with the extensive due process protections of MHL § 9.39) followed by a temporary disarmament until completion of a swift and effective administrative process would have been viewed as entirely constitutional, and indeed far more compassionate than the kinds of procedures then employed. The leading case on the subject is the Eighth Circuit's recent decision in United States v. Veasley, 98 F.4th 906 (8th Cir. 2024), which surveyed the history of firearms and mental health regulation to conclude that "The 'burden' imposed by [18 U.S.C.] § 922(g)(3) is 'comparable,' if less heavy-handed, than Founding-era laws governing the mentally ill." Id. at 915. If someone were both mentally ill and potentially dangerous, Early America treated them in a manner we would view as barbaric: such persons were "'confined in barred cells in the basement,' and 'particularly violent individuals' were 'restrained ... using a 'strait-waistcoat' or 'mad shirt,' or heavy arm and leg chains.' It should come as no surprise that confinement did not include access to guns." Veasley, 98 F.4th at 913 (quoting Lynn Gamwell & Nancy Tomes, Madness in America 20 (1995)). The process provided was often minimal. As the Veasley court recounted, persons alleged to be mentally ill could be confined at the discretion of "selectmen," by "justices of the peace, many of whom had no formal legal training," as was the case in New York, and even at times by a "friend" with no legal authority whatsoever. Id. at 914 (summarizing laws and secondary sources). No one today would view such laws as morally acceptable, but originalism places historical practice above

19

modern values. Cf. Rahimi, 602 U.S. at 717 (Gorsuch, J., concurring) (judges must "examine[] the laws, practices, and understandings from before and after ratification" because "[h]istory, not policy, is the proper guide.").

As weapons technology advanced throughout the 19th Century, states began passing laws specifically prohibiting the mentally ill from acquiring or possessing firearms. For instance, in 1881 Florida made it "unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife." 1881 Fla. Laws 87, TD Ex. 9. Two years later, Kansas similarly established criminal liability for "[a]ny person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol . . . or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons . . . to any person of notoriously unsound mind." 1883 Kan. Sess. Laws 159, TD Ex. 10. Similar laws were passed in other jurisdictions in the late 19th and early 20th centuries, and in 1932 Congress itself passed such a law to apply in the District of Columbia. See Pub. L. 275, 72 Stat. 650, 652 (1932) (forbidding anyone to "sell any pistol to a person who he has reasonable cause to believe is not of sound mind"). Although Washington, DC was federal land where the Second Amendment applied directly, there do not appear to have been any challenges whatsoever to the law's constitutionality. Cf. Bruen, 597 U.S. at 30 (courts "can assume it settled" that "longstanding" laws are constitutional where "we are [] aware of no disputes regarding the lawfulness of such prohibitions.").

The statutory purpose of 18 U.S.C. § 922(g)(4) is entirely consistent with the longstanding tradition of preventing mentally ill persons from harming themselves or others. See Veasley, 98 F.4th at 915-16. And the method utilized by 18 U.S.C. § 922(g)(4) – a temporary disarmament of institutionalized persons, pending a short and effective administrative process for rights restoration under 34 U.S.C. § 40915 – is significantly less burdensome and "less heavy-handed, than

Founding-era laws governing the mentally ill." Id. at 915. The challenged federal and state laws are entirely "consistent with the principles that underpin our regulatory tradition." Rahimi, 602 U.S. at 692.

> iii.    The administrative process for seeking a certificate of relief from disabilities does not violate the Second Amendment

Although Plaintiff's new pleading and motion have largely pivoted toward a substantive challenge to 18 U.S.C. § 922(g)(4) and away from a challenge to the procedures surrounding the transmittal of data to NICS or the lifting of firearms disabilities, it bears emphasis that reasonably speedy and effective administrative processes "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" do not infringe the right to keep and bear arms, as a matter of law. Bruen, 597 U.S. at 38 n.9 (quoting Heller, 552 U.S. at 635); see N.Y. State Firearms Ass'n v. James, No. 23 Civ. 6524, 2024 WL 1932050, at *6 (W.D.N.Y. May 2, 2024). The Second Amendment's text is not infringed where "none of the predominantly administrative regulations here operates to permanently deprive applicants of their right to own and carry firearms." Mills, No. 2024 WL 4979387 at *7-8.

