UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

EDMUND J. SUSMAN JR. and all
similarly situated individuals,

        Plaintiff,

      v.

ANN MARIE T. SULLIVAN, M.D. et al,

        Defendants.

24-CV-1281-LJV
DECISION & ORDER

---

On December 31, 2024, the plaintiff, Edmund J. Susman Jr., commenced this action under 42 U.S.C. § 1983 against Ann Marie T. Sullivan, M.D., in her official capacity as the Commissioner of the New York State Office of Mental Health. Docket Item 1. The complaint raised constitutional challenges to New York Mental Hygiene Law § 7.09(j). *Id.* On March 3, 2025, Susman amended his complaint to add another New York State defendant: Rossana Rosado, in her official capacity as Commissioner of the New York State Division of Criminal Justice Services (together with Sullivan, the "state defendants"). Docket Item 30. The amended complaint also added two federal defendants: Pam Bondi, in her official capacity as Attorney General of the United States, and Kash Patel, in his official capacity as the Director of the FBI (collectively, the "federal defendants"). *Id*. In addition to the original claims, the amended complaint raised constitutional challenges to 18 U.S.C. § 922(g)(4). Docket Item 30 ¶¶ 161-168.

The federal defendants have moved to dismiss the amended complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Docket Item 74.

After Susman responded to that motion, Docket Item 77, the federal defendants replied, Docket Item 78.  On February 9, 2026, this Court heard oral argument.  Docket Item 82.

For the reasons that follow, the Court grants the federal defendants' motion to dismiss.

## BACKGROUND[1]

Susman is a military veteran and former "Special Agent with the Bureau of Diplomatic Security" of the United States Department of State.  Docket Item 30 ¶ 95-98; *see* Docket Item 77 at 11 (noting Susman's "permanent retirement t[ook] effect in September 2025").  For more than 30 years, he "has been regularly armed with a firearm personally []or in his employment capacity . . . without incident."  Docket Item 30 ¶ 94.

In 2015, Susman "was experiencing suicidal ideations" and "sought to discuss some personal issues with a counselor."  *Id.* ¶¶ 114-15.  Susman "had not . . . taken any

---

[1] The following facts are taken from the amended complaint.  Docket Item 30. On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).  But on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff.  *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.,* 843 F.3d 561, 566 (2d Cir. 2016).

Susman attached a signed declaration to his complaint in which he attested to these facts.  Docket Item 30 at 29-30; *see L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("A complaint is . . . deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004))). Because the declaration has its own paragraph numbering, the Court cites the relevant page and paragraph number when referring to it.

steps to harm himself," nor did he have a plan to do so; indeed, he never has taken any such steps. *Id.* ¶¶ 116-17. Instead, he "simply sought to speak with someone," *id.* ¶ 118, and his wife therefore drove him to the hospital for an evaluation, *id.* ¶ 114.

As a result of this mental health episode, Susman was hospitalized at Erie County Medical Center ("ECMC") for several days. *Id.* ¶ 121. More specifically, after he "was observed and evaluated" by the "Comprehensive Psychiatric Emergency Program" ("CPEP") in the emergency room, *id.* ¶ 119, he was admitted to ECMC under New York Mental Hygiene Law § 9.39,[2] *id.* ¶¶ 120-21. According to Susman, he "voluntarily admitted himself to ECMC" and was never "'committed' or adjudicated as 'insane.'" *Id.* ¶¶ 121, 129.

Susman "was not provided with any notice that . . . voluntarily admitting himself to ECMC was a forfeiture of his Second Amendment rights." *Id.* ¶ 125. And unbeknownst to Susman, ECMC reported his section 9.39 commitment to the New York State Office of Mental Health, which in turn reported the information to the FBI's National Instant Criminal Background Check System ("NICS"). *Id.* ¶ 126.

---

[2] Section 9.39—"Emergency admissions for immediate observation, care, and treatment"—authorizes a hospital to "retain" a patient for up to fifteen days if a physician finds that the patient is likely to cause "serious harm to themself [sic] or others." N.Y. Mental Hyg. Law § 9.39. A patient is considered likely to cause serious harm if he or she poses a (1) "substantial risk of physical harm to themself [sic] as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that they [sic] are dangerous to themself [sic]"; (2) "substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm"; or (3) "substantial risk of physical harm to the person due to an inability or refusal, as a result of their [sic] mental illness, to provide for their [sic] own essential needs such as food, clothing, necessary medical care, personal safety, or shelter." *Id.* A hospital "shall admit such person pursuant to the provisions of this section only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements." *Id.*

On November 22, 2024, almost a decade after his admission to ECMC, Susman attempted "to purchase a firearm" and "underwent a NICS background check." *Id.* ¶ 106. When his purchase was denied by the background check system, *id.* ¶¶ 107-08, Susman was confused, and he "promptly appealed the denial to the NYS Attorney General's Office," *id.* ¶¶ 109, 134. He was told that his purchase was denied under 18 U.S.C. § 922(g)(4), "which prohibits a person who has been adjudicated as a mental defective or has been committed to a mental institution at 16 years of age or older from possessing a firearm." *Id.* ¶ 110.

On December 31, 2024, about a month after his purchase was denied, Susman filed this lawsuit. Docket Item 1. Susman says that this prohibition from purchasing or possessing a firearm under section 922(g)(4) rendered him "completely and permanently disarmed." Docket Item 30 ¶ 134. In fact, he says, he "face[s] an imminent threat of arrest . . . should [he] possess or attempt to acquire firearms []or ammunition. *Id.* at 30, ¶ 6.