This holding appears most frequently in the context of licensing cases,[6] and appears first in Bruen itself, in which "both the majority opinion and Kavanaugh concurrence indicated the likely constitutionality of shall-issue [licensing] regimes – at least to the extent they are not applied in practice to frustrate gun ownership or carrying by law-abiding, responsible citizens – without first conducting any exhaustive historical analysis, suggesting that such 'shall-issue' regimes do

---

[6] Federal courts have recognized that other straightforward administrative processes outside the licensing context do not impact the Second Amendment's text. See, e.g., N.Y. State Firearms Ass'n v. Nigrelli, No. 23 Civ. 6524, 2023 WL 8495198, at *3 (W.D.N.Y. Sept. 21, 2023) ("The Supreme Court has consistently upheld background checks as a constitutionally permissible component of "shall-issue" firearms licensing regimes."); United States v. Mingues, No. 23 Cr. 81, 2023 WL 9604697, at *4 n.6 (N.D.N.Y. Dec. 23, 2023) (Bruen found the constitutionality of certain administrative processes "without undertaking a historical analysis of laws requiring, for example, 'a background check' or 'a firearms safety course.'").

not infringe the right to keep and bear arms." United States v. Libertad, 681 F. Supp. 3d 102, 110 (S.D.N.Y. 2023) (emphasis in the original); accord Bruen, 597 U.S. at 80 (Kavanaugh, J., joined by Roberts, C.J., concurring). Accordingly, federal courts, including in New York, have found that "such laws generally do not 'infringe' the right to keep and bear arms" absent procedural abuses not alleged in this case. Md. Shall Issue, Inc. v. Moore, 116 F.4th 211, 222 (4th Cir. 2024).

The requirement that committed persons go through an administrative process prior to carrying a deadly weapon would also pass muster at Bruen's second step, as it is fully "consistent with this Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 17. From the earliest days of colonial America, governments have prevented the carriage of weapons by potentially dangerous persons, while allowing for individualized assessments of dangerousness analogous to the one conducted in the certificate of relief process. As early as 1637, Massachusetts disarmed followers of a dissident Protestant preacher because their perceived dangerousness but allowed those persons who "do not iustify" the preacher to "bee thereby freed from delivering in their armes." 1 Records of Mass. 1628-1641, at 211-12 (Nathaniel B. Shurtleff, ed. 1853), TD Ex. 11. As the colonies expanded throughout the 17th and 18th centuries, legislatures continued to pass laws preventing the acquisition or possession of weapons by persons belonging to groups thought dangerous, but would except persons who appeared in person and provided assurances that they would not use guns to harm others. E.g., 7 William W. Hening, The Statutes at Large, Being a Collection of all the Laws of Virginia 35-36 (Richmond: Franklin Press, 1809), TD Ex. 12; see N.Y. State Firearms Ass'n, 2024 WL 1932050 at *6 ("For example, where states disarmed Catholics, some Catholics were able to overcome disarmament by taking an oath of loyalty.").

This pattern repeated at the time of the Founding. In the Revolutionary era, colonies frequently disarmed individuals (often without any basis for suspicion), but allowed them to keep

weapons if they could show themselves not to be a threat. Pennsylvania, for instance, required all white male inhabitants to appear "before some one of the justices of the peace of the city or county where they shall respectively inhabit" to take an oath of allegiance, and if they failed to do so, to be "disarmed by the lieutenant or sublieutenants of the city or counties respectively." 1776-1777 Pa. Laws ch. XXI, §§ 1, 4, at 61-63, TD Ex. 13. Other colonies adopted similar provisions. See TD Exs. 14-16. Many states at the Founding Era also enacted "surety laws," a form of preventive justice where persons who might be considered threats to public safety could provide "a surety of the peace, meaning that the defendant pledged to keep the peace and often posted a bond as security for his good conduct." See Rahimi, 602 U.S. at 695-96; see also, e.g., 1795 Mass. Acts & Laws 436, TD Ex. 17. If a potentially dangerous person failed to provide sureties and post a bond, "he would be jailed." Id. at 695. The eight-justice majority in Rahimi found that these sureties were a sufficient analogue to sustain the constitutionality of 18 U.S.C. § 922(g)(8), another subsection of the same statute disarming involuntarily committed persons.