## **LEGAL PRINCIPLES**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

4

its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556). "When there are well-pleaded factual allegations [in the complaint], a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief," but that presumption is not afforded to "legal conclusions."  *Id.* at 678-79.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998); *see also Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (noting that a motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction).

## **DISCUSSION**

Susman's claims are grounded in a complex web of federal and state laws and regulations.  The Court therefore begins with a discussion of the background check system that prevented Susman from purchasing a firearm.

I.    **BACKGROUND CHECK SYSTEM**

A.    **Federal Law and Regulations**

For more than half a century, federal law has "regulated sales by licensed firearms dealers, principally to prevent guns from falling into the wrong hands." *Abramski v. United States*, 573 U.S. 169, 172 (2014).  More specifically, under 18 U.S.C. § 922, individuals who fall into one of several enumerated categories are prohibited from "possess[ing]" or "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  *Id.* § 922(g).  And the same law bars firearms dealers from selling or otherwise transferring guns to individuals who they "know[] or hav[e] reasonable cause to believe" fall into a prohibited category.  *Id.* § 922(d).  Only one of the prohibited categories is relevant here:  Section 922(g)(4) prohibits a person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from purchasing or possessing a firearm.

In 1993, to enable better enforcement of gun control laws, Congress enacted the Brady Handgun Violence Prevention Act ("the Brady Act").  18 U.S.C. § 922(t); *see Robinson v. Sessions*, 721 F. App'x 20, 21-22 (2d Cir. 2018) (summary order).  The Brady Act "require[d] the Attorney General to establish a national instant background[ ]check system by November 30, 1998."  *Printz v. United States*, 521 U.S. 898, 902 (1997).  The result was NICS, a system managed by the FBI (or, more specifically, the FBI's NICS Operations Center) that provides information "on whether receipt of a firearm by a [particular person] . . . would violate [f]ederal or state law."  28 C.F.R. § 25.2; *see Robinson*, 721 F. App'x at 21-22.

Federal law and related regulations spell out how NICS operates.  First, "before completing any sale, [a firearms] dealer must 'verif[y] the identity of the transferee by

6

examining a valid identification document' bearing a photograph." *Abramski*, 573 U.S. at 172 (second alteration in original) (quoting 18 U.S.C. § 922(t)(1)(C)).  Each "prospective customer[] must complete . . . the [Bureau of Alcohol, Tobacco, Firearms, and Explosives] Form 4473, which elicits personal information and propounds questions to certify that the customer is qualified to possess a firearm under the enumerated Brady Act factors."  *Robinson*, 721 F. App'x at 22 (citing 27 C.F.R. § 478.124; 28 C.F.R. § 25.7(a); 18 U.S.C. § 922(g)(1)-(9), (n)).  The Brady Act then requires[3] the firearms dealer to "submit that information" for a NICS background check "to determine whether the potential purchaser is for any reason disqualified from owning a firearm."[4]

---

[3] This requirement is subject to certain "limited exceptions."  *See Abramski*, 573 U.S. at 172.  A NICS background check is not required if the potential purchaser "has presented . . . a permit" of a certain type; if "an authorized government official has verified that the information available to [the] official does not indicate that possession of a firearm" by the prospective buyer would be unlawful; or if the Attorney General has otherwise signed off on the transaction.  *See* 18 U.S.C. § 922(t)(3).  Susman has not argued that any of those exceptions apply, *see* Docket Items 30 and 77; indeed, it is undisputed that Susman underwent a NICS background check when he sought to obtain a gun in November 2024, and he has not argued that he should not have, *see* Docket Item 30 ¶¶ 106-110.

[4] Who conducts the NICS background check depends on the state where the firearm transaction occurs.  By default, the NICS Operations Center performs the check. 28 C.F.R. § 25.2; *see Gazzola*, 88 F.4th at 200.  But federal regulations allow states to "alternatively designate a 'law enforcement agency' as a point of contact . . . to 'serv[e] as an intermediary between a[ firearms dealer] and the federal databases checked by . . . NICS.'"  *Gazzola*, 88 F.4th at 200 (quoting 28 C.F.R. § 25.2).  New York has designated the New York State Police as "a point of contact for NICS background checks," and state law "also directs the [New York] State Police to create a 'statewide firearms license and records database' containing records provided by various other state-level agencies, including" the New York State Office of Mental Health.  *Id.* at 201 (quoting N.Y. Exec. L. § 228(3)).

Under federal regulations, when a state designates one of its law enforcement agencies as a "NICS point of contact," that agency—rather than the NICS Operations Center—"receive[s] NICS background check requests" from firearms dealers.  28 C.F.R. § 25.2; *see Gazzola*, 88 F.4th at 200-01.  The agency then reaches out to NICS to search the federal databases.  28 C.F.R. § 25.6(d).  The agency also may "check state

*Abramski*, 573 U.S. at 172-73 (quoting § 922(t)(1)(A)-(B)); *see Gazzola v. Hochul*, 88 F.4th 186, 200 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2659 (2024).