Individualized administrative assessments of dangerousness are also the central feature of licensing laws, which developed over the course of the 19th Century as guns became more concealable and more deadly. In fact, "[f]or as long as licenses to carry concealed weapons have been issued in this country, the officials administering those systems have been tasked with making individualized assessments of each applicant." Antonyuk, 120 F.4th at 989. As the Second Circuit acknowledged, "there are a lot of" examples of such laws, id. at 988, and "these laws and ordinances did not merely exist—they appear to have existed without constitutional qualms or challenges." Id. at 990; see, e.g., TD Exs. 18-24 (examples of historical licensing laws from New York State). These laws operated similarly to the relief from disabilities process in that they "condition the ability to lawfully carry a concealed weapon on obtaining a permit based in part on

an individualized assessment by a[n administrative] official." <u>Antonyuk</u>, 120 F.4th at 990. New York's law of involuntary commitment and its administrative system for lifting firearms restrictions comfortably passes historical muster.

**POINT III**

**PLAINTIFF FAILS TO DEMONSTRATE IRREPARABLE HARM**

In the Second Circuit, the "presumption of irreparable harm arising from a constitutional deprivation is not automatic." <u>Joglo Realties, Inc. v. Seggos</u>, No. 16-cv-1666, 2016 WL 4491409, at *16 (E.D.N.Y. Aug. 24, 2016). Instead, the Circuit has held that it "often will be more appropriate to" consider the nature and extent of the alleged injuries to the plaintiff absent injunctive relief. <u>Time Warner Cable v. Bloomberg L.P.</u>, 118 F.3d 917, 924 (2d Cir. 1997). Here, Plaintiff cannot demonstrate irreparable harm because he has not applied to lift his restrictions. As discussed above, if OMH granted Plaintiff a certificate of relief, his alleged Second Amendment injury would be remedied. <u>See</u> 34 U.S.C. § 40915(b).  OMH processes applications for a certificate of relief in three to six months, and will often expedite the process for law enforcement officers. <u>See</u> JSOF ¶ 40. Despite this, Plaintiff opted not to apply for a certificate of relief prior to his first preliminary injunction motion, and has continued even after the Court strongly encouraged him to do so. <u>See, e.g.,</u> PI Tr. 36:10-18 ("[W]e've already wasted at least three months from November to February, and I would urge you not to waste any more time. You can proceed on two tracks, there's no reason not to, and I would urge you to do that."); JSOF ¶¶ 41-42. Plaintiff cannot claim irreparable harm from the State Defendants' actions when he refuses to utilize the administrative procedure that would remedy his alleged injuries. <u>See</u> <u>Rosenberg v. Pliler</u>, No. 21-cv-5321, 2021 WL 6014938, at *4 (S.D.N.Y. Dec. 20, 2021) ("[Plaintiff] would not have been harmed, let alone irreparably harmed, by making use of those three months to exhaust the administrative process."). "Any claim of irreparable harm stems from [Plaintiff's] own inaction."  <u>Smith v. Hollingsworth,</u>

24

No. 14-CV-1778, 2016 WL 4357489, at *2 (D.N.J. Aug. 15, 2016).

## POINT IV

### THE EQUITIES AND THE PUBLIC INTEREST SUPPORT INDIVIDUALIZED ADJUDICATION OF PERSONS WHO HAVE BEEN INVOLUNTARILY COMMITTED

Finally, the balance of equities and the public interest weigh heavily against Plaintiff. "These factors merge when the Government is the opposing party." Make the Road N.Y. v. Cuccinelli, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019). Here, "it is beyond cavil" that there is a "substantial, indeed compelling, governmental interest[] in public safety and crime prevention." NYSRPA v. Cuomo, 804 F.3d 242, 261 (2d Cir. 2015). And the public interest calculation has only grown starker due to the changes between the Plaintiff's first preliminary injunction application and this one; with the case now styled as a class action, the order requested by the Plaintiff would apply to all individuals who have been institutionalized under MHL § 9.39. See ECF No. 36-4 at 1. Put another way, the relief Plaintiffs seek would allow institutionalized persons to go straight from a psychiatric facility to a gun store. The risks from such a system are neither abstract nor hypothetical, as evidenced by the incidents that Congress cited as reasons for enacting the NICS Improvement Act of 2007. See 122 Stat. 2559 Sec. 2(8-9). The equities and the public interest therefore weigh strongly against an injunction.

## CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court deny Plaintiff's second motion for a preliminary injunction and grant such other and further relief as the Court deems just and proper.

Dated: Buffalo, New York
      May 2, 2025

LETITIA JAMES
Attorney General
State of New York
Attorney for the State Defendants

By: _____
Daniel Maguire
Assistant Attorney General
Main Place Tower, Suite 300A
350 Main Street
Buffalo, NY 14202
(716) 853-8419
Daniel.Maguire@ag.ny.gov

James M. Thompson
Special Counsel
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-6556
james.thompson@ag.ny.gov

26