In a NICS background check, the prospective purchaser's information is "compared against [several] databases." *See Robinson*, 721 F. App'x at 22. Those databases include the NICS Index, an FBI-managed database containing records from both state and federal agencies; the National Crime Information Center database, a "nationwide computerized information system of criminal justice data established by the FBI as a service to local, state, and [f]ederal criminal justice agencies"; and the "Interstate Identification Index." 28 C.F.R. §§ 25.2 and 25.6; *see Sedita v. United States*, 763 F. Supp. 3d 63, 68 (D.D.C. 2025) (stating that in a background check, "NICS searches relevant databases for any records suggesting that the customer may be prohibited from acquiring a firearm under federal or state law"). Based on whether records "match" the identifying information provided, a transaction is approved, delayed, or denied. *See* 25 C.F.R. § 25.6(c)(1)(iv), (g)(2); *see also Robinson*, 721 F. App'x at 22.

The FBI maintains a "NICS Audit Log of all incoming and outgoing transactions that pass through the system." 28 C.F.R. § 25.9(b); *see Sedita*, 763 F. Supp. 3d at 68. When a transaction is denied, the NICS Audit Log "retain[s]" all "records obtained or created in the course of" the background check for ten years, "after which time

---

or local record systems" and then, based on the results of both inquiries, "determine whether matching records provide information demonstrating that an individual is disqualified from possessing a firearm under [f]ederal or state law, and respond to [firearms dealers] with the results of a NICS background check." 28 C.F.R. § 25.2; *see Gazzola*, 88 F.4th at 220. The New York State Police served as the point of contact for Susman's background check. Docket Item 30 ¶ 107.

the[ records are] transferred to an appropriate FBI-maintained electronic database." 28 C.F.R. § 25.9(b)(1)(i); *see Sedita*, 763 F. Supp. 3d at 68.

### B.    New York's Role

NICS is a creation of the federal government, but it operates with assistance from the states. As noted above, the NICS Index includes records from both federal and state agencies. *See* 28 C.F.R. § 25.2. That is by design: In 2007, Congress passed the NICS Improvement Amendments Act, which aimed to make the federal background check system more comprehensive, including by providing grants to assist states in submitting all relevant records to NICS.[5] *See* NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 122 Stat. 2559 (codified at 34 U.S.C. §§ 40901-40903, 40911-40917, 40931, 40941); *see also City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 428 (4th Cir. 2019); *Montgomery v. Cuomo*, 291 F. Supp. 3d 303, 315-16 (W.D.N.Y. 2018). To be eligible for the grant money, states must have an administrative process by which anyone barred under federal law from owning firearms based on a mental health event may obtain a certificate of relief from firearm disabilities. *See* NICS Improvement Amendments Act of 2007 § 105 (codified at 34 U.S.C. § 40915).

---

[5] Congress passed the law in response to two mass shootings—including one at the Virginia Polytechnic Institute and State University ("Virginia Tech"). *See* NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 122 Stat. 2559. In fact, the congressional findings explicitly refer to the Virginia Tech shooting, "the deadliest campus shooting in [U.S.] history." *Id.* In Congress's view, that event underscored "the need to improve information-sharing that would enable [f]ederal and [s]tate law enforcement agencies to conduct complete background checks on potential firearms purchases" because "[i]n spite of a proven history of mental illness, the shooter was able to purchase the two firearms used in the shooting." *Id.*

In response to the NICS Improvement Amendments Act, "New York State law was amended to allow relevant mental health records to be made accessible to NICS." *Montgomery*, 291 F. Supp. 3d at 316. More specifically, section 7.09(j) of New York's Mental Hygiene Law now provides that the mental health commissioner "shall collect, retain or modify data or records, and shall transmit such data or records . . . for the purposes of responding to queries to [NICS] regarding attempts to purchase or otherwise take possession of firearms." N.Y. Mental Hyg. Law § 7.09(j)(1).

Consistent with statutory requirements, section 7.09(j)(2) also includes a program for obtaining relief from firearms disabilities. *Houston v. Nassau Cnty. Police Dep't*, 2020 WL 7643132, at *3 (E.D.N.Y. Dec. 23, 2020). "New York Mental Hygiene Law § 7.09 sets forth a process for removing a name from the NICS list by seeking a certificate of relief from disabilities, which is based on a determination as to whether the 'person's record and reputation are such that such person will not be likely to act in a manner dangerous to public safety and where the granting of the relief would not be contrary to public safety.'" *Id.* (quoting N.Y. Mental Hyg. Law § 7.09(j)(2)).

Finally, the New York regulatory code includes provisions that implement section 7.09(j). For example, rule 543 provides that the Office of Mental Health is "authorize[d] to collect, retain, modify[,] or transmit [mental health] data or records . . . for the purpose of responding to NICS queries regarding attempts to purchase or otherwise take possession of firearms." 14 N.Y. Comp. Codes R. & Regs. § 543.1(c). The rule further provides that those records "are expressly limited to [the records of] persons who have been involuntarily committed pursuant to article 9 or 10 of the Mental Hygiene Law" or under several other statutes not relevant here. *Id.* Other regulations, in turn, "establish

10

the required administrative 'certificate of relief from disabilities' process." *See id.* § 543.1(d); *id.* §§ 543.2-543.6.

## II.    MOTION TO DISMISS

### A.    Subject Matter Jurisdiction

The federal defendants argue that this Court lacks jurisdiction over Susman's claims against them. Docket Item 74-1 at 7-9.[6] They say that section 1983 does not apply to federal officials and that there is no other vehicle for this Court to exercise jurisdiction over a claim grounded in the Second Amendment. *See id.*; Docket Item 78 at 2-5. This Court agrees.

Susman argues that the Court has jurisdiction over his claims "directly under the Second Amendment" by way of "nonstatutory review."[7] Docket Item 77 at 12-13. But nonstatutory review is a last resort that "rarely succeeds." *See New York v. Nat'l Sci. Found.*, 793 F.Supp.3d 562, 610 (S.D.N.Y. 2025) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025)). Indeed, nonstatutory review is available only when a plaintiff has no other options available to vindicate his rights. *See Puerto Rico v. United States*, 490 F.3d 50, 60 n. 5 (1st Cir. 2007) ("[T]he absence of another avenue for the parties to vindicate their rights is a necessary condition for nonstatutory review.");

---

[6] Page numbers in docket citations refer to ECF pagination.

[7] Susman's amended complaint indicates that he also seeks relief against the federal defendants under 18 U.S.C. § 925A. Docket Item 30 ¶¶ 3, 82-92, 144-151. Susman does not raise section 925A as grounds for the Court's jurisdiction in his opposition papers. Nonetheless, to the extent Susman seeks relief against the federal defendants under section 925A, that claim must be dismissed because that section applies only to claims "against the State or political subdivision . . . or against the United States." *See* 18 U.S.C. § 925A.

11

*Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002) ("[T]he Supreme Court has emphasized that certain critical factors must be present to invoke nonstatutory review.  One such factor is that the agency's nonfinal action must 'wholly deprive the [party] of a meaningful and adequate means of vindicating its . . . rights.'").  And that certainly is not the case here.

As noted above, Susman can pursue a certificate of relief from disabilities that would enable him to purchase a firearm so long as his "record and reputation are such that [he] will not be likely to act in a manner dangerous to public safety and where the granting of the relief would not be contrary to public safety."  N.Y. Mental Hyg. Law § 7.09(j)(2).  Congress has authorized and encouraged states to implement such a process for cases just like this one, and New York has such a process that Susman can take advantage of.  *See* 34 U.S.C. § 40915; N.Y. Mental Hyg. Law § 7.09(j)(2).  Indeed, at Susman's very first appearance in this case, the Court asked the state defendants to expedite the process for Susman, and the state defendants assured the Court that they would try to do just that.  Docket Item 32 at 5.  But for some reason that this Court cannot fathom, Susman refuses to avail himself of this relief.

Susman claims that he cannot pursue a certificate of relief because he did not "suffer[] a disqualifying event."  *See* Docket Item 77 at 23.  But that conclusion is premised on the incorrect assumption that Susman's commitment to ECMC, classified by ECMC as a Mental Hygiene Law § 9.39 admission, was voluntary.  *See* Docket Item 77 at 19.  As this Court already has decided, and as both New York and federal courts have found, section 9.39 commitments are involuntary as a matter of law.  *See* Docket Item 27 at 24-25; *see e.g.*, *Phelps v. Bosco*, 711 F. App'x 63, 64-65 (2d Cir. 2018)

12

(summary order) ("Section 9.39 creates a procedure to admit an individual into a hospital against her will" and "is understood as a 'commitment' by New York courts"); *Giannavola v. Lee*, 2025 WL 1932020, at *8 (W.D.N.Y. July 14, 2025) ("It is well-established in the Second Circuit and New York state courts that a hospitalization pursuant to MHL § 9.39 is an 'involuntary commitment . . . .'"); *Montgomery*, 291 F.Supp.3d at 311-12 (stating that section 9.39 provides for "involuntary admission," in contrast to other sections of the Mental Hygiene Law that provide for voluntary admission); *Colihan v. New York*, 211 A.D.3d 1432, 1436 (3d Dep't 2022) (rejecting "any claim that petitioner's [section] 9.39 admission was not an involuntary commitment within the meaning of federal law" and adding that "[c]ourts have consistently understood Mental Hygiene Law § 9.39 to be one of the several sections of that law that authorize involuntary civil commitment" (collecting cases)).

In spite of those decisions, Susman insists that his hospitalization was voluntary because he "voluntarily admitted himself to ECMC." Docket Item 30 ¶ 121; Docket Item 77 at 11. But that circular assertion is nothing more than a conclusion that begs the question. And "the fact that a particular individual may have been cooperative with the admission process . . . does not"—indeed, cannot—"render a[ section 9.39 involuntary] admission voluntary under section 922(g)." Docket Item 27 at 25 (quoting *Colihan*, 211 A.D.3d at 1437).[8]

---

[8] At oral argument, Susman also argued that the Court must apply the *Bruen* analysis to determine whether section 9.39 admissions are historically involuntary for the purposes of the Second Amendment. Docket Item 83 at 6; *see N.Y. State Rifle & Pistol Ass'n., Inc., v. Bruen*, 597 U.S. 1 (2022). But *Bruen* concerns the constitutionality of firearm regulations, not classifications for mental health hospital admissions. *See id.* at 17 (evaluating whether "a firearm regulation is consistent with this [n]ation's historical tradition"). So while *Bruen* suggests that this Court should consider whether those who

Susman asserts that unless he was "adjudicated as insane or dangerous," section 922(g)(4) does not apply to him. *See* Docket Item 77 at 23. But the statute requires only that a person be "adjudicated as a mental defective or . . . committed to a mental institution" to be ineligible to purchase a firearm. *See* 18 U.S.C. § 922(g)(4). In fact, an involuntary commitment—including a commitment under section 9.39, *see supra*—is expressly classified as a disqualifying event under section 922(g)(4). So Susman's argument that he is not factually disqualified misses the mark.

What is more, Susman's disagreement with the state and federal governments' interpretation of his eligibility under section 922(g)(4) does not change the fact that he has another avenue for relief. In other words, even if Susman were right and he did not suffer a disqualifying event, there is no question that the state and federal governments think he did and that the administrative process therefore is available to him.

Susman cites *Sedita v. United States, see* Docket Item 77 at 13-14, but his reliance on that case is misplaced. There, the plaintiff had pursued at least three separate appeals and inquiries to the FBI contesting the denial of his firearm purchase. *Sedita*, 763 F. Supp. 3d at 69-70. He "repeatedly tried to set the record straight through the [g]overnment's administrative process, [but] remedy ha[d] eluded him." *Id.* at 67. In fact, the government had "rebuffed [the plaintiff]'s attempts to clear himself" of the prohibition. *Id.* Not so here, where Susman has not even started the process "to clear

---

are mentally challenged have historically been allowed to own and bear arms, it does not require the sort of historical analysis that Susman urges with respect to section 9.39 admissions. And as the Fourth Circuit recently found, the *Bruen* analysis leads to the conclusion that firearms have historically been denied to those with mental health issues—at least when, as here, there is a process to obtain relief from that disability. *See United States v. Gould*, 163 F.4th 795, 801-03 (4th Cir. Jan. 2, 2026).

himself," let alone exhausted his administrative remedies.  So while nonstatutory review

may have been appropriate in *Sedita* because there were no available remedies that

might have given the plaintiff a meaningful opportunity to vindicate his Second

Amendment rights, the same cannot be said here.

In sum, despite the availability of a process that might well vindicate his right to

purchase a firearm, Susman has refused even to start that process.  *See* Docket Item

77 at 16.  What is more, if Susman applied for a certificate of relief and his application

was denied, both New York and federal law would explicitly provide judicial review of

that decision.  *See* 34 U.S.C. § 40915(a)(3) (to obtain funding, state relief programs

must "permit[] a person whose application for the relief is denied to file a petition with

the [s]tate court of appropriate jurisdiction for a de novo judicial review of the denial");

N.Y. Mental Hyg. Law § 7.09(j)(2)(iii) ("denial of a petition for relief from disabilities may

be reviewed de novo pursuant to the proceedings under article seventy-eight of the civil

practice law and rules").[9]  Based on all that, Susman has not been "wholly deprive[d]" of

the opportunity to vindicate his rights*, see Rhode Island Dep't of Env't Mgmt.*, 304 F.3d

at 42 (quoting *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin. Inc.*, 502 U.S. 32,

43 (1991)), and nonstatutory review is unavailable.  And because Susman has failed to

---

[9] For the same reasons, Susman cannot seek relief under section 1983's federal counterpart, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  *Bivens* authorizes actions against federal officers for damages when a constitutional violation is alleged.  *Id.* at 389.  But a cognizable *Bivens* claim requires the absence of alternative remedies.  *Schweiker v. Chilicky,* 487 U.S. 412, 423 (1988) ( "When the design of a [g]overnment program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.").  Because of the availability of an alternative remedy, Susman does not have a cognizable *Bivens* claim against the federal defendants.

meet his "burden of proving by a preponderance of the evidence" that this Court has subject matter jurisdiction over his claims against the federal defendants, those claims are dismissed without prejudice.  *See Makarova*, 201 F.3d at 113.

## B.    Ripeness

But lack of a jurisdictional vehicle is not the only reason why Susman's claims fail.  For related reasons, they also are subject to dismissal because they are not ripe.

The doctrine of ripeness "is rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority."  *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733 n. 7 (1997)).  The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  "At its heart," the doctrine is about "whether [the court] would benefit from deferring initial review until the claims . . . have arisen in a more concrete and final form."  *Id.*  "Determining whether a case is ripe generally requires [the court] to 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  *Id.* (quoting *Abbott Labs.*, 387 U.S. at 149).

### 1.    Fitness for Judicial Decision

Federal law provides that if a state grants "an application for relief" from disabilities "with respect to an adjudication or a commitment to a mental institution[,] . . . the adjudication or commitment, as the case may be, is deemed not to have occurred."  34 U.S.C. § 40915.  In other words, if an individual gets relief from disabilities in

connection with a prior hospital admission for mental health reasons, then federal law provides that the section 922(g)(4) prohibition no longer applies.

The federal defendants say that this case is not yet ripe because Susman has refused even to pursue the certificate of relief available to him. Docket Item 74-1 at 9-10. Susman disagrees, saying that he did not suffer a disqualifying event and that the certificate of relief process therefore does not apply to him. Docket Item 77 at 23. But for the reasons explained above, and for the reasons that follow, that argument lacks merit.

First, as this Court has already decided—twice—Susman's commitment under section 9.39 was involuntary as a matter of law regardless of whether he voluntarily chose to seek help at ECMC. *See supra* Section II.A; Docket Item 27 at 24-25. This Court is not the only one to find that section 9.39 commitments are involuntary by their very nature; on the contrary, several others, both state and federal, have reached the same conclusion. *See, e.g.*, *Phelps*, 711 F. App'x at 64-65; *Giannavola,* 2025 WL 1932020, at *8; *Montgomery*, 291 F.Supp.3d at 311-12; *Colihan*, 211 A.D.3d at 1436. And because Susman's section 9.39 admission was involuntary, he indeed suffered a disqualifying event.[10]  *See* 18 U.S.C. § 922(g)(4).

Where a state provides a process for relief from the prohibitions of section 922(g)(4), however, the prohibition is not a permanent disqualification. *See United States v. Bartley*, 9 F.4th 1128, 1136 n.4 (9th Cir. 2021) (explaining that a state's

---

[10] Moreover, as noted above, *see supra* Section II.A, even if Susman were correct that the state and federal governments *should* not treat his admission as involuntary, there is no question that they do, and, therefore, that the administrative process for relief is available to him.

"provision for the restoration of rights under [section] 922(g)(4) means that [the] prohibition is not a lifetime ban").  Cases that have addressed the constitutionality of a section 922(g)(4) prohibition—that is, cases in which a constitutional challenge was ripe—have involved disqualifications in states without a process for obtaining relief from the disqualification and where the plaintiff therefore faced a permanent firearms ban. *See, e.g., Tyler v. Hillsdale Cnty. Sherrif's Dep't*, 837 F.3d 678, 694 (6th Cir. 2016) ("[T]he ban imposed by [section] 922(g)(4) . . . is effectively permanent.  Because . . . Michigan has not chosen to create a qualifying relief program . . . there is no path available for [the plaintiff] to seek the restoration of his Second Amendment right."); *United States v. Rehlander*, 666 F.3d 45, 48 (1st Cir. 2012) (where Maine law did not have a process to obtain relief from disqualification, plaintiffs were "permanently deprived of a right to bear arms based solely on procedures suitable for temporary hospitalization under emergency conditions").  Because New York indeed has a process to obtain relief from the disqualification, Susman's characterization of his ban as a "permanent disarmament," Docket Item 30 ¶ 129, is a misleading—and unsupported— overstatement.

In fact, Susman has not cited a single case where a court has reviewed a section 922(g)(4) ban of a plaintiff who was hospitalized for mental health treatment and who simply refused to pursue an available process to obtain relief.  Instead he cites cases where the bans were "permanent" because there were no such processes available, *see Tyler*, 837 F.3d at 694; *Rehlander*, 666 F.3d at 48, or where the plaintiff had not been committed in the first place, *United States v. Giardina*, 861 F.2d 1334, 1337 (5th Cir. 1988); *United States v. Hansel*, 474 F.2d 1120, 1123 (8th Cir. 1973).  Those cases

18

are inapposite here, where Susman does not dispute the fact that he was committed to ECMC under section 9.39 and where there is a process for relief available to him.

If there were no process that Susman could pursue to regain his Second Amendment rights, his claim might well be ripe. If he never was admitted to ECMC under section 9.39 and his classification therefore was simply a mistake, he might have a viable claim. Or if he had applied for and been denied relief, this Court might well entertain his constitutional challenge. But Susman has what looks like an easy road to relief, and for some reason he has chosen not to take that road. His constitutional claim is therefore not yet fit for judicial decision.

### 2.    Hardship to the Parties

Susman's current prohibition from purchasing firearms certainly poses a hardship to him. *See* Docket Item 30 ¶ 143. At this point, however, that hardship is largely self-imposed. Since his attempt to purchase a firearm in November 2024, and since filing this lawsuit in December 2024, Susman has not made any effort to pursue administrative relief from his disqualification, a process that undoubtedly would bring the issue to a head more quickly than litigation. *See* Docket Item 77 at 23.

And all signs indicate that if Susman applied for a certificate of relief, he would get it. From 2019 to 2023, the Office of Mental Health granted more than half of the applications for relief. Docket Item 16-1 ¶ 31. The process is meant for people exactly like Susman: those who have experienced a disqualifying event but whose "record and reputation are such that such person will not be likely to act in a manner dangerous to public safety and . . . the granting of the relief would not be contrary to public safety." N.Y. Mental Hyg. Law § 7.09(j)(2). Susman honorably served in the military for 22

19

years, carried a firearm for more than 30 years without incident, has never been arrested, and does not appear to have had a mental health episode since 2015. *See* Docket Item 30 ¶¶ 94-105. It is hard to imagine why his application for relief might be delayed or denied.[11]

The hardship that Susman faces would likely disappear if he took the simple step of seeking relief. His stubborn refusal to do that does not and cannot make his case any more justiciable. Because this case is not presently fit for judicial decision, and because any hardship could be easily remedied, Susman's constitutional challenge is unripe.

### C.    Second Amendment Claim

Finally, even if Susman had a valid jurisdictional vehicle to address his constitutional claim and even if his claim were ripe, this Court would deny it on the merits.

Susman challenges the application of section 922(g)(4) to both himself and others committed to the hospital under section 9.39.[12] Docket Item 30 ¶¶ 92, 161-164. More specifically, he says that disqualifying those who are hospitalized under section 9.39 from possessing firearms violates their Second Amendment rights. *Id.* The federal

---

[11] In her opposition to Susman's motion for a preliminary injunction and TRO, Sullivan estimated that an application could be processed in three to six months, with the process often expedited for law enforcement. *See* Docket Item 16 at 43. In fact, as already noted, at Susman's initial appearance before this Court, the lawyer representing the State of New York committed to help expedite the process. Docket Item 32 at 5.

[12] In his amended complaint, Susman seemed to have raised both an as-applied challenge and a facial challenge to section 922(g)(4). Docket Item 30 ¶¶ 1, 153. But Susman has explicitly abandoned any facial challenge. Docket Item 77 at 26 ("this is not a facial challenge to § 922(g)(4) generally" (emphasis omitted)).

defendants argue that Susman has not plausibly alleged that section 922(g)(4) as applied to section 9.39 violates the Second Amendment.  *See* Docket Item 74-1 at 15.  This Court agrees.

### 1.    Second Amendment Framework

The Second Amendment is short and simple:  "A well[-]regulated Militia[] being necessary to the security of a free State, the right of the people to keep and bear Arms[] shall not be infringed."  U.S. Const. amend. II.  But simple language does not mean easy interpretation, and as anyone who has not lived in a cave for the last several decades knows, that short passage has resulted in the spilling of gallons of judicial ink.  Recent guidance from the Supreme Court points to history as the key to interpreting what the amendment means:

> [T]he standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the [n]ation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022).

Because contemporary firearm restrictions rarely mimic those of past generations, the Court said, there is no need to find an "historical twin"; but a "well established and representative historical analogue" still is needed to justify any restriction of the right to bear arms.  597 U.S. at 30.  In other words, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit."  *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

21

Susman argues that because there is no historical analogue for applying section 922(g)(4) to "periods of observation or voluntary admissions to a hospital, as was the case here," his constitutional challenge survives under *Bruen*.   *See* Docket Item 77 at 22.  But as already noted, *see supra* note 8, that mischaracterizes the question.  Instead, the more appropriate inquiry is whether there is a historical analogue for prohibiting firearm possession and purchase by those who, like Susman, have been involuntarily committed to a hospital as posing a risk to themselves or others.  *See* N.Y. Mental Hyg. Law § 9.39.  And there is.

### 2.    Applying the Second Amendment Framework

By barring otherwise qualified citizens from purchasing or possessing firearms, section 922(g)(4) certainly prohibits conduct protected by the Second Amendment.  *See Zherka v. Bondi*, 140 F.4th 68, 75 (2d Cir. 2025) *cert. denied*, 2026 WL 135708 (2026) ("We construe [the plaintiff]'s complaint as asserting his desire to possess firearms only in a manner that the Second Amendment protects.").  So under *Bruen*, the question is whether the government has demonstrated that the regulation "is consistent with the [n]ation's historical tradition of firearm regulation."  597 U.S. at 24.  And that involves looking at whether those who might be mentally unstable have historically been able to possess firearms.

While "Founding-era regulations specifically addressing the intersection of mental illness and firearms are hard to come by, *United States v. Connelly*, 117 F.4th 269, 275 (5th Cir. 2024), . . . the historical evidence illustrates a common practice of locking up individuals who suffered from such severe mental illness that they posed a present danger to others." *United States v. Seiwert*, 152 F.4th 854, 867 (7th Cir. 2025).  In the

18th-century, those rendered dangerous because of mental illness faced severe restrictions on their civil liberties—indeed, they often were confined. *United States v. Veasley*, 98 F.4th 906, 913-14 (8th Cir. 2024). These types of severe restrictions on the liberty of the mentally ill made specific restrictions on firearm possession "not necessary" at the time. *Beers v. Att'y Gen. U.S.*, 927 F.3d 150, 157-58 (3d Cir. 2019), *vacated as moot by*, 140 S. Ct. 2758 (2020). "By the late 1800s, state legislatures allowed the prosecution of people who gave guns to the mentally ill." *Veasley*, 98 F.4th at 915.

Congress codified section 922(g)(4) and prohibited those committed to a mental institution from possessing firearms when it passed the Gun Control Act of 1968. *See Abramski*, 573 U.S. at 172. Section 922(g)(4) of that act included the same language that it does today. *See* Gun Control Act of 1968 § 922(g)(4), Pub. L. No. 90-618, 82 Stat. 1213 (1968). "Congress'[s] intent in enacting [section] 922(g) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983), *superseded by statute on other grounds as stated in Logan v. United States*, 552 U.S. 23, 27 (2007). "Section 922(g)(4) is designed to protect both society and the mentally ill individual and is consistent with the [n]ation's historical tradition when applied to a person who has previously been committed to a mental institution." *United States v. Franzky*, 2024 WL 4494988, at *4 (D.S.D. Oct. 15, 2024).

Although the Supreme Court has not explicitly addressed the constitutionality of section 922(g)(4), it has held repeatedly that firearm restrictions on the mentally ill are "presumptively lawful." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26

23

(2008); *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' . . . . We repeat those assurances here."). And in affirming the dismissal of claims challenging section 922(g)(4), the Second Circuit has found that "the restriction on gun purchases by individuals committed to a mental institution is presumptively lawful."[13] *Heller v. Bedford Central Sch. Dist.*, 665 F. App'x 49, 54 (2d Cir. 2016) (summary order).

Courts also have upheld firearm restrictions on those deemed to be dangerous. For example, the Supreme Court upheld the constitutionality of section 922(g)(8) which disarms anyone subject to a domestic violence restraining order: "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. at 702. Along the same lines, the Second Circuit recently dismissed a challenge to section 922(g)(1), which disarms those convicted of a felony even as applied to non-violent felony convictions. *Zherka*, 140 F.4th at 84 ("Indeed, the Supreme Court and this Court have affirmed that dangerous people can be disarmed").[14] And at least one state court in New York has noted the "strong historical tradition" supporting firearm regulations for "those who present a risk of harm to themselves." *See Gonyo v. D.S.*, 82 Misc.3d 1018,

---

[13] The Fourth Circuit also has found that "[d]isarmament under [section] 922(g)(4) is facially constitutional," but it "express[ed] no opinion on as-applied challenges to the statute. *Gould*, 163 F.4th at 807.

[14] Susman has accused the federal defendants of "liken[ing him] to a convicted felon" when they cite cases referring to section 922(g)(1). Docket Item 77 at 15. To be clear, this Court does not liken Susman to a felon—or to anyone in any other category under section 922(g)—when it cites those sections. Rather, the Court simply notes the analogy among related subsections of the statute that Susman has challenged.

24

1053 & n.11, 210 N.Y.S.3d 612, 637 & n.11 (Sup. Ct. Dutchess Cnty. 2024) (discussing the history of laws related to suicide, adding that "the confiscation of firearms from the suicidal seems to be more than supported by historical traditions that rendered much more severe 'remedies' to the possibility of self-harm").

This Court agrees with that long and strong line of cases. Those with a mental illness may constitutionally be deprived of the right to possess firearms.

Because mental illness has historically been viewed as a non-permanent condition, firearm restrictions based on mental health issues are more likely to survive scrutiny when the ban is not permanent. *See Tyler*, 837 F.3d at 699 (McKeague, J., concurring) ("Mental illness is not static, so it cannot be constitutional to *permanently* prevent [a plaintiff] from exercising his Second Amendment right without affording him some sort of process to demonstrate that the *non-permanent* label of 'mentally ill' no longer applies to him."). Along the same lines, when the Third Circuit found that the section 922(g)(3) ban on firearms for those addicted to a controlled substance was constitutional, it noted that "[section] 922(g)(3)'s burden is temporary." *See United States v. Harris*, 144 F.4th 154, 163 (3d Cir. 2025) ("Section 922(g)(3)'s 'limited duration' thus tracks the historical restrictions on lunatics or drunks which were also temporary and ceased once someone regained his senses or sobered up."). And the Supreme Court has held the same in a similar case. *See Rahimi,* 602 U.S. at 698-99 (holding that temporary disarmament of those who pose a threat is consistent with the Second Amendment).

Here, as already has been noted, Susman's disqualification is not permanent. In fact, he has a way to obtain relief that he has not yet even tried to pursue. And for that reason as well, the statute at issue passes constitutional muster.

All that is not to say that Susman is unstable or dangerous or mentally ill. Indeed, the record suggests that he is not. But he admittedly was committed to ECMC under section 9.39, and a section 9.39 commitment requires a doctor to find that the individual poses a "substantial risk of physical harm" to himself or others. N.Y. Mental Hyg. Law § 9.39. So regardless of whether Susman went to the hospital voluntarily, regardless of whether he really needed to be hospitalized, and regardless of whether he would have sought treatment had he known the firearm-related consequences of doing so, the fact is that he was committed under a law that prohibits him from possessing a firearm without first obtaining relief from that disqualification. And because there is a process that rescinds any section 922(g)(4) prohibition once an individual no longer poses a threat, N.Y. Mental Hyg. Law § 7.09(j)(2), that disqualification is constitutional.

In sum, there is indeed a historical analogue for the non-permanent disarmament of those whose mental health renders them dangerous. Because the facts pleaded by Susman do not plausibly establish that section 922(g)(4) as applied to those committed under section 9.39 violates the Second Amendment—that is, "[b]ecause [Susman's] core argument is incorrect as a matter of law"—his claims against the federal defendants must be dismissed. *See Giannavola*, 2025 WL 1932020, at *7-8 (granting defendant's motion to dismiss where plaintiff's core argument relies on the incorrect premise that section 9.39 hospitalizations are not involuntary commitments). So even if this Court had jurisdiction over ripe claims, they would be dismissed.

26

**CONCLUSION**

This Court has a great deal of respect for those who face mental challenges and seek help.  The Court applauds Susman for doing just that years ago.  And the Court has sympathy for the red tape that he faces as a result of his having done the right thing.

But red tape is all he faces, at least at this point.  Based on the record before this Court there appear to be good—in fact, compelling—reasons why Susman ought to be able to possess and purchase a firearm again.  Docket Item 27 at 32.  And there is an administrative process to restore that right to those in Susman's position, a process that Susman thus far has refused to pursue.

What is more, that process is far better equipped than this Court to make the necessary determination about whether Susman—or anyone else who has been hospitalized under section 9.39—should be able to possess a weapon.  Susman certainly has provided good reasons that appear to the Court to qualify him to possess a firearm.  But this Court is not a medical professional, nor is it schooled in evaluating mental health issues and whether they counsel against weapon possession.  That is better left to the experts—here, to the New York State Office of Mental Health.

Why Susman refuses to ask that office for relief is a mystery to this Court.  As best the Court can tell, it is because Susman—and perhaps his lawyer—have a point they want to make.  But this Court does not have the jurisdiction to help them make that point.  And even if it did, this Court would not do so.

For all the reasons stated above, the motion to dismiss brought by the federal defendants, Pam Bondi and Kash Patel, Docket Item 74, is GRANTED.  The Clerk of

27

the Court shall terminate Bondi and Patel as defendants in this action.  The case is referred back to Judge Foschio for further proceedings consistent with the referral order of February 25, 2025, Docket Item 28.


SO ORDERED.

Dated:   March 31, 2026
         Buffalo, New York




/s/ Lawrence J. Vilardo
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE